UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| **LUCAS WALL,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No. 6:21-cv-975-PGB-DCI |
| v. | : | |
| | : | District Judge Paul Byron |
| **CENTERS FOR DISEASE CONTROL & PREVENTION,** | : | |
| | : | Magistrate Judge Daniel Irick |
| ***et. al,*** | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AGAINST**
**ALL FEDERAL DEFENDANTS ON COUNTS 1-12 & 14-15 OF THE COMPLAINT**

COMES NOW plaintiff, *pro se*, and moves for an order temporarily restraining all Federal Defendants[1]

from enforcing the Federal Transportation Mask Mandate ("FTMM")[2] pending a ruling on the Motion for

Preliminary Injunction I plan to file in the next few days.

My Complaint includes 23 causes of action, however this motion is limited to Counts 1-12 & 14-15

concerning the FTMM and its direct application to me as a disabled and vaccinated traveler. I have ticketed

plans to travel by air again in six days and will be directly and imminently harmed if the FTMM is not

temporarily restrained (because the Federal Defendants will again deny me the ability to travel by air).

Wall Declaration at ¶ 9, attached hereto as Pl. Ex. 1. I also still need to complete my blocked June 2 flight

---

[1] The Federal Defendants named in this case are: Centers for Disease Control & Prevention, Department of Health & Human Services, Transportation Security Administration, Department of Homeland Security, Department of Transportation, and President Joseph Biden.

[2] The Federal Transportation Mask Mandate consists of: 1) Executive Order 13998, 86 Fed. Reg. 7205 (Jan. 26, 2021); 2) Department of Homeland Security Determination 21-130 (Jan. 27, 2021); 3) Centers for Disease Control & Prevention Order "Requirement for Persons To Wear Masks While on Conveyances & at Transportation Hubs," 86 Fed. Reg. 8,025 (Feb. 3, 2021); 4) Transportation Security Administration Security Directives 1542-21-01A, 1544-21-02A, and 1582/84-21-01A (May 12, 2021); and 5) TSA Emergency Amendment 1546-21-01A (May 12, 2021).

from Orlando to Fort Lauderdale immediately, otherwise I won't be able to use the ticket I paid for to fly from Fort Lauderdale to Salt Lake City on the 16th. Wall Decl. at ¶ 10. The remaining counts will be addressed in later briefs and are not subject to this request for a TRO.

## I. LEGAL STANDARD

"The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts to give notice and the reasons why it should not be required." Fed.R.Civ.P. 65(b).

Local Rule 6.01 lays out the local rules for obtaining a TRO in this district including five parts the moving party must include, four standards the legal memorandum must meet, and service upon the defendants. Each of these requirements will be addressed in the Argument section below.

To obtain a temporary restraining order, the movant must demonstrate: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the nonmovant; and (4) that entry of the relief would serve the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005).

A plaintiff seeking a TRO must show that the extraordinary remedy of an *ex parte* restraining order is warranted. Plaintiff must show that the injury is so imminent that notice and a hearing is impractical. *Taafee v. Robinhood Markets*, No. 8:20-cv-513-T-36SPF (W.D. Fla. March 31, 2020).

## II. STATEMENT OF THE FACTS

The facts of this case are laid out in excruciating detail in ¶¶ 1-960 of the Complaint. Dkt. 1. I draw the Court's attention to the most relevant facts related to this request for a temporary restraining order:

1. I've been taking care of my elderly mother in The Villages, Florida – located in this judicial district – during the last several months of the COVID-19 pandemic. *Id.* at ¶ 1.

2. Now that my mom and I are both fully vaccinated, I booked May 31, 2021, eight airline tickets for summer travel to see friends and family as well as visit several National Park Service units. *Id.* at ¶ 2.

3. The first flight I booked was Southwest Airlines Flight 2204 from Orlando (MCO) to Fort Lauderdale (FLL) June 2, 2021. *Id.* at ¶ 3.

4. I have been fully vaccinated since May 10, 2021. *Id.* at ¶ 19.

5. Due to my Generalized Anxiety Disorder, I have never covered my face. I tried a mask a couple times for brief periods last year, but had to remove it after five or so minutes because it caused me to instigate a feeling of a panic attack, including hyperventilating and other breathing trouble. *Id.* at ¶ 20.

6. Defendant TSA, in conjunction with Southwest Airlines, refused to let me board Flight 2204 from MCO to Fort Lauderdale (FLL) the morning of June 2. *Id.* at ¶ 36 and Wall Decl. at ¶ 7.

7. I am stranded at my mother's house in The Villages because I was deprived of the ability to take the flight I paid for.

8. The next flight I have booked is June 16, 2021: JetBlue Airways Flight 2319 from Fort Lauderdale (FLL) to Salt Lake City (SLC). Dkt. 1 at ¶ 4 and Wall Decl. at ¶ 7.

9. I have numerous other flights booked domestically and internationally from June 18 to July 15. Dkt. 1 at ¶¶ 5-10 and Wall Decl. at ¶ 11.

### III. I MEET THE CRITERIA REQUIRED TO OBTAIN A TEMPORARY RESTRAINING ORDER

Fed.R.Civ.P. 65 spells out the procedure for obtaining a TRO. Those requirements are supplemented by Local Rule 6.01. I will address each requirement beginning first with the federal rules:

A. Fed.R.Civ.P. 65(b)(1): Formal notice to the Federal Defendants is not possible at this time because service of process has not been effectuated given that the Complaint was just filed June 7, docketed June 8, and summons issued June 9. No attorney for the Federal Defendants has yet to enter an appearance in this matter. I have communicated informally by e-mail with Eric Beckenhauer, supervisor in the U.S. Department of Justice's Civil Division, Federal Programs Branch, as five of his USDOJ colleagues who have recently handled similar CDC and TSA litigation. Mr. Beckenhauer informed me by e-mail May 25 – after I advised him I was planning soon to file this suit – that "A decision about who will be handling a case ordinarily isn't made until after the complaint has been filed, so I'm afraid I don't have any names or contact information to pass along at the moment."

B. This week I have e-mailed Mr. Beckenhauer and the five others at USDOJ the Complaint and all other papers filed in this case so far. I also advised them I planned to seek a temporary restraining order, but I have not received any response from any of the six government lawyers.

C. Fed.R.Civ.P. 65(b)(1)(A): My Complaint and the attached Declaration clearly show that immediate and irreparable injury, loss, or damage will result to me before the adverse party can be heard in opposition because I have already been denied the ability to fly once (on June 2) and am at risk of being banned from using the other airline tickets I have purchased for later this month directly because of the Federal Defendants' enforcement of the FTMM.

D. Fed.R.Civ.P. 65(b)(1)(B): I certify. as explained above. the efforts I have made to give notice to the Federal Defendants. A ruling on this motion should not wait for the government attorney(s) to

enter an appearance because they seem unwilling to do so until service of process is made. Because I did not receive the summonses until June 9, I could not send them to the Federal Defendants by Certified Mail until that date.

E.   Fed.R.Civ.P. 65(c): No security is needed in conjunction with this motion because the Federal Defendants would not suffer any monetary damages if the TRO is granted. The TRO would simply temporarily set aside the Federal Defendants' enforcement of the FTMM until this Court can hold a hearing on the motion for preliminary injunction I plan to will in the next few days.

F.   Local Rule 6.01(a)(1): I have included "Temporary Restraining Order" in the title.

G.   Local Rule 6.01(a)(2): The conduct to be restrained is set forth in the attached Proposed Order, namely the Federal Defendants' enforcement nationwide of the FTMM; or, in the alternative, their enforcement of the FTMM in this judicial district; or in the alternative, their enforcement of the FTMM specifically against me. The persons subject to restraint are all employees of the Federal Defendants, especially officers of TSA who enforce the FTMM at airport checkpoints, as well as collaterally (by operation of the FTMM being temporarily restrained) all airlines and other transportation providers that are required to enforce TSA security directives.

H.   Local Rule 6.01(a)(3): As stated above, no security is required. "The Court recognizes that it maintains broad discretion to determine the amount of security and may, if appropriate, waive the security. *Johnston v. Tampa Sports Auth.*, 8:05-cv-2191-T-27MAP, 2006 WL 2970431, at *1 (M.D. Fla. Oct. 16, 2006) (Whittemore, J.) (collecting cases)." *Taafee.*

I.   Local Rule 6.01(a)(4): My legal memorandum is contained in the Argument section below.

J.   Local Rule 6.01(a)(5): A proposed order is attached.

K.   Local Rule 6.01(b): I address the four requirements of the legal memorandum in the Argument section below.

L.   Local Rule 6.01(c): I vow to comply with the rule requiring service of all enumerated documents immediately after the order resolving this motion.

## IV. ARGUMENT

**A. There is a strong likelihood I will ultimately prevail on the merits of my claims.**

I have a substantial likelihood of success on the merits. At least four federal district courts have already vacated Defendant CDC's Eviction Moratorium as illegal and/or unconstitutional – and the U.S. Court of Appeals for the Sixth Circuit denied the government's motion for a stay pending appealing, ruling in no uncertain terms that it could not prevail on the merits.[3]

Because the FTMM I challenge in the instant matter was issued under the same section of federal law as the Eviction Moratorium, the case law supports the arguments I make that the FTMM was issued beyond the statutory and constitutional authority of the Federal Defendants. Also, the Supreme Court has repeatedly frowned upon restrictions of constitutional rights during the COVID-19 pandemic.

As detailed in Section V of the Complaint, the FTMM: (1) was issued without observing the notice-and-comment procedure required by the Administrative Procedure Act ("APA"); (2) is not in compliance with the Regulatory Flexibility Act; (3) constitutes arbitrary and capricious agency action; (4) exceeds Defendant CDC's statutory authority under the Public Health Service Act; (5) is an improper delegation of legislative power; (6) violates of the 10th Amendment because it applies to intrastate transportation in direct conflict with the mask policies of 46 states; (7) violates the Fifth Amendment's right to due process by assigning FTMM enforcement and exemption powers to private companies as well as state, regional, and local agencies with no ability to appeal denial of boarding to a federal decisionmaker; (8) violates the

---

[3] *Tiger Lily v. HUD*, No. 2:20-cv-2692, 2021 WL 1171887 (W.D. Tenn. Mar. 15, 2021); *Tiger Lily v. HUD*, 992 F.3d 518, 520 (6th Cir. 2021) (denying emergency motion for stay pending appeal); *Alabama Association of Realtors v. HHS*, No. 20-cv-3377, D.D.C. May 5, 2021); *Skyworks v. CDC*, No. 5:20-cv-2407 (N.D. Ohio March 10, 2021); and *Terkel v. CDC*, No. 6:20-cv-564, 2021 WL 742877 (E.D. Tex. Feb. 25, 2021).

constitutional right to freedom of travel; (9) exceeds Defendant TSA's statutory authority to ensure transportation security; (10) does not comply with Defendant DOT's regulations concerning how to treat passengers with a known communicable disease; and (11) violates the Air Carrier Access Act by discriminating against all passengers with disabilities who can't wear face masks by barring them from flying or having to submit to numerous onerous requirements of transportation providers to obtain an exemption that violates the ACAA and its accompanying regulations.

**1. The FTMM exceeds Defendants HHS & CDC's statutory authority under the Public Health Service Act**.

Ignoring for now the multitude of procedural defects Defendant CDC (under its parent agency, HHS) committed in issuing the FTMM without notice and comment or a regulatory flexibility analysis, and how the FTMM was issued in an arbitrary and capricious manner, let's focus on Count 4: "Violation of the Administrative Procedure Act against Defendants CDC & HHS: The FTMM exceeds CDC's statutory authority under the Public Health Service Act." Dkt. 1 at 186. Because § 361 of the Public Health Service Act contains no authority to adopt a nationwide mask mandate for the transportation (or any other) sector, the Court must set the FTMM aside.

As part of its response to the COVID-19 pandemic, Defendants CDC and HHS issued a nationwide Eviction Moratorium based on § 361. 42 U.S.C. § 264. Likewise, as authority for the FTMM, Defendants CDC and HHS invoked § 361 and CDC regulations implementing that statute (42 CFR §§ 70.2, 71.31(b), and 71.32(b)), but CDC provided no analysis of this authority in the FTMM Order. Dkt. 1 at Pl. Ex. 11.

Like the federal courts who have considered challenges to the Eviction Moratorium, this Court must set aside the mask mandate because § 361 does not authorize it. The suits that successfully sought to vacate the Eviction Moratorium are extremely similar to the instant action.

Most recently, the Sixth Circuit denied a motion to stay a District Court judgment that held the Eviction Moratorium Order exceeded the CDC's authority under 42 U.S.C. § 264. *Tiger Lily v. HUD*, No. 2:20-cv-

2692, 2021 WL 1171887 (W.D. Tenn. Mar. 15, 2021), appeal filed No. 21-5256 (6th Cir. 2021); *Tiger Lily v. HUD*, 992 F.3d 518, 520 (6th Cir. 2021) (denying emergency motion for stay pending appeal).

"Whether the government is likely to succeed on the merits boils down to a simple question: Did Congress grant the CDC the power it claims? … CDC points to 42 U.S.C. § 264 as the sole statutory basis for the [Eviction Moratorium] order's extension. But the terms of that statute cannot support the broad power that the CDC seeks to exert," the Sixth Circuit wrote. *Id.*

**2. The Federal Defendants are not entitled to *Chevron* deference.**

When reviewing an agency's construction of a statute it administers, courts generally apply the two-step *Chevron* framework that requires them to: (1) determine whether the statute is unambiguous; and (2) if so, to defer to the agency's construction if it is permissible. *Chevron v. NRDC*, 467 U.S. 837, 842–43 (1984); *Arangure v. Whitaker*, 911 F.3d 333, 338 (6th Cir. 2018). Where the statute is unambiguous, then "that is the end of the matter;" a court applies it as written. *Id.* (quoting *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013)).

In the motion-for-stay briefing before the Sixth Circuit in *Tiger Lily*, "neither party has argued that *Chevron* applies. Whether or not it applies, we find that the statute is unambiguous; therefore, we need not proceed beyond step one in any event." *Tiger Lily*.

Section 361 of the Public Health Service Act empowers the Secretary of Defendant HHS to "make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases," either internationally or between states. 42 U.S.C. § 264(a). "For purposes of carrying out and enforcing such regulations," the Secretary is authorized to "provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary." *Id.* The Secretary is also authorized to, within certain limits, make and enforce regulations to apprehend, examine, and, if necessary, detain individuals

"believed to be infected with a communicable disease" or who are "coming into a State or possession" from a foreign country. 42 USC § 264(b)–(d).

However, courts have held that no portion of § 361 authorized Defendants HHS and CDC to prohibit landlords from evicting tenants during a pandemic, interfering with state eviction laws. Likewise, no portion of § 361 authorizes those same defendants to make every American using any form of public transportation (airplanes, buses, trains, ferries, cruise ships, school buses, and so on) wear a face mask.

The government has argued in the Eviction Moratorium cases that § 361's language authorizing the Secretary to order "other measures, as in his judgment may be necessary," authorizes Defendants HHS and CDC to issue any public-health order deemed "necessary." Courts have not concurred with this incredibly broad and erroneous agency interpretation.

"This kind of catchall provision at the end of a list of specific items warrants application of the *ejusdem generis* canon, which says that 'where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.' *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) (citation omitted). The residual phrase in § 264(a) is 'controlled and defined by reference to the enumerated categories . . . before it,' *Id.* at 115, such that the 'other measures' envisioned in the statute are measures like 'inspection, fumigation, disinfection, sanitation, pest extermination' and so on, 42 U.S.C. § 264(a). Plainly, government intrusion on property to sanitize and dispose of infected matter is different in nature from a moratorium on evictions. *See Terkel v. CDC*, No. 6:20-cv-564, 2021 WL 742877, at *6 (E.D. Tex. Feb. 25, 2021) …" *Tiger Lily* (6th Cir. 2021).

**3. The FTMM must be vacated because it falls outside the scope of the Public Health Service Act.**

Just like the Eviction Moratorium, the FTMM falls outside the scope of the statute and must be set aside. "[W]e cannot read the Public Health Service Act to grant the CDC the power to insert itself into the

landlord-tenant relationship without some clear, unequivocal textual evidence of Congress's intent to do so. Regulation of the landlord-tenant relationship is historically the province of the states." *Id.*

Likewise, regulation of public health is historically the province of the states. And unlike with the Eviction Moratorium, where Congress did authorize such a measure for a short period of time, Congress has **never** enacted a federal mask mandate. Congress has approved at least 20 laws directly concerning the coronavirus pandemic, yet none of these have authorized a mask mandate. *See* discussion in the Complaint at ¶¶ 339-353.

"It is an 'ordinary rule of statutory construction that if Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute.' *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) (quotation marks and citation omitted); *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172–73 (2001)." *Tiger Lily* (6th Cir. 2021).

There is no "unmistakably clear" language in the Public Health Service Act indicating Congress's intent to invade the traditionally State-operated arena of public health by forcing all people to wear a mask while traveling, especially those like myself who were attempting to travel wholly within a state (my denied June 2 flight from Orlando to Fort Lauderdale, Florida) or simply taking a public bus ride for one mile.

"As the district court noted, the broad construction of § 264 the government proposes raises not only concerns about federalism, but also concerns about the delegation of legislative power to the executive branch. The government would have us construe the phrase 'and other measures, as in his judgment may be necessary,' 42 U.S.C. § 264, as a 'broad grant of authority' to impose any number of regulatory actions, provided the Secretary believes those actions will help prevent the spread of disease, regardless of whether they are in any way tethered to the 'specific intrusions on private property described in the second sentence' of § 264. 'In the absence of a clear mandate in the Act, it is unreasonable to assume that Congress intended to give the Secretary the unprecedented power' of that kind. *Indus. Union Dep't, AFL-*

*CIO v. API*, 448 U.S. 607, 645 (1980) (plurality opinion). We will not make such an unreasonable assumption." *Id.*

Congressional intent has been clear throughout the COVID-19 pandemic: it has left decisionmaking about masks, lockdowns, business closures and restrictions, school shutdown, limits on the size of public gatherings, and other mitigation measures up to the states. "Given that the government is unlikely to succeed on the merits, we need not consider the remaining stay factors." *Id.*

By regulation, the Secretary of HHS delegated his Public Health Service authority to the Director of Defendant CDC. 42 C.F.R. § 70.2. Pursuant to this regulation, when the Director determines that the measures taken by health authorities of any state or local jurisdiction are insufficient to prevent the spread of communicable disease, "he/she may take such measures to prevent such spread of the diseases as he/she deems reasonably necessary, including inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection." *Id.* Nowhere in the regulation, like the statute, does it authorize requiring Americans to put something on their body. And noteworthy in this case, Defendant CDC has not made the required determination that measures taken by specific states are deemed insufficient to prevent the spread of communicable disease.

Applying *Chevron* and using the traditional tools of statutory interpretation, a court must first consider at Step One "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. "If Congress has directly spoken to [an] issue, that is the end of the matter." *Confederated Tribes of Grand Ronde Cmty. of Or. v. Jewell*, 830 F.3d 552, 558 (D.C. Cir. 2016) (citing *Chevron*, 467 U.S. at 837). "[T]he court, as well [as] the agency, must give effect to the unambiguously expressed intent of Congress." *Lubow v. U.S. Dep't of State*, 783 F.3d 877, 884 (D.C. Cir. 2015) (quoting *Chevron*, 467 U.S. at 842–43). Only if the text is silent or ambiguous does a court proceed to Step Two.

"The first question, then, is whether the relevant statutory language addresses the 'precise question at issue.' … Though the Public Health Service Act grants the Secretary broad authority to make and enforce

regulations necessary to prevent the spread of disease, his authority is not limitless. These enumerated measures are not exhaustive. The Secretary may provide for 'other measures, as in his judgment may be necessary.' But any such 'other measures' are 'controlled and defined by reference to the enumerated categories before it.' *See Tiger Lily*, 992 F.3d at 522–23 (internal quotation marks and alteration omitted); *Id.* at 522 (applying the *ejusdem generis* canon to interpret the residual catchall phrase in § 264(a)). These 'other measures' must therefore be similar in nature to those listed in § 264(a). *Id.; Skyworks*, 2021 WL 911720, at *10. And consequently, like the enumerated measures, these 'other measures' are limited in two significant respects: first, they must be directed toward 'animals or articles,' 42 U.S.C. § 264(a), and second, those 'animals or articles' must be 'found to be so infected or contaminated as to be sources of dangerous infection to human beings,' *Id.; see Skyworks*, 2021, WL 911720, at *10. In other words, any regulations enacted pursuant to § 264(a) must be directed toward 'specific targets 'found' to be sources of infection.' *Alabama Association of Realtors v. HHS*, No. 20-cv-3377 (D.D.C. May 5, 2021).

**4. The Federal Defendants clearly lack statutory authority to impose a nationwide mask mandate.**

The FTMM satisfies none of these textual limitations. Plainly, imposing a federal mask mandate in the transportation sector is different in nature than "inspect[ing], fumigat[ing], disinfect[ing], sanit[izing], . . . exterminat[ing] [or] destr[oying]," 42 U.S.C. § 264(a), a potential source of infection. *See Tiger Lily*, 992 F.3d at 524. Moreover, interpreting the term "animals" and/or "articles" to include human beings would stretch the term beyond its plain meaning.

"The Department's interpretation goes too far. The first sentence of § 264(a) is the starting point in assessing the scope of the Secretary's delegated authority. But it is not the ending point. While it is true that Congress granted the Secretary broad authority to protect the public health, it also prescribed clear means by which the Secretary could achieve that purpose. *See Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006). And those means place concrete limits on the steps

12

the Department can take to prevent the interstate and international spread of disease. *See supra* at 11.

To interpret the Act otherwise would ignore its text and structure." *Alabama Association of Realtors*.

A court shall construe a statute to avoid serious constitutional problems unless such a construction is contrary to the clear intent of Congress. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

"An overly expansive reading of the statute that extends a nearly unlimited grant of legislative power to the Secretary would raise serious constitutional concerns, as other courts have found. ... Congress did not express a clear intent to grant the Secretary such sweeping authority. ... [C]ourts 'expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.' *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000); *Am. Lung Ass'n v. EPA,* 985 F.3d 914, 959 (D.C. Cir. 2021) (collecting cases)." *Alabama Association of Realtors*.

There is no question that the decision to impose a nationwide mask mandate on all forms of transportation is one "of vast economic and political significance."

**5. The FTMM is at odds with the mask policies of 46 states.**

Mask mandates have been the subject of "earnest and profound debate across the country." *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006). There have been statewide mask mandates put into place at some point during the pandemic by 40 states. However, now that Defendant CDC has updated its guidance to say mask wearing is no longer necessary among those who are fully vaccinated, there remain only four states in the country that require everyone (vaccinated and unvaccinated) cover their faces in public. Dkt. 1 at Pl. Exs. 68 & 82.

Going farther, several states, including Florida, ***prohibit*** any governmental agency from requiring any person be muzzled. Florida is one of 10 states that never had a statewide mask mandate, and Gov. De-Santis made it the clear policy of Florida is that no person should ever be required to cover their face,

acknowledging the health dangers masking creates: "Surgeon General Dr. Scott Rivkees issued a Public Health Advisory … stating that continuing COVID-19 restrictions on individuals, including long-term use of face coverings and withdrawal from social and recreational gatherings, pose a risk of adverse and unintended consequences …" Executive Order 21-102 (May 3, 2021). Dkt. 1 at Pl. Ex. 55.

"Accepting [Defendant HHS'] expansive interpretation of the Act would mean that Congress delegated to the Secretary the authority to resolve not only this important question, but endless others that are also subject to 'earnest and profound debate across the country.' *Gonzales*, 546 U.S. at 267 (internal quotation marks omitted). Under its reading, so long as the Secretary can make a determination that a given measure is 'necessary' to combat the interstate or international spread of disease, there is no limit to the reach of his authority." *Alabama Association of Realtors*.

It is telling that Defendant CDC has never used § 264(a) to require Americans obstruct their breathing. "When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy," the Court must "greet its announcement with a measure of skepticism." *Util. Air Regul. Grp.*, 573 U.S. at 324.

One may view the FTMM and masks in general as good or bad public policy. Americans disagree passionately about this. But this dispute presents a narrow question. This case turns on whether Congress has authorized Defendant CDC to adopt a nationwide mask mandate. Congress has not – despite ample opportunity during the 15-month pandemic to so legislate.

"[B]efore deferring to an administrative agency's statutory interpretation, courts 'must first exhaust the traditional tools of statutory interpretation and reject administrative constructions' that are contrary to the clear meaning of the statute.'" *Black v. Pension Benefit Guar. Corp.*, 983 F.3d 858, 863 (6th Cir. 2020)  (quoting *Arangure v. Whitaker*, 911 F.3d 333, 336 (6th Cir. 2018)).

"Congress directed the actions set forth in Section 361 to certain animals or articles, those so infected as to be a dangerous source of infection to people. On the face of the statute, the agency must direct

other measures to specific targets 'found' to be sources of infection – not to amorphous disease spread but, for example, to actually infected animals, or at least those likely to be ..." *Skyworks v. CDC*, No. 5:20-cv-2407 (N.D. Ohio March 10, 2021). "Because the Court determines that the statute is unambiguous and, by issuing a nationwide eviction moratorium, CDC exceeded the authority Congress gave it in Section 361, the Court holds that action unlawful and sets it aside, as the APA requires." *Id*.

In sum, the Public Health Service Act authorizes Defendants HHS and CDC to combat the spread of disease through a range of measures, but these measures plainly do not encompass a nationwide mask mandate on all forms of public transportation effecting tens of millions of Americans every day – including those fully vaccinated and/or with natural immunity to COVID-19.

**6. The FTMM exceeds Defendants DHS & TSA's statutory authority under the TSA enabling act.**

Defendants TSA and DHS have well exceeded their authority under the act creating the Transportation Security Administration. For the first time, TSA and DHS claim authority of TSA to regulate nonsecurity matters, to wit: directives mandating face masks be worn by passengers throughout the nation's transportation system, most of which apply to solely intrastate trips.

TSA was created by statute, the Aviation & Transportation Security Act of 2002, to address "security in all modes of transportation." 49 U.S.C. § 114(d). TSA's function is limited by that law to address ***security threats***. General health and safety measures are outside the scope of the enabling act. Further, the relevant federal regulations under which the Security Directives and Emergency Amendment were issued clearly state that they are to be used for ***security threats***, not public health. See, e.g., 49 CFR § 1542.303(a): "When TSA determines that additional security measures are necessary to respond to a ***threat assessment or to a specific threat*** against civil aviation, TSA issues a Security Directive setting forth mandatory measures." (emphasis added). And to the extent that these orders were issued under any "emergency" authority, TSA's failure to act during the first 11 months of the COVID-19 pandemic precludes such use and counsels the necessity of ordinary notice-and-comment rulemaking under the APA. These Directives

are thus *ultra vires*. TSA has no congressional authority to expand its domain from transportation security to enforcing public-health orders.

Defendant TSA has invented authority to enforce passengers and employees in the nation's entire transportation system wear face masks everywhere – from the check-in counter, to security checkpoints, bathrooms, food courts, airline lounges, boarding areas, and on conveyances themselves, without any regard to physical distancing, whether the area is indoors or outdoors, and whether a passenger or employee is vaccinated and/or possesses natural immunity to coronavirus.

"I have a substantial interest in the FTMM at issue in this suit. I am a frequent flyer, subject to Defendant TSA's enforcement policies dozens of times a year. I was denied the ability to fly June 2 because of the FTMM. I have seven airline tickets booked for travel in the next five weeks, all of which will require me passing through a TSA checkpoint wearing a mask, which I can't do because of my disability. Wall Decl. at ¶ 8.

TSA's mask enforcement directives go far above and beyond state rules for face coverings. As noted above, the FTMM is in direct contradiction to the mask polices of 46 states and the District of Columbia, and violate Defendant CDC's own May 13 guidance that "vaccinated people don't need masks … **people who are fully vaccinated can stop wearing masks** or maintaining social distance in most indoor and outdoor settings." Dkt. 1 at Pl. Ex. 63 (emphasis added).

Defendant CDC finally admitted May 13: "The science is clear***: If you are fully vaccinated, you are protected, and you can start doing the things that you stopped doing because of the pandemic*** …" *Id.* (emphasis added).

Just today (June 10), Defendant Biden told federal agencies that they no longer have to limit the number of employees allowed in the workplace, lifting yet another COVID-19 restriction. Pl. Ex. 2. Recently it lifted the Executive Order that required fully vaccinated people to wear masks in/on all federal buildings

and lands. "The long-awaited guidance, the first major announcement on pandemic staffing the admin-

istration has issued since January, reversed a previous 25% cap on capacity inside federal offices." *Id.*

TSA's directives are so far-reaching they explicitly require those who are eating and drinking at any

transportation facility in the nation to wear masks "between bites and sips" – a policy found nowhere else

in the country, even during the peak of the pandemic.

A review of 49 USC Chapter 449 makes clear Congress' mandate to Defendant TSA was with regard to

passenger and cargo screening, managing intelligence relating to threats to civil aviation, technology to

detect weapons and explosives, federal air marshals, and similar matters. Nowhere in the law did Con-

gress imagine a transportation ***security*** agency focused on ensuring planes aren't blown up get involved

in ***public-health*** enforcement. Nowhere in any statute has TSA ever been assigned responsibility for avia-

tion safety matters or for any public health-related enforcement whatsoever.

Before the FTMM directives took effect Feb. 1 of this year, Defendant TSA had never attempted to

extend its jurisdiction from security matters into general safety or health concerns. Thus, TSA greatly dis-

turbs the status quo with its new foray into nonsecurity matters.

If Defendant TSA is permitted to regulate what a person wears on his/her face, there would be no end

to its powers. There is no distinction between the authority it claims to stop a virus (even among travelers

such as myself who are fully vaccinated and pose zero risk of transmitting coronavirus to others) and the

authority that would be required to set crew sleep requirements, maintenance standards for the escala-

tors between arrivals and departures levels of an airport, or the speed limit on the roads entering a parking

garage at any transportation hub.

In conclusion, not only does Defendant TSA lack authority to enforce the FTMM, the mask mandate

actually negatively impacts transportation security because it has created chaos in the sky and on the

ground. *See* discussion of the numerous incidents of unruly passenger and crew behavior as a direct result

of the mask mandate at ¶¶ 424-479 of the Complaint.

**7. The FTMM is unconstitutional.**

"No person shall … be deprived of life, liberty, or property, without due process of law." U.S. Const., Amend. 5. Travelers, including me, have a liberty interest in not being forced to wear something that we don't want to wear to block our breathing – a function essential for human life – (or alternatively being barred from all modes of public transportation). Abridged liberty cannot be merely compensated with cash, especially in this case where it is highly unlikely that there is any avenue in which monetary damages could be pursued by myself or any of the other millions of individuals subject to TSA's *ultra vires* enforcement directives. This is unchanged even if the rule implicates only a modest or slight liberty interest. The question is whether the harm is irreparable, not whether it is severe.

"The court declares that the challenged [CDC Eviction Moratorium] … exceeds the power granted to the federal government to 'regulate Commerce … among the several States' and to 'To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers.' U.S. Const. Art. 1, § 8. That [CDC eviction] order is held and declared unlawful as 'contrary to constitutional . . . power.' 5 U.S.C. § 706(2)(B)." *Terkel v. CDC*, No. 6:20-cv-564 (E.D. Tex. Feb. 25, 2021).

With the FTMM contradicting the mask policies of 46 states and the nation's capital, it also can't survive scrutiny under the 10th Amendment, especially when it concerns travel wholly within a state (such as my denied flight June 2 from Orlando to Fort Lauderdale).

**a. The FTMM blocks the freedom to travel for no justifiable public-policy benefit.**

The FTMM also violates the long-standing constitutional freedom to travel without undue governmental interference. When the government deprives a person the freedom to travel without due process of law, it violates the Bill of Rights.

"The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment. … Freedom of movement is basic in our scheme of values. *See Crandall v. Nevada*, 6 Wall. 35, 44; *Williams v. Fears*, 179 U. S. 270, 274; *Edwards v. California*, 314 U.S.

160. … Since we start with an exercise by an American citizen of an activity included in constitutional protection, we will not readily infer that Congress gave the Secretary … unbridled discretion to grant or withhold it." *Kent v. Dulles*, 357 U.S. 116 (1958).

As a fundamental right inherent in citizenship and the nature of the federal union, the right to travel in the United States is basic to American liberty. The right precedes the creation of the United States and appears in the Articles of Confederation. Abridgement of any mode of transportation undermines the constitutionally enshrined travel right.

The 1831 Supreme Court ruling in *Beckman v. Saratoga & Schenectady Railroad* established that whenever there is a compelling public interest in a technology available to the public, for instance, a new mode of transport such as railways, then all citizens are equally entitled to enjoy its benefits and to access it. The right of free movement is not tied to any specific mode of transportation. Consequently, it encompasses all means of travel. If I want or need to travel by air – for example on a lengthy trip such as Fort Lauderdale, Florida, to Salt Lake City, Utah, coming up June 16, that is my right. I only plan to stay in Utah for two nights, making it impossible to travel there by means other than airplane. Also, I don't own an automobile that I could use for my transportation. I must use public transportation.

Freedom of travel includes the right to movement on common carriers. "A carrier becomes a common carrier when it 'holds itself out' to the public, or to a segment of the public, as willing to furnish transportation within the limits of its facilities to any person who wants it.'" That means that any individual or corporation becomes a common carrier by promoting to the public the ability and willingness to provide transportation service, including air travel. Air transport providers operating in, to, or from the United States act under common carrier rules. FAA Advisory Circular No. 120-12A (Apr. 24, 1986), https://ti-nyurl.com/FAAAC120-12A (visited June 9, 2021).

Even if other modes of travel exist, it is not acceptable to force travelers to forego using air travel because "it would work a considerable hardship on many air travelers to be forced to utilize an alternate

form of transportation, assuming one exists at all." *United States v. Alvarado*, 495 F.2d 799, 806 (2nd Cir. 1974). The Court should find the FTMM too broadly and indiscriminately restricts the right to travel – especially for the fully vaccinated and people with disabilities who can't wear a mask – and thereby abridges the liberty guaranteed by the Fifth Amendment.

"It is a familiar and basic principle, recently reaffirmed in *NAACP v. Alabama*, 377 U.S. 288, 307; 84 S.Ct. 1302, 1314; that 'a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *Aptheker v. Secretary of State*, 378 U.S. 500 (1964).

"Even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose." *Id.* The Supreme Court more recently affirmed the fundamental constitutional right to travel in 1999 in *Saenz v. Roe*.

The FTMM impermissibly establishes an irrebuttable presumption that every single person traveling anywhere in the United States is infected with COVID-19 and therefore must wear a mask to supposedly prevent transmission of the virus. (Scientific research actually shows that masks do nothing to reduce coronavirus spread and are actually harmful to humans. *See* the extensive discussion at ¶¶ 513-855 of the Complaint.) The Federal Defendants claim that every single traveler – even those who are fully vaccinated and/or have natural immunity – are deemed to be a direct threat to transportation security. This conclusion is beyond absurd and is scientifically impossible.

Public health can be adequately protected by means which, when compared with the FTMM, are more discriminately tailored to the constitutional liberties of individuals. For instance, the Federal Defendants could utilize the "Do Not Board" and "Lookout" systems to stop those who test positive for COVID-19 from

flying for two weeks while they are ill. Dkt. 1 at Pl. Ex. 66. This would specifically target those travelers who are a genuine threat to public health without infringing on the freedom to travel for everyone else.

The broad and enveloping requirement for every American traveler to cover their face indiscriminately excludes plainly relevant considerations such as the individual's vaccination and immunity status. The FTMM "therefore is patently not a regulation 'narrowly drawn to prevent the supposed evil,' cf. *Cantwell v. Connecticut*, 310 U.S. 307." *Aptheker*.

"This freedom of movement is the very essence of our free society, setting us apart. Like the right of assembly and the right of association, it often makes all other rights meaningful – knowing, studying, arguing, exploring, conversing, observing, and even thinking. Once the right to travel is curtailed, all other rights suffer, just as when curfew or home detention is placed on a person." *Id.* (Douglas, J., concurring).

**b. The Constitution can't be suspended just because we are near the end of a global pandemic.**

The Supreme Court has scowled upon COVID-19 restrictions that violate constitutional rights. The Court granted in February a church's application for injunctive relief against California's restrictive church attendance limits. "I adhere to the view that the 'Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States.' … But the Constitution also entrusts the protection of the people's rights to the Judiciary …" *South Bay United Pentecostal Church v. Newson*, 592 U. S. ___; No. 20A136 (20–746) (Feb. 5, 2021) (Roberts, C.J., concurring).

"[C]ourts nearly always face an individual's claim of a constitutional right pitted against the government's claim of special expertise in a matter of high importance involving public health or safety. It has never been enough for the State to insist on deference or demand that individual rights give way to collective interests. Of course we are not scientists, but neither may we abandon the field when government officials with experts in tow seek to infringe a constitutionally protected liberty." *Id.* (Gorsuch, Thomas, and Alito, JJ., concurring).

"Even in times of crisis – perhaps especially in times of crisis – we have a duty to hold governments to the Constitution." *Id.*

In another case arising from California's pandemic restrictions on religious worship, the Supreme Court also granted an application for emergency injunctive relief. In the instant matter, we have Defendant CDC, with the support of Defendant Biden, telling fully vaccinated Americans they may go about their lives without wearing a mask – except in the transportation sector. The Supreme Court doesn't care for those sorts of distinctions, especially when constitutional rights such as due process and the freedom to travel are denied when other nonconstitutionally protected activities such as going to the Indianapolis 500 with more than 100,000 other people or attending a rock concert with more than 20,000 others are permitted without mask wearing.

"[T]he government has the burden to establish that the challenged law satisfies strict scrutiny. … [N]arrow tailoring requires the government to show that measures less restrictive of the [constitutionally protected] activity could not address its interest in reducing the spread of COVID. Where the government permits other activities to proceed with precautions, it must show that the [constitutionally protected] exercise at issue is more dangerous than those activities even when the same precautions are applied. Otherwise, precautions that suffice for other activities suffice for [constitutionally protected] exercise too." *Tandon v. Newson*, 593 U.S. ___; No. 20A151 (April 9, 2021).

In this matter, the Federal Defendants have measures available to them that are far less restrictive than mandating masks be worn in the entire national transportation system, especially a system that's long been established to stop passengers with a communicable disease from traveling such as the "Do Not Board" and "Lookout" lists. *See* discussion in ¶¶ 354-365 of the Complaint. Dkt. 1.

An American is "irreparably harmed by the loss of [constitutionally protected] rights 'for even minimal periods of time'; the State has not shown that 'public health would be imperiled' by employing less restrictive measures." *Tandon.*

**B. My inability to take flights represents irreparable injury because I am being denied the use of services I have paid for, and my constitutional rights to travel and due process are being infringed upon.**

I will without a doubt suffer irreparable injury if the requested relief is not granted, and the Federal Defendants by their actions June 2 denying me the ability to board an airplane have already caused me irreparable injury.

A "violation of a constitutional right constitutes irreparable injury ..." *Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) (citing *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)).

Absent judicial relief, I'll be irreparably injured by the Federal Defendants because I won't be able to go to Utah next week, which is 2,081 miles away from Fort Lauderdale. The only realistic way I can go is by air, but the Federal Defendants will prevent me from making the trip absent relief – just like they already denied me the ability to fly from Orlando to Fort Lauderdale on June 2.

"But even in a pandemic, the Constitution cannot be put away and forgotten," the Supreme Court famously wrote in *Roman Catholic Diocese of Brooklyn v. Cuomo,* No. 20A87 (Nov. 25, 2020).

**C. Absent a restraining order, I will be unable to take the June 16 and other flights I currently have booked because of the Federal Defendants' illegal enforcement of the Federal Transportation Mask Mandate. But the Federal Defendants won't suffer any harm.**

The threatened injury to me outweighs the harm the relief would inflict on the Federal Defendants. Whereas I have been denied the ability to use airline tickets I have paid for and been deprived of my constitutional rights to due process and freedom to travel, the government would suffer no harm if the Court grants me a TRO. The relief requested would actually match the federal mask policy in every realm of society except transportation.

Defendants CDC and TSA cannot have an interest in taking actions that are outside of their statutory authority and/or constitutionally. They therefore cannot claim to have any cognizable "injury" as a result of the issuance of a TRO.

**D. The federal government's greatest interest in combatting the COVID-19 pandemic is getting Americans vaccinated so they can return to a normal life. As a fully vaccinated traveler, I pose no threat to the public and am merely seeking to do what Defendant CDC itself has said I can do.**

Entry of the requested TRO would serve the public interest in promoting vaccinations and not discriminating against travelers with disabilities. Furthermore, Defendant CDC's determination that transportation poses a greater risk than numerous other activities is arbitrary and capricious. The Federal Defendants have not presented any evidence, for example, that flying on a commercial plane is more dangerous than, for instance, being an indoor banquet hall with 300 people at wedding reception or other event.

In fact, studies have shown airplanes are among the safest places you can be during the pandemic. *See* discussion at ¶¶ 942-960 of the Complaint. Dkt. 1. Most importantly, there have not been any reported major outbreaks of COVID-19 at airports or on board aircraft. The Supreme Court drew this similar distinction when granting injunctive relief to catholic churches in New York who faced draconian limits on how many people could attend mass.

"Not only is there no evidence that the applicants have contributed to the spread of COVID–19 but there are many other less restrictive rules that could be adopted to minimize the risk to public interests. Finally, it has not been shown that granting the applications will harm the public. As noted, the State has not claimed that attendance at the applicants' services has resulted in the spread of the disease. And the State has not shown that public health would be imperiled if less restrictive measures were imposed." *Roman Catholic Diocese.*

Should the Court not restrain the Federal Defendants from enforcing their illegal mask directives, people who enter an airport every second will be subject to them, not to mention what is surely a substantial number of people who use wholly intrastate bus, train, subway, ferry, rideshares, school buses, and other forms of public transportation subject to the FTMM. Thus, it is in the public interest to restrain the mask mandate from being enforced nationwide (or at least in this judicial district or, at bare minimum, specific to myself until a preliminary injunction hearing can occur). Right now tens of millions of Americans

are subjected every single day to Defendant TSA's unlawful "security" directives that have nothing to do with ensuring transportation security. This Court has the power to put a stop to it, especially considering that scientific research shows that masks do nothing to reduce coronavirus spread and are actually harmful to humans. *See* discussion at ¶¶ 513-855 of the Complaint. Dkt. 1.

Justice Gorsuch wrote in a concurring opinion in *Roman Catholic Diocese* that government is not free to disregard the Constitution in times of crisis: "Even if the Constitution has taken a holiday during this pandemic, it cannot become a sabbatical."

## V. PRAYER FOR RELIEF

WHEREFORE, I request this Court issue the attached proposed order granting me the requested relief.

Respectfully submitted this 10th day of June 2021.


*Lucas Wall*

Lucas Wall, plaintiff
435 10th St., NE
Washington, DC 20002
Telephone: 202-351-1735
E-Mail: Lucas.Wall@yahoo.com

25

**CERTIFICATE OF SERVICE**

Because this is a new case, no attorneys for the defendants have as of yet entered an appearance. How-ever, I hereby certify that on June 10, 2021, I e-mailed this motion to the defendants' potential counsel as well as executives whom I have been communicating with prior to filing this lawsuit:


Eric Beckenhauer, Leslie Vixen, and Steven Myers
Civil Division, Federal Programs Branch
U.S. Department of Justice
eric.beckenhauer@usdoj.gov, leslie.vigen@usdoj.gov, and steven.a.myers@usdoj.gov

Danny Tennie and Jennifer Utrecht
Civil Division, Appellate Staff
U.S. Department of Justice
jennifer.l.utrecht@usdoj.gov and daniel.tenny@usdoj.gov

Karin Hauptmann
Acting U.S. Attorney for the Middle District of Florida
U.S. Department of Justice
karin.hoppmann@usdoj.gov

Daniel Gerber
Counsel for Greater Orlando Aviation Authority
Rum Berger & Kirk
dgerber@rumberger.com

Jim Harrison
Chief Executive Officer
Central Florida Regional Transportation Authority
jharrison@golynx.com and inquiry@golynx.com

Norman Hickling
Director Of Mobility Services
Central Florida Regional Transportation Authority
nhickling@golynx.com

Matthew Friedman
Director Of Marketing Communications
Central Florida Regional Transportation Authority
mfriedman@golynx.com

Telis Chandler
Director of Safety & Security
Central Florida Regional Transportation Authority
tchandler@golynx.com

Hilda Mercedes
EECO/Civil Rights Compliance Administrator
Central Florida Regional Transportation Authority
hmercedes@golynx.com


*Lucas Wall*

Lucas Wall, plaintiff