# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

LUCAS WALL,

               Plaintiff,

     v.

CENTERS FOR DISEASE
CONTROL AND PREVENTION,
*et al.*,

               Defendants.

Case No. 6:21-cv-975-PGB-DCI

## FEDERAL DEFENDANTS' COMBINED MOTION TO DISMISS, CROSS-MOTION FOR SUMMARY JUDGMENT, AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

BRIAN M. BOYNTON
Acting Assistant Attorney General

KARIN HOPPMANN
Acting United States Attorney

ERIC B. BECKENHAUER
Assistant Branch Director

MARCIA K. SOWLES
  Senior Trial Counsel
STEPHEN M. PEZZI
  Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch

ADAM R. SMART
Assistant United States Attorney

*Counsel for the Federal Defendants*

# TABLE OF CONTENTS

INTRODUCTION............................................................1

BACKGROUND ......................................................... 3

I.      Statutory and Regulatory Background ...................................3

II.     The COVID-19 Pandemic.............................................7

III.    The Challenged Orders..............................................9

IV.     Litigation Background............................................. 13

ARGUMENT.............................................................. 15

I.      **The Court lacks subject-matter jurisdiction over all of Plaintiff's claims against DHS, TSA, DOT, and the President of the United States. ......................................................... 16**

        a.      The Court of Appeals has exclusive jurisdiction over claims relating to the challenged TSA Security Directives (Counts 9-12). ..... 17

        b.      The Court lacks jurisdiction over Plaintiff's claims that DOT has failed to enforce the Air Carrier Access Act (Count 15)................... 19

                1.      The Court of Appeals has exclusive jurisdiction to review DOT's actions under the ACAA. ...................................... 20

                2.      Plaintiff cannot satisfy the requirements for mandamus jurisdiction under 28 U.S.C. § 1361. .................................. 21

        c.      Plaintiff's claims against the President are not redressable (Counts 5-8, and 23). ........................................................... 25

        d.      Plaintiff lacks standing to challenge the international traveler testing order (Counts 19-23). ...................................... 26

II.     **Plaintiff's APA challenges to the CDC's transportation mask order are meritless................................................................. 27**

        a.      The transportation mask order is authorized by the Public Health Service Act (Count 4). ............................................... 27

        b.      The transportation mask order is consistent with the ACAA and DOT's implementing regulations (Count 14)................................ 37

i

  c.  The transportation mask order is not arbitrary and capricious (Count 3). ........................................................... 41

  d.  The transportation mask order does not violate the APA's notice-and-comment requirements (Count 1).......................................... 46

III. **Plaintiff's APA challenges to the TSA's Security Directives implementing the CDC's transportation mask order are meritless (Counts 9-12).** ...................................................... **48**

  a.  The TSA's Security Directives fall within TSA's statutory authority............................................................... 48

  b.  The TSA's Security Directives do not violate the APA's notice-and-comment requirements..................................... 52

IV. **Plaintiff's APA challenges to the CDC's international traveler testing order are meritless (Counts 19-23).** ........................... **53**

  a.  The international traveler testing order is authorized by the Public Health Service Act (Count 22). .................................. 54

  b.  The international traveler testing order is not arbitrary and capricious (Count 21)................................................. 56

  c.  The international traveler testing order does not violate the APA's notice-and-comment requirements (Count 19)............................. 57

V. **All of Plaintiff's constitutional claims are meritless........................... 58**

  a.  Plaintiff's right-to-travel claim is meritless (Count 8). ....................... 58

  b.  Plaintiff's non-delegation claims are meritless (Counts 5 and 23). ...... 62

  c.  Plaintiff's Due Process claim is meritless (Count 7). ....................... 63

  d.  Plaintiff's Tenth Amendment claim is meritless (Count 6). ............... 65

VI. **Plaintiff's complaint violates the Federal Rules of Civil Procedure........ 68**

VII. **Plaintiff's requested relief is overbroad. ...................................... 69**

 **CONCLUSION** ................................................................. **70**

# TABLE OF AUTHORITIES

## CASES

*13th Reg'l Corp. v. Dep't of Interior*,
  654 F.2d 758 (D.C. Cir. 1980) ...................................................................... 23

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935) ...................................................................................... 65

*Abdi v. Wray*,
  942 F.3d 1019 (10th Cir. 2019) ...................................................... 58, 59, 60, 64

*Air Lines Pilots Ass'n v. CAB*,
  750 F.2d 81 (D.C. Cir. 1984)......................................................................... 20

*Ala. Ass'n of Realtors v. HHS*,
  141 S. Ct. 2320 (2021) .................................................................................. 34

*Ala. Ass'n of Realtors v. HHS*,
  No. 21-5093, 2021 WL 2221646 (D.C. Cir. June 2, 2021) ............................. 35

*Ali v. Fed. Bureau of Prisons*,
  552 U.S. 214 (2008) ...................................................................................... 30

*Am. Ass'n of Exps. & Imps. Textile and Apparel Grp. v. United States*,
  751 F.2d 1239 (Fed. Cir. 1985) ..................................................................... 57

*Am. Disabled for Attendant Programs Today v. HUD*,
  170 F.3d 381 (3rd Cir. 1999) ........................................................................ 24

*Am. Wildlands v. Kempthorne*,
  530 F.3d 991 (D.C. Cir. 2008) ...................................................................... 43

*Amerijet Int'l v. DHS*,
  43 F. Supp. 3d 4 (D.D.C. 2014) .................................................................... 18

*Arrington v. Green*,
  757 F. App'x 796 (11th Cir. 2018) ................................................................ 69

*Ass'n of Citizens to Protect & Pres. the Env't v. FAA*,
  287 F. App'x 764 ........................................................................................... 17

*Babbitt v. Sweet Home Chapter of Cmtys. for a Greater Or.*,
  515 U.S. 687 (1995) ...................................................................................... 30

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
  462 U.S. 87 (1983) ................................................................ 41

*Barnhart v. Walton*,
  535 U.S. 212 (2002) .............................................................. 34

*Beydoun v. Sessions*,
  871 F.3d 459 (6th Cir. 2017) ................................................ 60

*Big Time Vapes, Inc. v. FDA*,
  963 F.3d 436 (5th Cir. 2020), *cert. denied*,
  2021 WL 2302098 (U.S. June 7, 2021)................................... 62

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engr's*,
  781 F.3d 1271 (11th Cir. 2015) ............................................. 70

*Brown v. HHS*,
  --- F. 4th ----, 2021 WL 2944379 (11th Cir. July 14, 2021).......................... 34, 35

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) .............................................................. 69

*Camp v. Pitts*,
  411 U.S. 138 (1973) .............................................................. 44

*Cash v. Barnhart*,
  327 F.3d 1252 (11th Cir. 2003) ............................................. 21

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984) ........................................................ 27, 28

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983)................................................................. 27

*Combat Veterans for Cong. Political Action Comm. v. FEC*,
  795 F.3d 151 (D.C. Cir. 2015) .............................................. 48

*Competitive Enter. Inst. v. Dep't of Transportation*,
  863 F.3d 911 (D.C. Cir. 2017) .............................................. 43

*Corbett v. United States*,
  458 F. App'x 866 (11th Cir. 2012).............................. 17, 18, 19

*Cospito v. Heckler*,
  742 F.2d 72 (3d Cir. 1984) ................................................... 65

*Cramer v. Skinner,*
    931 F.2d 1020 (5th Cir. 1991) ..................................................................... 61

*DHS v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020) ............................................................................... 44

*Doe v. Moore,*
    410 F.3d 1337 (11th Cir. 2005) ............................................................ 59, 60

*Durso v. Napolitano,*
    795 F. Supp. 2d 63 (D.D.C. 2011) .............................................................. 18

*FCC v. Prometheus Radio Project,*
    141 S. Ct. 1150 (2021) .......................................................... 15, 41, 43, 56

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) .................................................................................. 32

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ............................................................................ 25, 26

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) .............................................................................. 69

*Gilmore v. Gonzales,*
    435 F.3d 1125 (9th Cir. 2006) .......................................................... 17, 19, 61

*Green v. Brantley,*
    981 F.2d 514 (11th Cir. 1993) ............................................................... 17, 18

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) .................................................................................. 68

*Guance v. deVincentis,*
    708 F.2d 1290 (7th Cir. 1983) .................................................................... 19

*Gundy v. United States,*
    139 S. Ct. 2116 (2019), *rehearing denied,* 140 S. Ct. 579 ...................... 32, 62

*Heckler v. Chaney,*
    470 U.S. 821 (1985) .................................................................................. 23

*Heckler v. Ringer,*
    466 U.S. 602 (1984) .................................................................................. 21

*In re Gateway Radiology Consultants, P.A.,*
    983 F.3d 1239 (11th Cir. 2020) ..................................................... 28

*Indep. Turtle Farmers of La. v. United States,*
    703 F. Supp. 2d 604 (W.D. La. 2010) .......................................... 29

*J.W. Hampton, Jr., & Co. v. United States,*
    276 U.S. 394 (1928) ....................................................................... 62

*Jackson v. Bank of Am., N.A.,*
    898 F.3d 1348 (11th Cir. 2018) ................................................... 68

*Kabeller, Inc. v. Busey,*
    999 F.2d 1417 (11th Cir. 1993) ............................................. 20, 21

*Klaassen v. Trs. of Ind. Univ.,*
    --- F. 4th ----, 2021 WL 3281209 (7th Cir. Aug. 2, 2021) ............ 58, 64

*Lifestar Ambulance Serv., Inc. v. United States,*
    365 F.3d 1293 (11th Cir. 2004) ................................................... 21

*Little Sisters of the Poor v. Pennsylvania,*
    140 S. Ct. 2367 (2020) .................................................................. 47

*Louisiana v. Mathews,*
    427 F. Supp. 174 (E.D. La. 1977) ........................................... 28, 29

*Love v. Delta Air Lines,*
    310 F.3d 1347 (11th Cir. 2002) ............................................. 20, 22

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ................................................................. 27, 53

*M.S. v. Brown,*
    902 F.3d 1076 (9th Cir. 2018) ..................................................... 25

*Madsen Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ....................................................................... 69

*Mahon v. USDA,*
    485 F.3d 1247 (11th Cir. 2007) ................................................... 27

*Marshall v. United States,*
    414 U.S. 417 (1974) ....................................................................... 29

*Merritt v. Shuttle, Inc.*,
     245 F.3d 182 (2d Cir. 2001) ...................................................................... 18

*Miccosukee Tribe of Indians of Fla. v. United States*,
     566 F.3d 1257 (11th Cir. 2009) ................................................................. 41

*Miller v. Reed*,
     176 F.3d 1202 (9th Cir. 1999) ................................................................... 60

*Mississippi v. Johnson*,
     71 U.S. 475 (1867) ..................................................................................... 25

*Monsanto Co. v. Geertson Seed Farms*,
     561 U.S. 139 (2010) ................................................................................... 69

*Murphy v. NCAA*,
     138 S. Ct. 1461 (2018) ............................................................................... 67

*NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*,
     513 U.S. 251 (1995) ................................................................................... 34

*Nat'l Advert. Co. v. City of Miami*,
     402 F.3d 1335 (11th Cir. 2005) ................................................................. 63

*Nat'l Broad. Co. v. United States*,
     319 U.S. 190 (1943) ................................................................................... 62

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
     545 U.S. 967 (2005) ............................................................................ 33, 34

*Nat'l Fed. of Indep. Bus. v. Sebelius*,
     567 U.S. 519 (2012) ................................................................................... 67

*Nat'l Mining Ass'n v. Dep't of Labor*,
     812 F.3d 843 (11th Cir. 2016) ................................................................... 41

*New York v. United States*,
     505 U.S. 144 (1992) ................................................................................... 65

*Newdow v. Roberts*,
     603 F.3d 1002 (D.C. Cir. 2010) ................................................................ 26

*NLRB v. Jones & Laughlin Steel Corp.*,
     301 U.S. 1 (1937) ....................................................................................... 67

*Norton v. S. Utah Wilderness,*
   *All.,* 542 U.S. 55 (2004) ............................................................. 24

*Norwegian Cruise Line Holdings, Ltd. v. Rivkees,*
   --- F. Supp. 3d ---, 2021 WL 3471585 (S.D. Fla. Aug. 8, 2021) ........................ 45

*PDK Labs., Inc. v. DEA,*
   362 F.3d 786 (D.C. Cir. 2004) ..................................................... 47, 48

*Printz v. United States,*
   521 U.S. 898 (1997) ................................................................ 67

*Saenz v. Roe,*
   526 U.S. 489 (1999) ............................................................ 58, 59

*Sebelius v. Auburn Reg'l Med. Ctr.,*
   568 U.S. 145 (2013) ................................................................ 33

*Sierra Club v. Van Antwerp,*
   526 F.3d 1353 (11th Cir. 2008) .................................................... 41

*Smith v. Turner,*
   48 U.S. 283 (1849) ................................................................... 3

*Swan v. Clinton,*
   100 F.3d 973 (D.C. Cir. 1996) ................................................... 23, 26

*Telecomms. Rsch. & Action Ctr. v. FCC,*
   750 F.2d 70 (D.C. Cir. 1984) ...................................................... 20

*Tiger Lily, LLC v. HUD,*
   --- F. 4th ----, 2021 WL 3121373 (6th Cir. July 23, 2021) ........................... 35

*Touby v. United States,*
   500 U.S. 160 (1991) ............................................................ 61, 62

*Town of Southold v. Town of E. Hampton,*
   477 F.3d 38 (2d Cir. 2007) .................................................... 59, 60

*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018) ............................................................. 69

*United States ex rel. McLenan v. Wilbur,*
   283 U.S. 414 (1931) ................................................................ 23

*United States v. Curtiss-Wright Exp. Corp.*,
   299 U.S. 304 (1936) ................................................................ 55

*United States v. Darby*,
   312 U.S. 100 (1941) ................................................................ 65

*United States v. Dean*,
   604 F.3d 1275 (11th Cir. 2010) ............................................... 47

*United States v. Flores-Montano*,
   541 U.S. 149 (2004) ................................................................ 55

*United States v. Lopez*,
   514 U.S. 549 (1995) ................................................................ 67

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) ........................................................... 33, 34

*Util. Air Regulatory Grp. v. EPA*,
   573 U.S. 302 (2014) ................................................................ 32

*Wall v. Babers*,
   82 A.3d 794 (D.C. 2014) ......................................................... 61

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ................................................................ 62

*Wickard v. Filburn*,
   317 U.S. 111 (1942) ........................................................... 66, 67

## STATUTES

5 U.S.C. § 551 ......................................................................... 46

5 U.S.C. § 553 ....................................................... 46, 47, 57, 58

5 U.S.C. § 701 ......................................................................... 24

5 U.S.C. § 706 ............................................................. 24, 27, 47

28 U.S.C. § 1361 .................................................................... 21

42 U.S.C. §§ 264-272 ............................................................... 4

42 U.S.C. § 264 ............................................................... *passim*

49 U.S.C. § 114 .................................................................... *passim*

49 U.S.C. § 115 .................................................................... 53

49 U.S.C. § 1486 ................................................................. 17

49 U.S.C. § 41705 .................................................. 19, 22, 24, 37

49 U.S.C. § 44901 ............................................................... 50

49 U.S.C. § 44902 ............................................................... 50

49 U.S.C. § 44903 .......................................................... 49, 50

49 U.S.C. § 44905 ............................................................... 50

49 U.S.C. § 46101 ......................................................... 22, 24, 40

49 U.S.C. § 46106 ............................................................... 24

49 U.S.C. § 46107 ............................................................... 24

49 U.S.C. § 46110 ....................................................... 17, 21, 23

49 U.S.C. § 49101 ............................................................... 24

58 Stat. 703 (1944) ............................................................... 1

Act of May 27, 1796,
   1 Stat. 474 (1796), *repealed* 1799 ..................................... 3

Act of Feb. 25, 1799,
   1 Stat. 619 (1799) ............................................................ 3

Act of Feb. 15, 1893,
   27 Stat. 449 (1893) .......................................................... 3

Pub. L. No. 96-88,
   93 Stat. 668 (1979), *codified at* 20 U.S.C. § 3508 ................. 4

**RULES**

Fed. R. Civ. P. 8 ................................................................. 68

Fed. R. Civ. P. 10 ............................................................... 68

x

Fed. R. Civ. P. 12 ........................................................................... 26

**REGULATIONS**

14 C.F.R. Part 382 ........................................................................ 37

14 C.F.R. § 382.19 ............................................................. 37, 38, 39

14 C.F.R. § 382.21 ................................................................. 37, 38

14 C.F.R. § 382.23 ....................................................................... 40

14 C.F.R. § 382.155 ..................................................................... 22

14 C.F.R. § 382.159 ................................................................ 22, 40

42 C.F.R. pt. 70 ............................................................................. 5

42 C.F.R. § 70.2 ..................................................................... *passim*

42 C.F.R. § 70.3 ............................................................................. 7

42 C.F.R. § 70.6 ............................................................................. 7

42 C.F.R. § 70.12 ........................................................................... 7

42 C.F.R. § 71.31 .............................................................. 6, 55, 57

42 C.F.R. § 71.32 .............................................................. 6, 54, 57

*Interstate Quarantine Regulations,*
   11 Fed. Reg. 9389 (Aug. 27, 1946) ............................................... 5

*Interstate Quarantine,*
   12 Fed. Reg. 3189 (May 16, 1947), *codified at* 42 C.F.R. § 12.3 (1947) ................ 5

*Interstate Quarantine,*
   12 Fed. Reg. 6210 (Sept. 16, 1947), *recodifying provision at* 42 C.F.R. § 73.2 .......... 5

31 Fed. Reg. 8855 (June 25, 1966) ................................................... 4

*Proposed Data Collections Submitted for Public Comment and Recommendations,*
   65 Fed. Reg. 19772 (Apr. 12, 2000) ........................................... 5, 6

Final Rule, *Control of Communicable Diseases; Apprehension and Detention of Persons With Specific Diseases; Transfer of Regulations,*
65 Fed. Reg. 49906 (Aug. 16, 2000) ............................................................5

*Declaring a Nat'l Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak,*
85 Fed. Reg. 15337 (Mar. 13, 2020) ..................................................... 7, 8

*Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19,*
85 Fed. Reg. 55292 (Sept. 4, 2020) ....................................................... 7, 8

*Requirement for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery From COVID-19 for All Airline or Other Aircraft Passengers Arriving Into the United States From Any Foreign Country,*
86 Fed. Reg. 6331 (Jan. 21, 2021) ..................................................... 12, 13

*Promoting COVID-19 Safety in Domestic and International Travel,*
86 Fed. Reg. 7205 (Jan. 21, 2021) ..............................................................9

*Requirement for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery From COVID-19 for all Airline or Other Aircraft Passengers Arriving Into the United States From Any Foreign Country,*
86 Fed. Reg. 7387 (Jan. 26, 2021) ................................................13, 56, 57

*Order Under Section 361 of the Public Health Service Act, Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs,*
86 Fed. Reg. 8025 (Feb. 3, 2021) .......................................................*passim*

*Ratification of Security Directive,*
86 Fed. Reg. 13971 (Mar. 12, 2021) ......................................................... 12

*Ratification of Security Directives and Emergency Amendment,*
86 Fed. Reg. 26825 (May 18, 2021) ......................................................... 12

## U.S. CONSTITUTION

U.S. Const., art. I, s.8 ................................................................... 65, 66

U.S. Const. art. VI ........................................................................... 67

U.S. Const., amend. X ......................................................................... 65

## OTHER AUTHORITIES

CDC, *When You've Been Fully Vaccinated* (updated July 27, 2021),
https://perma.cc/C3LC-HMLF .............................................................8, 45

CDC COVID Data Tracker,
https://covid.cdc.gov/covid-data-tracker .................................................8, 45

CODE WIND TALK, Triplevibes Radio (Jul. 21, 2021),
https://www.youtube.com/watch?v=AWzx-VryzdA. ....................................61

*Consolidation & Revision of Laws Relating to the Public Health Service*,
H.R. Rep. No. 78-1364 (1944) ..........................................................3

*COVID-19 testing at the airport* (Rapid Test),
https://perma.cc/WWM8-EWE9 ...........................................................57

HHS, *Determination that a Public Health Emergency Exists* (Jan. 31, 2020),
https://perma.cc/VZ5X-CT5R ....................................................................7

https://covid.cdc.gov/covid-data-tracker/#vaccinations ...............................8, 45

Local Rule 3.01(g) ........................................................................15

Mid-Morning Coffee Break with Adam (July 26, 2021),
http://radioshows.net/WWGH/ATCG-Lucas-Wall-072621.mp3 ...................61

Nicole Acevedo, NBC NEWS, *Florida breaks record for new daily Covid cases for
third time this week* (Aug. 7, 2021),
https://perma.cc/F43W-9D8X ................................................................2

Paul French, *In the 1918 flu pandemic, not wearing a mask was illegal in some parts of
America. What changed?* (April 4, 2020), CNN.com,
https://perma.cc/JCJ6-F2ZU ...................................................................36

Riemersman & Grogan *et al.*, *Vaccinated and unvaccinated individuals have similar
viral loads in communities with a high prevalence of the SARS-CoV-2 delta variant*
(July 31, 2021) ...........................................................................45

Sanitation, *Merriam-Webster.com Dictionary*,
https://perma.cc/9ARR-YKYH ...............................................................31

*Statement from CDC Director Rochelle P. Walensky* (July 30, 2021),
https://perma.cc/X5MM-EV4G ...........................................................9, 45

TSA, Coronavirus (COVID-19) Information,
    https://www.tsa.gov/coronavirus ............................................................ 51

YouTube, *TSA Denies Me Entry to Security Checkpoint at Orlando (MCO) for
Refusing to Wear a Mask* (June 2, 2021),
    https://www.youtube.com/watch?v=XGxxF71KWCc ........................... 13, 14

*What is Gateway Pundit, the conspiracy-hawking site at the center of the bogus Florida
'crisis actors' hype?*, THE WASHINGTON POST (Feb. 23, 2018),
    https://perma.cc/4LT2-CKXN.................................................................. 43

*Why Doctors Wear Masks* (Sept. 1, 2020), YALEMEDICINE.ORG,
    https://perma.cc/TE77-8PBH ............................................................ 31, 36

**INTRODUCTION**

Congress has authorized the Secretary of Health and Human Services (HHS), through the Centers for Disease Control and Prevention (CDC), to adopt "such regulations as in [the agency's] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions [of the United States], or from one State or possession into any other State or possession." Public Health Service Act ("PHSA"), ch. 373, § 361(a), 58 Stat. 703 (1944) (*codified at* 42 U.S.C. § 264(a)). Invoking that authority, the CDC has issued temporary orders that (with some exceptions) generally require (1) individuals to wear masks when traveling on public transportation conveyances like airplanes, trains, and buses; and (2) international air travelers to provide proof of a negative COVID-19 test (or recovery from COVID-19) before departure to the United States. Both orders were issued to prevent the spread of COVID-19.

Plaintiff Lucas Wall, *pro se*, now claims that those orders exceed the CDC's statutory authority, are arbitrary and capricious or procedurally infirm under the Administrative Procedure Act (APA), and violate the U.S. Constitution. He also challenges a variety of other actions and inactions, including the Transportation Security Administration (TSA) security directives that implement the CDC's orders. On Mr. Wall's view of the science, "masks do nothing to reduce coronavirus spread and are actually harmful to humans." Pl.'s Emergency Mot. for TRO, ("Pl.'s TRO Mot."), ECF No. 8, at 20. He also alleges that he "can't wear a mask because of [his]

1

anxiety," Compl. ¶ 42, ECF No. 1, such that requiring him to do so (or obtain a medical exemption) as a condition of commercial air travel is unlawful.  Mr. Wall seeks broad relief that would bar enforcement of these orders worldwide—as applied to him, or to anyone.  And he does so as cases caused by the Delta variant of COVID-19 are surging, including "breakthrough infections" among the fully vaccinated.  *See, e.g.*, Nicole Acevedo, NBC NEWS, *Florida breaks record for new daily Covid cases for third time this week* (Aug. 7, 2021), https://perma.cc/F43W-9D8X.

At the outset, the Court lacks subject-matter jurisdiction over many of Mr. Wall's claims, as clear statutory provisions channel jurisdiction exclusively to the courts of appeals for (as one example) challenges to TSA orders.  Regardless, all of these claims are meritless.  Congress prudently delegated broad authority to the CDC to take reasonable public-health measures to prevent the spread of communicable disease.  That authority has never been more important than during this pandemic, and the measures at issue here—masking and testing—are conventional disease-prevention steps.  Nor is there anything in the APA or the Constitution that prohibits these temporary, reasonable, and science-based public-health measures.

While Plaintiff may "strongly oppose any mask mandate," Compl. ¶ 21, his general opposition provides no basis to overturn the CDC's considered scientific judgments.  For those who seek to use our nation's public-transportation systems during a global pandemic, Congress has entrusted those judgments to the medical experts at the CDC—not to Mr. Wall, and, respectfully, not to the courts.

# BACKGROUND

## I.   Statutory and Regulatory Background

The federal government has a long history of acting to combat the spread of communicable disease.  Congress enacted the first federal quarantine law in 1796 in response to a yellow fever outbreak, authorizing President Washington to direct federal officials to help states enforce quarantine laws.  Act of May 27, 1796, ch. 31, 1 Stat. 474 (1796) (repealed 1799); *see Smith v. Turner*, 48 U.S. 283, 300 (1849).  Following a yellow fever outbreak, Congress replaced the 1796 Act with a federal inspection system for maritime quarantines.  Act of Feb. 25, 1799, ch. 12, 1 Stat. 619 (1799).  And in 1893, Congress authorized the Secretary of the Treasury to adopt additional regulations to prevent the introduction of communicable disease into the United States or across state lines where the Secretary considered state or local regulation inadequate.  Act of Feb. 15, 1893, ch. 114, 27 Stat. 449 (1893).

Congress enacted the Public Health Service Act in 1944.  *Consolidation & Revision of Laws Relating to the Public Health Service*, H.R. Rep. No. 78-1364, at 1 (1944).  In section 361(a), Congress broadened the federal government's "basic authority to make regulations to prevent the spread of disease into this country or between the States."  *Id.* at 24.  For example, Congress removed references to specific diseases to provide federal health authorities flexibility to respond to new types of contagion and "expressly sanction[ed] the use of conventional public-health enforcement methods" by the government in disease-control efforts.  *Id.* at 24-25.

3

The resulting statute, 42 U.S.C. § 264—part of a broader statutory scheme authorizing HHS to take wide-ranging public health actions, *see id.* §§ 264-272—authorizes the Secretary of HHS[1] "to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." *Id.* § 264(a). The second sentence of subsection (a) further clarifies that "[f]or purposes of carrying out and enforcing such regulations," the Secretary "may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary." *Id.*

Subsection (b) imposes specific limits on the Secretary's ability to "provide for the apprehension, detention, or conditional release of individuals"—a power not referenced in subsection (a)—permitting such impositions on a person's physical movement only for diseases specified by Executive Order. *Id.* § 264(b). Subsections (c) and (d) set further limits on the detention of individuals. *See id.* § 264(c)-(d). The final subsection provides that the statute and any regulation adopted thereunder

---

[1] Although the statute assigns authority to the Surgeon General, all statutory powers and functions of the Surgeon General were transferred to the Secretary of HHS in 1966, 31 Fed. Reg. 8855 (June 25, 1966), 80 Stat. 1610 (1966), *see also* Pub. L. No. 96-88, § 509(b), 93 Stat. 668, 695 (1979) (*codified at* 20 U.S.C. § 3508(b)). The Secretary has retained these authorities despite the reestablishment of the Office of the Surgeon General in 1987.

supersede state law "to the extent that such a provision conflicts with an exercise of Federal authority." *Id.* § 264(e).

The Secretary of HHS has promulgated regulations implementing these provisions and delegating their enforcement to CDC. *See* 42 C.F.R. pt. 70; *Control of Communicable Diseases, Apprehension and Detention of Persons With Specific Diseases, Transfer of Regulations*, 65 Fed. Reg. 49,906, 49,907 (Aug. 16, 2000). The Secretary appears to have first promulgated the regulation titled "measures in the event of inadequate local control" in 1947, *see Interstate Quarantine*, 12 Fed. Reg. 3189 (May 16, 1947) (*codified at* 42 C.F.R. § 12.3 (1947)), following publication of a "general notice of proposed rule making" in the Federal Register, *see Interstate Quarantine Regulations*, 11 Fed. Reg. 9389 (Aug. 27, 1946).[2] The regulation has been relocated several times without substantive change. *See, e.g.*, *Interstate Quarantine*, 12 Fed. Reg. 6210 (Sept. 16, 1947) (*recodifying provision at* 42 C.F.R. § 73.2). In 2000, again without any alteration to its substance, the regulation was repromulgated to transfer, in part, authority from the Food & Drug Administration to CDC, *see* Final Rule, *Control of Communicable Diseases; Apprehension and Detention of Persons With Specific Diseases; Transfer of Regulations*, 65 Fed. Reg. 49906 (Aug. 16, 2000), and the agency provided a notice-and-comment period, *see Proposed Data Collections Submitted for Public Comment*

---

[2] This "general notice of proposed rulemaking" does not specifically seek comments on the "measures in the event of inadequate local control" provision, *see* 11 Fed. Reg. at 9389, but is referenced as the relevant notice for that regulation in subsequent Federal Register publications, *see* 12 Fed. Reg. at 3189.

*and Recommendations*, 65 Fed. Reg. 19772 (Apr. 12, 2000). Although the notice specifically requested comments regarding proposed data collection projects, *see id.* at 19,772, it referenced the provision at issue here, stating that "[t]he regulations . . . being assumed by CDC were developed to facilitate Federal action in the event of large outbreaks of disease requiring a coordinated effort involving several States, or in the event of inadequate local control," *id.*

That regulation, now codified at 42 C.F.R. § 70.2, provides the CDC with discretion to address the uncontrolled spread of communicable disease. Specifically, if the CDC Director "determines that the measures taken by health authorities of any State or possession (including political subdivisions thereof) are insufficient to prevent the spread of any of the communicable diseases" between or among states, he is empowered to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary." 42 C.F.R. § 70.2. These measures include, but are not limited to, "inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection." *Id.*

In addition, separate longstanding regulations, unchallenged here, provide that "[w]henever the Director has reason to believe that any arriving carrier . . . is or may be infected . . . with a communicable disease, he/she may require detention, disinfection, . . . or other related measures respecting the carrier or article or thing as he/she considers necessary to prevent the introduction, transmission, or spread of communicable diseases." 42 C.F.R. § 71.32(b); *see also id.* § 71.31(b) (allowing

"detention of a carrier until the completion of the measures outlined in this part that are necessary to prevent the introduction or spread of a communicable disease"). And other regulations (generally not at issue here) authorize CDC to limit interstate travel of infected persons, *see id.* § 70.3, to apprehend and detain persons, *id.* § 70.6, and to conduct medical examinations, *id.* § 70.12, to control the spread of disease.

## II.    The COVID-19 Pandemic

In December 2019, the novel coronavirus later named SARS-CoV-2 was first detected in Wuhan, Hubei Province, in the People's Republic of China. *See Declaring a Nat'l Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, 85 Fed. Reg. 15337 (Mar. 13, 2020). The virus causes a respiratory disease known as COVID-19. *Id.* COVID-19 is a serious illness that spreads easily. COVID-19 poses a risk of "severe" respiratory illness, meaning that persons who have the disease may require hospitalization, intensive care, or the use of a ventilator. 85 Fed. Reg. at 55,292. Severe cases may be fatal. *Id.* CDC has cautioned that the virus that causes COVID-19 transmits "very easily and sustainably" between people within "close contact"—approximately six feet—of one another. *Id.* at 55,293. Persons not displaying symptoms are capable of transmitting the virus. *Id.* at 55,292.

On January 31, 2020, the Secretary of HHS declared a public health emergency. HHS, *Determination that a Public Health Emergency Exists* (Jan. 31, 2020), https://perma.cc/VZ5X-CT5R. On March 11, 2020, the World Health Organization (WHO) classified COVID-19 as a pandemic. 85 Fed. Reg. at 15337. And on March

13, 2020, then-President Trump declared the outbreak a national emergency. *Id.* By late August 2020, the virus had spread to all 50 states. *Id.* at 55292. As of the date of this filing, it has infected more than 35 million and killed more than 614,000 people in the United States alone, and many more around the world. *See* CDC COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker (last visited August 9, 2021).

To combat the spread of this highly contagious, deadly virus, governments at all levels have taken "unprecedented or exceedingly rare actions" to protect the public. 85 Fed. Reg. at 55,292. These include border closures, travel restrictions, stay-at-home orders, eviction moratoria, and mask requirements. *Id.* "[M]ask wearing" in particular "is one of the most effective strategies available for reducing COVID-19 transmission." 86 Fed. Reg. at 8025.

By this spring, significant progress had been made with vaccinations and falling case counts in the United States, which led the CDC to relax its mask-wearing guidance for fully vaccinated individuals. *See* Compl. ¶ 136. Nevertheless, as of this filing, only about half the country is fully vaccinated. *See* https://covid.cdc.gov/covid-data-tracker/#vaccinations (last visited August 9, 2021). And new, highly transmissible variants are circulating, leading the CDC just a few weeks ago to recommend that, "[t]o maximize protection from the Delta variant and prevent possibly spreading it to others," even fully vaccinated individuals should "wear a mask indoors in public if you are in an area of substantial or high transmission." CDC, *When You've Been Fully Vaccinated* (updated July 27, 2021),

8

https://perma.cc/C3LC-HMLF; *see Statement from CDC Director Rochelle P. Walensky* (July 30, 2021), https://perma.cc/X5MM-EV4G ("Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people. High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus.").

## III.   The Challenged Orders

a. **The CDC's Transportation Mask Order.** On January 21, 2021, President Biden issued an Executive Order explaining that public-health experts "have concluded that mask-wearing, physical distancing, appropriate ventilation, and timely testing can mitigate the risk of travelers spreading COVID-19." Exec. Order 13998, *Promoting COVID-19 Safety in Domestic and Int'l Travel*, 86 Fed. Reg. 7205 (Jan. 21, 2021). "Accordingly, to save lives and allow all Americans, including the millions of people employed in the transportation industry, to travel and work safely," the President called on all relevant government agencies to "immediately take action, to the extent appropriate and consistent with applicable law, to require masks to be worn in compliance with CDC guidelines" on public-transportation systems. *Id.*

A few weeks later, the CDC issued the transportation mask order. *See* Ex. 1, CDC, *Order Under Section 361 of the Public Health Service Act, Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs*, 86 Fed. Reg. 8025 (Feb. 3, 2021). Generally, the transportation mask order requires persons to "wear masks over

9

the mouth and nose when traveling on conveyances into and within the United States"

and "at transportation hubs." *Id.* at 8026.   The order's objectives are

- Preservation of human life;
- Maintaining a safe and secure operating transportation system;
- Mitigating the further introduction, transmission, and spread of COVID-19 into the United States and from one state or territory into any other state or territory; and
- Supporting response efforts to COVID-19 at the Federal, state, local, territorial, and tribal levels.

*Id.* at 8027.   In addition, the order notes that "[r]equiring masks will help us control

this pandemic and aid in re-opening America's economy." *Id.* at 8029.

The scientific justifications for the mask order are straightforward: "Masks help

prevent people who have COVID-19, including those who are pre-symptomatic or

asymptomatic, from spreading the virus to others." *Id.* at 8028.   They "also provide

personal protection to the wearer by reducing inhalation of" "virus-laden droplets."

*Id.*   "The community benefit of wearing masks . . . is due to the combination of these

effects; individual prevention benefit increases with increasing numbers of people

using masks consistently and correctly." *Id.*

The order also explains why mask-wearing is especially important on public

transportation and in commercial air travel: "[t]raveling on multi-person conveyances

increases a person's risk of getting and spreading COVID-19 by bringing persons in

close contact with others, often for prolonged periods[.]" *Id.*   "Furthermore, given

how interconnected most transportation systems are across the nation and the world,

local transmission can grow even more quickly into interstate and international

transmission when infected persons travel on non-personal conveyances without wearing a mask and with others who are not wearing masks." *Id.*

The order exempts "child[ren] under the age of 2," and anyone "with a disability who cannot wear a mask, or cannot safely wear a mask," among others. *Id.* at 8027. It also exempts (among other things) "[p]rivate conveyances operated solely for personal, non-commercial use." *Id.* at 8028. And it does not apply "[w]hile eating, drinking, or taking medication, for brief periods." *Id.* Although the order could theoretically be enforced through criminal penalties, "CDC does not intend to rely primarily on . . . criminal penalties but instead strongly encourages and anticipates widespread voluntary compliance[.]" *Id.* at 8030 n.33.

**b. The TSA's Security Directives.** On January 27, 2021, the Acting Secretary of Homeland Security issued a Determination of a National Emergency that invoked his emergency powers and directed the TSA to support "the CDC in the enforcement of any orders or other requirements necessary to . . . mitigate the spread of COVID-19 through the transportation system." Ex. 2, DHS Decl. of Nat'l Emergency (Jan. 27, 2021). The TSA then issued a series of directives to implement and support the enforcement of the CDC's mask order: Security Directive (SD) 1542-21-01 (Ex. 3) applies the CDC's mask requirements to airport operators; SD 1544-21-02 (Ex. 4) to domestic aircraft operators; and SD 1582-21-01 (Ex. 5) to surface-transportation

systems.  Emergency Amendment 1546-21-01 later imposed those requirements on foreign air carriers landing in or taking off from the United States.  Ex. 6.[3]

**c. The CDC's International Traveler Testing Order.**  On December 25, 2020, the CDC issued an order generally requiring air travelers seeking to depart the United Kingdom with a final destination in the United States to provide documentation of a negative COVID-19 test result to the airline before departure.  *See* Ex. 7, *Requirement for Negative Pre-Departure COVID-19 Test Result for All Airline Passengers Arriving Into the United States from the United Kingdom (UK)* (Dec. 25, 2020).  The order noted that a COVID-19 variant that was then spreading through England "may be more transmissible than previously circulating variants," and that although testing "does not eliminate all risk," it can "make travel safer by reducing spread on conveyances and in transportation hubs" "where social distancing may be challenging."  *Id.* at 3-4.

A few weeks later, the UK variant had been identified in North America, along with another highly transmissible variant from South Africa.  Ex. 8, *Requirement for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery From COVID-19 for All Airline or Other Aircraft Passengers Arriving Into the United States From Any Foreign Country*, 86 Fed. Reg. 6331, 6333-34 (Jan. 21, 2021).  On January 13, 2021, "[b]ased on increased transmissibility and spread of these new variants of SARS-CoV-2, and to reduce introduction and spread of these and future SARS-CoV-2 variants into the

---

[3] Each of these security directives has since been ratified by the Transportation Security Oversight Board.  *See Ratification of Security Directive*, 86 Fed. Reg. 13,971 (Mar. 12, 2021); *Ratification of Security Directives and Emergency Amendment*, 86 Fed. Reg. 26,825 (May 18, 2021).

United States," the CDC determined that "expanding current UK pre-departure testing requirements to all foreign countries and U.S.-bound passengers is warranted." *Id.* at 6334.

On January 26, 2021, the CDC reissued the testing order with minor modifications, superseding the January 13 version. *See* Ex. 9, *Requirement for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery From COVID-19 for all Airline or Other Aircraft Passengers Arriving Into the United States From Any Foreign Country*, 86 Fed. Reg. 7387 (Jan. 26, 2021). Overall, the justification for these testing requirements is simple: "Individuals who travel may be at risk for exposure to SARS-CoV-2 before, during, and after travel," which "could result in U.S.-bound travelers further spreading the virus to others during travel, upon arrival in the United States, and at their destinations." *Id.* at 7389.

## IV.   Litigation Background

According to Plaintiff's complaint (and videos he posted on YouTube[4]), on June 2, 2021, without wearing a mask, Mr. Wall approached a TSA checkpoint at Orlando International Airport, attempting to board a flight to Fort Lauderdale. *See* Compl. ¶¶ 38-40. A uniformed TSA officer told him: "I need you to put your mask on, OK?" *See* YouTube, *TSA Denies Me Entry to Security Checkpoint at Orlando (MCO) for Refusing to Wear a Mask* (June 2, 2021), https://www.youtube.com/watch?v=XGxxF71KWCc. The officer then reached to

---

[4] The videos are linked in the complaint, and at https://www.youtube.com/user/lewnwdc.

hand Mr. Wall a mask.  *See id.*  Mr. Wall refused: "No I won't wear a mask," to which the officer responded: "To get in you need a mask."  *Id.*  Mr. Wall continued: "No, that's in violation of Florida law, I'm traveling to Fort Lauderdale."  *Id.*  The officer then put away the box of masks, and asked Mr. Wall to "wait on the side for me."  *Id.*

Over the next hour, just outside the security checkpoint, Mr. Wall spoke with various employees of both TSA and Southwest Airlines.  Mr. Wall eventually claimed that he "can't wear a mask because of [his] anxiety."  Compl. ¶ 42.  In response, a TSA supervisor asked: "Do you have medical documentation concerning your anxiety issue that's preventing you from wearing a mask?"  *Id.*  Mr. Wall responded: "I don't have it with me, no."  *Id.*  Mr. Wall ultimately explained that he submitted Southwest's medical exemption form two days prior (when he booked his ticket), which is less than the seven days' advance notice required by the airline.  *See id.* ¶¶ 47, 57, 68; *see also* ECF No. 1-13, Pl.'s Ex. 204 (Southwest Airlines form).

A Southwest employee told Mr. Wall that "[w]e're trying to get it expedited . . . but it has to go through an approval process.  It's not something we can just come out and say 'he's approved.'"  Compl. ¶ 69.  Ultimately, the efforts of airline staff to process Mr. Wall's medical exemption request on an expedited basis were apparently unsuccessful: "Unfortunately I tried to see if I could push this through, because you didn't meet the requirements, and unfortunately our company is saying now you have to wear a mask if you go through" the TSA checkpoint.  *Id.* ¶ 71.

Mr. Wall left the airport, and on June 7, 2021, filed this lawsuit. On June 15, the Court denied his TRO motion. Order, ECF No. 28 ("TRO Opinion"). After a plethora of filings on a variety of issues (including before the Eleventh Circuit and the Supreme Court), Mr. Wall moved for summary judgment. Pl.'s Mot. for Summ. J. at 10, ECF No. 83 ("Pl.'s MSJ"). On August 4, 2021, all parties agreed that Counts 2, 10, 13, 16, and 20 should be dismissed. *See infra*, Local Rule 3.01(g) Certification. Federal Defendants now move to dismiss, cross-move for summary judgment, and oppose Plaintiff's motion for summary judgment.

## ARGUMENT

Mr. Wall believes that "face masks are totally ineffective in reducing coronavirus spread (and are actually harmful in many circumstances)." Compl. at 3. But the science says otherwise, which is why the CDC issued an order in January that—temporarily, and with various exceptions, including for those who cannot safely wear a mask for legitimate medical reasons—generally requires masks for those traveling in our nation's public transportation systems. CDC was doing exactly what Congress authorized it to do: to take actions that "in [its] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases" in the United States. 42 U.S.C. § 264(a). And because CDC "reasonably considered the relevant issues and reasonably explained the decision," *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021), the Court should not accept Mr. Wall's invitation to

substitute its (or his) judgment for that of the expert agency.  The same is true with respect to the international traveler testing order.

Mr. Wall asks a lot of this Court: no less than a "worldwide" injunction, Pl.'s Certificate of Interested Persons, ECF No. 77 at 3, which would prevent enforcement of any of the challenged orders, in any context, against anyone.  But there is no legal basis for that result, or even relief for Mr. Wall alone.  Several of his claims fail straightforwardly for lack of subject-matter jurisdiction, because he filed in the wrong court (*e.g.*, with respect to all claims against DHS, TSA, and DOT).  In any event, all of his claims (even those over which the Court does have jurisdiction) are meritless.  The precise reasons why vary widely, but the overarching problem with all of them is that Mr. Wall seems to think it is up to him (or the federal courts) to make complex decisions of scientific and public-health policy during a global pandemic.  In fact, Congress has entrusted that power to the CDC.  *See* 42 U.S.C. § 264(a).

## I. The Court lacks subject-matter jurisdiction over all of Plaintiff's claims against DHS, TSA, DOT, and the President of the United States.

The Court lacks jurisdiction over several of Plaintiff's claims, including: (1) all claims against the Department of Homeland Security (DHS), TSA, the Department of Transportation (DOT), and the President; (2) all claims challenging the international traveler testing order; and (3) all of Mr. Wall's mandamus claims.  Those claims should all be dismissed without any consideration of the merits.

**a. The Court of Appeals has exclusive jurisdiction over claims relating to the challenged TSA Security Directives (Counts 9-12).**

All of Plaintiff's claims challenging TSA Security Directives should be dismissed, because 49 U.S.C. § 46110 vests exclusive jurisdiction over such claims in the courts of appeals:

> a person disclosing a substantial interest in an order issued by the Secretary of Transportation (or Administrator of the Transportation Security Administration with respect to security duties and powers designated to be carried out by the Administrator of the Transportation Security Administration . . . ) in whole or in part under [part A], part B, or subsection (l) or [(s)] of section 114 may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or the court of appeals of the United States for the circuit in which the person resides . . . .

49 U.S.C. § 46110(a).  The courts of appeals have "exclusive jurisdiction to affirm, amend, modify or set aside any part of [such an] order."  *Id.* § 46110(c).

Thus, pursuant to section 46110, only courts of appeals may consider challenges to orders issued by the TSA or the Secretary of Transportation.  *See Green v. Brantley,* 981 F.2d 514, 519 (11th Cir. 1993) (district court lacked jurisdiction to review challenge to FAA order).[5]  If such a claim is filed in district court, it should be dismissed.  *Id.* at 521; *accord Corbett v. United States,* 458 F. App'x 866, 870 (11th Cir. 2012) (district court lacked jurisdiction to review TSA security screening procedure); *Gilmore v. Gonzales,* 435 F.3d 1125, 1133 (9th Cir. 2006) (district court lacked jurisdiction to review TSA Security Directive requiring passengers to present

---

[5] When *Green* was decided, the judicial review provisions at issue were codified at 49 U.S.C. § 1486 rather than 49 U.S.C. § 46110, but "[t]he statutes do not materially differ."  *Ass'n of Citizens to Protect & Pres. the Env't v. FAA,* 287 F. App'x 764, 766 n. 3 (11th Cir. 2008).

identification); *Merritt v. Shuttle, Inc.*, 245 F.3d 182, 187 (2d Cir. 2001) ("Section 46110(c) precludes federal district courts from affirming, amending, modifying, or setting aside any part of such an order."); *Green*, 981 F.2d at 516 (district court lacked subject matter jurisdiction over claim challenging FAA order); *Amerijet Int'l v. DHS*, 43 F. Supp. 3d 4, 13-14 (D.D.C. 2014) (TSA Security Directive is an "order" within the meaning of section 46110); *Durso v. Napolitano*, 795 F. Supp. 2d 63, 69 (D.D.C. 2011) (district court lacks jurisdiction over claim challenging TSA screening order).

The TSA Security Directives (and Emergency Amendment) challenged here are all orders that fall within section 46110's exclusive jurisdictional channel to the courts of appeals. Each order was issued pursuant to TSA's authority under Part A ("Air Commerce and Safety") of Title 49 and/or Section 114(l).[6]

Plaintiff cannot "escape the jurisdictional limitations of § 46110 by claiming that he asserts" constitutional challenges to the orders. *Corbett*, 458 F. App'x at 871. When an individual challenges an action that falls within the scope of Section 46110, the courts of appeals have exclusive jurisdiction over the claim and any other claims that are "inescapably intertwined." *Green*, 981 F.2d at 521. A claim is intertwined "if it alleges that the plaintiff was injured by such an order and that the court of appeals has authority to hear the claim on direct review of the agency order." *Merritt*, 245 F.3d at

---

[6] SD 1542-21-01A (applicable to airport operators and airlines that have exclusive area agreements) was issued pursuant to 49 U.S.C. §§ 114 and 44903; SD 1544-21-02A (applicable to aircraft operators) was issued pursuant to 49 U.S.C. §§ 114, 44902, and 44903; SD 1582/84-21-01A (applicable to surface transportation) was issued pursuant to 49 U.S.C. § 114; and EA 1546-21-01A (applicable to foreign air carriers) was issued pursuant to 49 U.S.C. § 114, 44902 and 44903.

187.   This includes constitutional claims that "squarely attack[]" particular agency orders.  *Gilmore*, 435 F.3d at 1130 (Fourth Amendment and right-to-travel claims); *accord Corbett*, 458 F. App'x at 871 (explaining that "§ 46110 does not deny . . . judicial review" of Fourth Amendment claims, but channels review to the courts of appeals); *Guance v. deVincentis*, 708 F.2d 1290, 1293 (7th Cir. 1983) (due process).

Accordingly, the Court should dismiss all of Plaintiff's claims against TSA (Counts 9-12) for lack of subject-matter jurisdiction.

### b.  The Court lacks jurisdiction over Plaintiff's claims that DOT has failed to enforce the Air Carrier Access Act (Count 15)

Plaintiff does not challenge any final, reviewable order or action by DOT. Instead, in Count 15, Plaintiff asserts that DOT has failed to enforce the Air Carrier Access Act ("ACAA"), 49 U.S.C. § 41705, and seeks a writ of mandamus compelling DOT to enforce the ACAA as he interprets it.  *See* Compl. ¶¶ 1042-1045, Prayer for Relief, ¶ J.  As explained below, Mr. Wall's interpretation of the ACAA is misguided, and DOT has issued an enforcement policy precisely to ensure protection under the ACAA for those who cannot wear a mask for legitimate medical reasons.  *See* Pl.'s Ex. 208, ECF No. 1-13.  But in all events, this Court lacks jurisdiction to consider this claim for at least two reasons: (1) the courts of appeals have exclusive jurisdiction to consider any claim regarding DOT's actions under the ACAA, and (2) Plaintiff cannot satisfy the stringent requirements for mandamus jurisdiction.

### 1. The Court of Appeals has exclusive jurisdiction to review DOT's actions under the ACAA.

Count 15 suffers from the same jurisdictional defect as the claims against TSA. Because the ACAA falls within Part A ("Air Commerce and Safety") of Title 49, the courts of appeals have "exclusive jurisdiction to affirm, amend, modify or set aside any part" of any enforcement order issued under the ACAA.  49 U.S.C. § 46110(c). Under that provision, as this Court recently recognized, "the ACAA creates a 'limited private right' for individuals with a 'substantial interest' in an enforcement action to petition for review of DOT decisions in a United States Court of Appeals."  *Wall v. Southwest Airlines*, No. 6:21-cv-1008 (M.D. Fla. June 16, 2021), ECF No. 8 at 5 (quoting *Love v. Delta Air Lines*, 310 F.3d 1347, 1357 (11th Cir. 2002)).

The fact that Plaintiff is not challenging a final order but challenging DOT's alleged failure to issue an order, or to take some form of enforcement action, does not avoid this jurisdictional flaw.  Courts have recognized that where, as here, a statute grants the courts of appeals exclusive jurisdiction to review an agency action, the courts of appeals also have exclusive jurisdiction to review claims alleging that an agency has *failed* to act. *Kabeller, Inc. v. Busey*, 999 F.2d 1417, 1421-22 (11th Cir. 1993) (per curiam); *Air Lines Pilots Ass'n v. CAB*, 750 F.2d 81, 84 (D.C. Cir. 1984); *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984).

In *Kabeller*, for example, a skydiving company filed an administrative complaint with the Federal Aviation Administration (FAA) alleging that a city was not in compliance with certain grant agreements.  Alleging that the FAA had unreasonably

delayed acting on its complaint, the company filed suit in district court seeking to compel action. The district court dismissed, ruling that the court of appeals had exclusive jurisdiction. *Kabeller*, 999 F.2d at 1419-20. The Eleventh Circuit affirmed, explaining that "where a statute commits review of agency action to the Court of Appeals, any suit seeking relief that might affect the Circuit Court's future jurisdiction is subject to the exclusive review of the Court of Appeals." *Id.* at 1420.

The same is true here. Judicial review of Plaintiff's claim under the ACAA, to the extent that it is cognizable anywhere, must be pursued in the courts of appeals pursuant 49 U.S.C. § 46110. Accordingly, the Court should dismiss Count 15.

### 2. Plaintiff cannot satisfy the requirements for mandamus jurisdiction under 28 U.S.C. § 1361.

A writ of mandamus is "an extraordinary remedy which should be utilized only in the clearest and most compelling of cases." *Cash v. Barnhart*, 327 F.3d 1252, 1257 (11th Cir. 2003). The mandamus statute provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. "Mandamus jurisdiction is appropriate only where (1) the defendant owes a clear nondiscretionary duty to plaintiff and (2) the plaintiff has exhausted all other avenues of relief." *Lifestar Ambulance Serv., Inc. v. United States*, 365 F.3d 1293, 1295 (11th Cir. 2004); *see Heckler v. Ringer*, 466 U.S. 602, 616 (1984) (mandamus "is intended to provide a remedy for plaintiff only if he has exhausted all other avenues of relief" and "the defendant owes him a clear nondiscretionary duty").

21

Plaintiff fails to meet either of these jurisdictional requirements. First, he has not exhausted other avenues of relief, namely, seeking an exemption from the airlines and (assuming an airline handled his exemption claim inappropriately) filing an administrative complaint with DOT. As Plaintiff ultimately acknowledges (and as explicitly contemplated by the CDC's transportation mask order), airlines have established procedures for seeking exemptions from the mask requirement. Compl. ¶¶ 11-18, 54. Here, Plaintiff does not allege that he has followed or exhausted those procedures—to the contrary, he admits that he has sought to bypass them, based on his own belief that they are illegal.[7]

Moreover, although the ACAA does not provide a private right of action to bring suit against an airline, *Love*, 310 F.3d at 1357, any person believing a carrier has violated the ACAA or DOT's implementing regulations may seek redress from the DOT through well-established complaint procedures. 14 C.F.R. § 382.159. A person may file an informal complaint using an online form available on DOT's website, or by mail to DOT's Office of Aviation Consumer Protection. *Id.* § 382.159(a). A person may also file a formal written complaint with DOT. *Id.* § 382.155; 49 U.S.C. § 46101(a). The ACAA provides that "the Secretary shall investigate each complaint of a violation." 49 U.S.C. § 41705(c)(1). A person aggrieved by DOT's action on a

---

[7] Although Mr. Wall submitted an (untimely) exemption form to Southwest Airlines with respect to his June 2, 2021 itinerary, he admits that he did not submit the requisite documentation from a physician. Instead, he wrote on the form that he considered the request to be illegal. *See* Compl. ¶¶ 15-16. Southwest explained that without a physician's statement, it was unable to approve his request. *See* ECF No. 50 at 3-4 (email from Southwest Airlines to Plaintiff dated June 17, 2021).

complaint could (assuming that all other jurisdictional requirements were met) pursue an action in an appropriate court of appeals under 46 U.S.C. § 46110. Here, Plaintiff has apparently made no attempt to pursue any of these administrative remedies.

Second, Plaintiff has no "clear and undisputable" right to require DOT to take an enforcement action, particularly under the circumstances here. To warrant mandamus relief, the duty to be performed must be "ministerial and the obligation to act peremptory, and clearly defined. The law must not only authorize the demanded action, but require it; the duty must be clear and undisputable." *13th Reg'l Corp. v. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980) (quoting *United States ex rel. McLenan v. Wilbur*, 283 U.S. 414, 420 (1931)); *see Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996) (a ministerial duty is "one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty").

The decision whether to take enforcement action is not a ministerial act—just the opposite, it is "generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Decisions of agency enforcement discretion "involve[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* "[T]he agency must not only assess whether a violation has occurred, but whether the agency resources are best spent on this violation or another, whether the agency is likely to succeed if its acts," and "whether a particular enforcement action requested best fits the agency's overall policies[.]" *Id.*

The statutory provisions governing DOT's authority to conduct investigations and to take enforcement action under Part A of Title 49 confirm the discretionary nature of the Secretary's decision to initiate an investigation (absent a formal administrative complaint alleging a violation of the ACAA)[8] or to bring an enforcement action. *See* 49 U.S.C. § 46101(a)(2) ("On initiative of the Secretary . . . , the Secretary . . . *may* conduct an investigation, if a reasonable ground appears to the Secretary," that there has been a violation) (emphasis added); *id.* § 46106 (The Secretary "*may* bring a civil action against a person in a district court of the United States to enforce this part") (emphasis added); *see also id.* § 46107(b)(1) ("On the request of the Secretary of Transportation . . . , the Attorney General *may* bring a civil action in an appropriate court—(A) to enforce this part or a requirement or regulation prescribed, . . . under this part; and (B) to prosecute a person violating this part or a requirement or regulation prescribed . . . under this part.") (emphasis added).[9]

---

[8] As noted above, 49 U.S.C. § 41705(c)(1) does require DOT to "investigate each complaint of a violation of [the ACAA]." However, this requirement does not obligate the agency to take any specific enforcement action, and DOT retains its authority to determine that the investigation does not warrant further "action." 49 U.S.C. § 49101(3). In all events, Plaintiff has not even filed a complaint.

[9] For the same reason, Plaintiff's claim that DOT has failed to enforce the ACAA also fails to state a claim under the APA, which does not permit judicial review of agency actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Moreover, although the APA allows reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1), the APA limits such relief to cases in which the plaintiff has identified discrete actions which the agency is required by law to take; the APA does not allow a broad-based programmatic challenge to DOT's enforcement decisions. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (APA precludes "broad programmatic attack" and instead allows review of a claim that "an agency failed to take a *discrete* agency action that it is *required to take.*"); *Am. Disabled for Attendant Programs Today v. HUD*, 170 F.3d 381, 389 (3rd Cir. 1999) (APA does not allow plaintiff to pursue "broad-based attack on HUD's investigative and enforcement scheme" that allegedly violated 42 U.S.C. § 3608).

And although this is a matter for DOT's enforcement discretion rather than oversight by Plaintiff, DOT *has* implemented an enforcement policy, which makes clear that the airlines retain their ACAA obligations regarding persons with disabilities who cannot wear a mask (or cannot wear a mask safely) because of their disability. *See* Pl.'s Ex. 208, ECF No. 1-13.  That policy, which is fully consistent with the CDC orders that Plaintiff challenges, also sensibly acknowledges that airlines may require proof from the party seeking an exemption that they are unable (not just unwilling) to wear a mask, for legitimate medical reasons. *See id.* at 6.

### c.  Plaintiff's claims against the President are not redressable (Counts 5-8, and 23).

The redressability requirement of Article III standing is not satisfied "if a federal court lacks the power to issue" the relief requested by the Plaintiff. *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018).  That principle is fatal to all of Plaintiff's claims against the President of the United States.  Accordingly, all of those claims should be dismissed, and the President should be dismissed as a Defendant.

Although federal courts may issue injunctions in appropriate circumstances against the President's subordinates, issuing an injunction directly against the President himself would violate the longstanding principle—rooted in the separation of powers—that federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties[.]" *Mississippi v. Johnson*, 71 U.S. 475, 501 (1867); *see also Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (plurality op.)(stating that a "grant of injunctive relief against the President himself [was] extraordinary, and

25

should have raised judicial eyebrows").   "[F]or the President to 'be ordered to perform particular executive . . . acts at the behest of the Judiciary,' . . . at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers." *Swan*, 100 F.3d at 978 (citation omitted).[10]

Accordingly, because the Court will be unable to award relief against the President, Plaintiff's claims against the President are not redressable, which provides an independent basis for the Court to dismiss him as a Defendant.[11]

### d. Plaintiff lacks standing to challenge the international traveler testing order (Counts 19-23).

There is no evidence in the record that Plaintiff has any specific international travel plans.  While his complaint referenced a trip to Germany, Compl. ¶ 8, the date for that planned trip has long since passed.  It is entirely speculative whether he will ever be subject to the testing requirement in the future.  Under directly on-point Supreme Court precedent, that deprives him of Article III standing (or moots his claims)—even if he has a *general* intent to travel abroad at some point in the future.  "Such 'some day' intentions—without any description of concrete plans, or indeed

---

[10] The same is true of Plaintiff's claims for declaratory relief against the President.  In practice, to subject the President to suits for declaratory relief poses essentially the same concerns as injunctions. *See Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment) ("It is incompatible with [the President's] constitutional position that he be compelled personally to defend his executive actions before a court.").  Thus, even where (unlike here) "[t]he only apparent avenue of redress for plaintiffs' claimed injuries would be injunctive or declaratory relief against . . . the President himself . . . [s]uch relief is unavailable."  *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010).

[11] Plaintiff has also failed to state any claim against the President under Federal Rule of Civil Procedure 12(b)(6), given the absence of any allegation that the President (rather than his subordinates) engaged in any unlawful conduct.  In addition, the Supreme Court has squarely held that the President himself is not subject to APA litigation, because the President is not an "agency" as that term of art is used in the APA.  *See Franklin*, 505 U.S. at 796.

26

even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that" the Supreme Court requires. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992).  Nor does it matter that he would have been subject to the testing requirement on his prior (canceled) trips. *See City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) (past injury does not provide standing to seek prospective injunctive relief).  All of Plaintiff's challenges to the testing order should be dismissed for lack of Article III standing (or because they are moot). [12]

## II.  Plaintiff's APA challenges to the CDC's transportation mask order are meritless.

Under the APA, a court may set aside agency action only where it is "arbitrary, capricious, an abuse of discretion, unconstitutional, in excess of statutory authority, without observance of procedure as required by law, or unsupported by substantial evidence." *Mahon v. USDA*, 485 F.3d 1247, 1253 (11th Cir. 2007); *see* 5 U.S.C. § 706(2).  Although Plaintiff tries several of those theories in his varied claims challenging the CDC's transportation mask order, they all fail.

### a.  The transportation mask order is authorized by the Public Health Service Act (Count 4).

The CDC acted within its statutory authority in issuing the transportation mask order.  Under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S.

---

[12] Indeed, much the same could be said of Plaintiff's *domestic* travel plans.  Federal Defendants have not emphasized that argument here, lest Mr. Wall buy new tickets and claim that another emergency requires the Court's immediate intervention.  As a formal matter, however, there is a strong jurisdictional argument that Mr. Wall lacks standing for *all* of his claims on this basis, and the Court could dismiss the case in its entirety for that reason alone (with or without discussion of the merits).

27

837 (1984), the Court first asks "whether Congress has directly spoken to the precise question at issue." *Id.* at 842.  If so, both the Court and the agency "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843.  "If, however, the statute is ambiguous on the point, we assume that Congress delegated to the agency the authority to reasonably answer the question." *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1256 (11th Cir. 2020).  So "[t]he second *Chevron* step is to determine if the agency's interpretation of the statute is reasonable." *Id.*

Here, only *Chevron*'s first step is necessary, because Congress unambiguously vested CDC (through the Secretary of HHS) with authority to take decisive action to control the spread of communicable diseases through conventional sanitation measures like masking.  But even if the statute were ambiguous, CDC's reasonable interpretation warrants deference.

**1.**  The first sentence of 42 U.S.C. § 264(a) empowers the Secretary "to make and enforce such regulations *as in his judgment are necessary* to prevent the introduction, transmission, or spread of communicable diseases" into or throughout the United States.   (emphasis added).   The text of the statute thus evinces a legislative determination to defer to the "judgment" of public-health authorities about what measures *they* deem "necessary" to prevent communicable disease, *see id.*  In other words, "Congress has granted broad, flexible powers to federal health authorities who must use their judgment in attempting to protect the public against the spread of communicable disease." *Louisiana v. Mathews*, 427 F. Supp. 174, 176 (E.D. La. 1977).

And "[w]hen Congress undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation." *Marshall v. United States*, 414 U.S. 417, 427 (1974).

The examples Congress gave of specific measures the Secretary may take— which are illustrative, not exhaustive—underscore the breadth of this authority, showing that it may even infringe on personal liberties where appropriate to protect public health. *See Indep. Turtle Farmers of La. v. United States*, 703 F. Supp. 2d 604, 619-20 (W.D. La. 2010) (explaining that "the list does not act as a limitation upon the types of regulations that may be enacted under Section 361 [of the PHSA]"). Such measures include the authority to impose restrictions on individuals' freedom of movement, including the "apprehension, detention, or conditional release of individuals." 42 U.S.C. § 264(a)-(b). The terms of the statute—including the examples of measures that the Secretary may adopt—invite the Secretary's exercise of expert judgment to determine what regulations may be appropriate to "prevent the introduction, transmission, or spread of communicable diseases." *Id.*

This point is bolstered by the fact that, although subsection (a) makes no mention of the Secretary's ability to detain persons, it is plainly contemplated as within the scope of what may be "necessary" in his "judgment," given the specific *restrictions* placed on any such regulations in subsections (b) through (d). *See id.* § 264(a)-(d). So it cannot be the case that the list of specific measures in subsection (a) is intended to

29

be an exhaustive list of the permissible measures available to the Secretary—otherwise, the restrictions on detention in subsections (b) through (d) would make little sense. [13]

**2.** Plaintiff focuses most of his attention on the second sentence of 42 U.S.C. § 264(a), arguing that the list of more specific measures that the Secretary "may" implement to prevent the spread of disease should be read as limiting the authority granted by the first sentence.   Relying on arguments that have been advanced in other litigation challenging other CDC orders, Plaintiff invokes the *ejusdem generis* canon of construction, "which says that where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."   Pl.'s MSJ at 10 (quotation omitted).   This argument not only fails on its own terms but, if anything, underscores that the order falls comfortably within the second sentence.

The *ejusdem generis* canon focuses on "the common attribute" of specific items to aid in the interpretation of a "catchall phrase."   *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 224-25 (2008).   The *noscitur a sociis* canon likewise looks to surrounding words to inform meaning.   *Babbitt v. Sweet Home Chapter of Cmtys. for a Greater Or.*, 515 U.S. 687,

---

[13] Although he argues that the mask order exceeds the authority that Congress has delegated to the Executive Branch, Plaintiff appears not to dispute that the regulation implementing this statutory language, by delegating authority to the CDC, is consistent with the statute.   Nor could he: the regulation is consistent with Congress's intent to provide flexibility in combatting the spread of disease, by allowing the CDC Director to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary[.]"   *See* 42 C.F.R. § 70.2.   The regulation does impose the additional requirement that CDC "determine[] that the measures taken by the health authorities of State or possession (including political subdivisions thereof) are insufficient to prevent the spread of . . . disease."   *Id.*   CDC has satisfied that obligation here.   *See* 86 Fed. Reg. 8025, 8030 (Feb. 3, 2021) ("This Order shall not apply" where state or local "requirements . . . provide the same level of public health protection as—or greater protection than—the requirements listed herein.").

702 (1995).  Here, the statute and the relevant regulations each permit CDC to take a number of similar (or more intrusive) actions that may affect individual rights, including "fumigation, disinfection, sanitation," and even the "destruction" of private property.  42 U.S.C. § 264(a); 42 C.F.R. § 70.2.

Masking is a conventional "sanitation" measure.  A leading dictionary defines "sanitation" as "the act or process of making sanitary" or "the promotion of hygiene and prevention of disease by maintenance of sanitary conditions."  Sanitation, *Merriam-Webster.com Dictionary*, https://perma.cc/9ARR-YKYH.  Much like wearing gloves or a gown, or disinfecting surfaces, wearing a mask reduces the transmission of viral particles.  That is exactly why "doctors have been wearing medical-grade N95 or surgical masks . . . during surgeries or patient interactions as part of their daily routines, for many decades."  *Why Doctors Wear Masks* (Sept. 1, 2020), YALEMEDICINE.ORG, https://perma.cc/TE77-8PBH.  And even if there were doubt on this score—and there is not—the temporary requirement to wear masks on public transportation is a comparable (or milder) imposition than the other examples enumerated in the statute.  It thus qualifies as an "other measure[]" that CDC has determined "may be necessary" "in [its] judgment," within the meaning of the second sentence of 42 U.S.C. § 264(a).

So regardless of whether the Court interprets the first sentence of 42 U.S.C. § 264(a) broadly, as it is written (*i.e.*, to authorize any measure that "in [the CDC's] judgment [is] necessary to prevent the introduction, transmission, or spread of communicable diseases"), or rather adopts a narrower interpretation (*i.e.*, to authorize

only measures that are akin to those listed in the second sentence, including "sanitation" measures), the transportation mask order is lawful.

**3.** Plaintiff references "[t]he major-questions doctrine," Pl.'s MSJ at 12, though it is one that, to the government's knowledge, has never featured in a Supreme Court or Eleventh Circuit *majority* opinion. *See Gundy v. United States*, 139 S. Ct. 2116, 2141-42 (2019) (Gorsuch, J., dissenting) (advocating in dissent for application of a "major questions" doctrine in the context of nondelegation challenges). In any event, Plaintiff never explains why a temporary requirement to wear a face covering while on public transportation (or obtain a medical exemption) even *qualifies* as such a "major question." To the contrary, a temporary requirement to wear a mask (or document one's medical inability to do so) during a global pandemic is a comparatively minor imposition, particularly in the context of commercial air travel— in which travelers are routinely subjected to extensive government searches and safety measures, under color of federal law, that would be unthinkable in many other settings. And the order does not, for example, "lay[] claim to extravagant statutory power over the national economy" in general, nor depart from prior agency interpretations to bring about "an enormous and transformative expansion in [its own] regulatory authority." *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000) (rejecting FDA's new interpretation of its own authority to regulate tobacco products).

**4.**  Even if the statute were ambiguous, *Chevron* step two requires deference to the agency's reasonable interpretation.  The rationale underlying *Chevron* deference is that "ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion"—decisions that "involve[] difficult policy choices that agencies are better equipped to make than courts."  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).  *Chevron* thus applies where "Congress delegated authority to the agency generally to make rules carrying the force of law, and . . . the agency interpretation . . . was promulgated in the exercise of that authority."  *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001).  In such circumstances, courts must uphold the agency's interpretation "as long as it is a permissible construction of the statute, even if it differs from how the court would have interpreted the statute."  *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 158 (2013).

Those prerequisites for *Chevron* deference are satisfied here.  The PHSA reflects a congressional delegation to HHS to promulgate regulations with the force of law.  The statute authorizes the Secretary "to make and enforce such regulations as in his judgment are necessary" to prevent the spread of disease.  42 U.S.C. § 264(a).  It further allows the Secretary to "provide for . . . measures [that] in his judgment may be necessary" in order to "carry[] out and enforc[e] such regulations[.]"  *Id.*  And the implementing regulation paraphrases this language to delegate to the CDC Director the full authority Congress provided to "take such measures to prevent such spread of

33

the diseases as he/she deems reasonably necessary," provided he makes the additional determination that state and local disease-control measures are inadequate. 42 C.F.R. § 70.2. The language clearly provides the agency authority to make binding regulations. *Accord Brand X*, 545 U.S. at 980-81 (analyzing a statute empowering an agency to "execute and enforce" an Act and "prescribe such rules and regulations as may be necessary in the public interest to carry out [its] provisions"). Finally, the mask order was issued pursuant to that authority, and has the force of law. *See* 86 Fed. Reg. at 8030.[14] Accordingly, even if the Court determines that the statutory question is a close one, it should defer to CDC's reasonable interpretation under *Chevron*.

5. Plaintiff is wrong to analogize the mask order to the CDC's eviction moratorium, which both the Supreme Court and the Eleventh Circuit recently left in place. *See Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2320 (2021) (denying application to vacate stay pending appeal); *Brown v. HHS*, --- F. 4th ----, 2021 WL 2944379 (11th Cir. July 14, 2021) (affirming denial of preliminary injunction for lack of irreparable harm, after declining to "consider or resolve the scope of the CDC's statutory authority").

---

[14] The fact that the agency did not engage in notice-and-comment rulemaking does not change this conclusion. *See Barnhart v. Walton*, 535 U.S. 212, 221 (2002) ("that the Agency previously reached its interpretation through means less formal than 'notice and comment' rulemaking, . . . does not automatically deprive that interpretation of the judicial deference otherwise its due"); *Mead*, 533 U.S. at 231 ("we have sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded"). Instead, factors like the clear authority pursuant to which it was promulgated, the fact that the Order carries the force of law, its formality—the Order was published in the Federal Register—and the agency's unquestionable public-health expertise demonstrate that deference to the agency's interpretation of the statute is warranted. *See Mead*, 533 U.S. at 230-31; *see also NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257-58 (1995) (deferring, under *Chevron*, to agency's reasonable position articulated in interpretive letters).

To be clear, several courts *have* endorsed CDC's interpretation of its authority. *See, e.g.*, *Ala. Ass'n of Realtors v. HHS*, No. 21-5093, 2021 WL 2221646, at *1 (D.C. Cir. June 2, 2021) ("[T]he CDC's eviction moratorium falls within the plain text of 42 U.S.C. § 264(a)."). But even the unfavorable lower-court opinions about the eviction moratorium have acknowledged that the CDC's authority to prevent the spread of disease includes areas of traditional federal jurisdiction—as contrasted with the evictions and landlord-tenant relations that those courts described as traditional state-law matters. *See, e.g.*, *Tiger Lily, LLC v. HUD*, --- F. 4th ----, 2021 WL 3121373, at *4 (6th Cir. July 23, 2021) (reasoning that the CDC's eviction moratorium "alters the federal-state framework by permitting federal encroachment" on the "traditional state power," over "landlord-tenant relations"); *see also Brown*, 2021 WL 2944379, at *26 (Branch, J., dissenting) (arguing in dissent that "§ 264(a) does not authorize the CDC Order" placing a moratorium on evictions "because [t]here is no unmistakably clear language in the Public Health Service Act indicating Congress's intent to invade the traditionally State-operated arena of landlord-tenant relations") (quotation omitted).

Some of those opinions have also accepted the argument (advanced by Plaintiff here) that the CDC's authority is limited to the types of measures specifically listed in the second sentence of 42 U.S.C. § 264(a), because of various canons of construction. *See, e.g.*, *Brown*, 2021 WL 2944379, at *26 (Branch, J., dissenting) ("Applying the canons of *noscitur a sociis* and *ejusdem generis*, 'other measures' must be measures like inspection, fumigation, disinfection, sanitation, pest extermination, or destruction of

animals or articles found to be sources of dangerous infection[.]").  But as explained above, even if that reading were correct, the transportation mask order still qualifies: either as an actual "sanitation" measure, or (at a minimum) as an "other measure[]" sufficiently similar to a "sanitation" measure.  42 U.S.C. § 264(a).

The mask order is thus consistent with even the narrowest interpretation of CDC's authority in the eviction-moratorium opinions: it is a targeted response to a public-safety threat facing our nation's interstate-transportation system— unquestionably an area of traditional federal control—and it relies on an entirely conventional sanitation measure to reduce the spread of communicable disease, [15] which falls comfortably within the CDC's core mission.  Likewise, especially when it comes to air travel, there is nothing novel about the federal government adopting safety measures that might be considered unnecessary in other contexts, such that any uncommon clarity from Congress should be expected or required.  So although Federal Defendants respectfully disagree with several of the opinions about CDC's eviction moratorium, even if they were correct (or binding), they would not warrant vacatur of the CDC's transportation mask order.

---

[15] *See, e.g.*, Paul French, *In the 1918 flu pandemic, not wearing a mask was illegal in some parts of America.  What changed?* (April 4, 2020), CNN.com, https://perma.cc/JCJ6-F2ZU ("Mask-wearing laws largely had public support and were mostly policed by consent."); *Why Doctors Wear Masks* (Sept. 1, 2020), YaleMedicine.org, https://perma.cc/TE77-8PBH ("While mask-wearing may be new to most of us, doctors have been wearing medical-grade N95 or surgical masks . . . during surgeries or patient interactions as part of their daily routines, for many decades.").

### b.   The transportation mask order is consistent with the ACAA and DOT's implementing regulations (Count 14).

The transportation mask order is likewise consistent with the ACAA and its implementing regulations—both with respect to the general requirement to wear a mask, and the exemptions for persons with disabilities that prevent them from wearing a mask or doing so safely.

At the outset, there is plainly no violation of the ACAA itself, and it is not clear that Plaintiff contends otherwise. Although he does cite 49 U.S.C. § 41705, *see* Compl. ¶ 1037, that statute merely prohibits an "air carrier" from "[d]iscrimination against handicapped individuals." The CDC is not an "air carrier," but in any case, by generally requiring masking, neither the mask order nor airlines implementing it "discriminate against" passengers on the basis of "a physical or mental impairment that substantially limits one or more major life activities." 49 U.S.C. § 41705. To the contrary: the order explicitly *exempts* any "person with a disability who cannot wear a mask, or cannot safely wear a mask, because of the disability." 86 Fed. Reg. 8027. And the motivation for the mask requirement is not anyone's disability, but generally applicable concerns about the spread of a communicable disease.

As for the ACAA's implementing regulations in 14 C.F.R. Part 382, they likewise apply only to airlines, 14 C.F.R. §§ 382.19, 382.21, so they have no clear relevance to Plaintiff's claims against the CDC (or the Federal Defendants generally). But even ignoring that threshold problem, those regulations provide clear guidance on

how airlines should accommodate persons with disabilities when implementing the transportation mask order, and are not violated here.

In Count 14, Plaintiff alleges that the mask order runs afoul of 14 C.F.R. § 382.21, which he reads to preclude an airline from requiring a passenger to wear a mask, or refusing him carriage for not doing so, unless it determines that the passenger in fact "has a communicable disease and poses a 'direct threat'" to other passengers or crew.  Compl. ¶ 1038 (citing 14 C.F.R. § 382.21).  That reading is mistaken, as that regulation has no application here.  In short, Section 382.21 provides that an airline may not "[r]efuse to provide transportation to [a] passenger" or "[i]mpose on the passenger any condition . . . not imposed on other passengers" "*on the basis* that [he] has a communicable disease or infection," absent a finding of a direct threat.  14 C.F.R. § 382.21 (emphasis added).  But the mask order does not differentiate between passengers who do or do not have COVID-19, or direct airlines to deny carriage to passengers "on the basis" of their infection status; passengers who decline to wear masks are denied carriage "on the basis" of their refusal to adhere to that safety requirement.  The Court need go no further to reject this claim.

To the extent Mr. Wall alleges in Count 14 (or perhaps Count 15) that the mask order instead runs afoul of 14 C.F.R. § 382.19—which governs airlines' refusal of carriage "on the basis of disability," as opposed to infection status—the claim also fails.  Under Section 382.19, an airline may not refuse carriage to a passenger who asserts an inability to wear a mask (or to do so safely) due to a disability unless the

airline first makes "an individualized assessment [of the direct threat posed by that passenger], based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence." *Id.* § 382.19(c)(1).   The purpose of the assessment is to ascertain "(i) [t]he nature, duration, and severity of the risk [posed by the individual]; (ii) [t]he probability that the potential harm to the health and safety of others will actually occur; and (iii) [w]hether reasonable modifications of policies, practices, or procedures will mitigate the risk." *Id.*   If the airline has adequately determined, based on such an individualized assessment, that the passenger does pose a direct threat to the health or safety of others because of a disability-related condition, the airline "must select the least restrictive response from the point of view of the passenger, consistent with protecting the health and safety of others," and must "not refuse transportation to the passenger if [the airline] can protect the health and safety of others by means short of a refusal" to provide transportation. *Id.* § 382.19(c)(2).

Today, airlines allow passengers who are unable to wear a mask (or to do so safely) because of a disability to travel without masks so long as those passengers participate in these "individualized assessments" and follow the conditions imposed by the carrier to protect the health and safety of others.   In any event, airlines are permitted to refuse "any passenger whose carriage would violate FAA or TSA requirements." 14 C.F.R. § 382.19(c).   That alone is sufficient to resolve the matter, given the TSA Security Directives implementing the CDC's mask order. *See* Exs. 3-6.

Regardless, as noted earlier, each of the challenged orders provides an exemption for persons who have a disability that prevents them from wearing a mask or doing so safely.  *See* 86 Fed. Reg. at 8027; Ex. 3, SD 1542-21-01A at 4; Ex. 4, SD 1544-21-02A at 3; Ex. 5, SD 1582/84-21-01A at 4; Ex. 6, EA 1546-21-01A at 3.  To be sure, to ensure the integrity of the exemption process, the airlines may impose reasonable conditions, including that passengers request an accommodation in advance, provide documentation from a licensed medical provider, or participate in a third-party medical consultation.  86 Fed. Reg. at 8027 n.8.  In addition, the CDC order allows airlines to impose protective measures, such as requesting that the person seeking an exemption submit a negative COVID-19 test, or seating the individual in a less-crowded section of the aircraft.  *Id.*  Plaintiff points to nothing in the text of Section 382.19 mandating otherwise. [16]

---

[16] Plaintiff also cites 14 C.F.R. § 382.23(a) which provides that an airline generally "must not require a passenger with a disability to have a medical certificate as a condition for being provided transportation."  *See* Compl. ¶ 239.  But "medical certificate" is a defined term, describing documentation used to verify that the person can complete the flight safely without requiring extraordinary medical assistance.  *See* 14 C.F.R. § 382.23(b)(2).  Airlines may also require a medical certificate for a passenger if he or she has a communicable disease or condition that could pose a direct threat to the health or safety of others on the flight, and in this context, a "medical certificate" is defined as "a written statement from the passenger's physician saying that the disease or infection would not, under the present conditions in the particular passenger's case, be communicable to other persons during the normal course of the flight."  *Id.* § 382.23(c)(2).  The term does not encompass medical documentation verifying a disability to obtain an exemption from a generally applicable requirement.  In all events, if Plaintiff believes that an airline has improperly denied him an exemption or imposed particular requirement not permitted by the ACAA, his remedy in the first instance is to seek redress from DOT through its complaint procedures, 49 U.S.C. § 46101(a); 14 C.F.R. § 382.159, not to file a claim in district court.  *See supra* Section I(b)(2).

c.     **The transportation mask order is not arbitrary and capricious (Count 3).**

Arbitrary and capricious review is "exceedingly deferential." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (quotation omitted).  Courts may not "substitute [their] judgment for the agency's as long as its conclusions are rational." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009).  "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 141 S. Ct. at 1158.  Of particular relevance here, the Eleventh Circuit "give[s] an extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise." *Nat'l Mining Ass'n v. Dep't of Labor*, 812 F.3d 843, 866 (11th Cir. 2016) (quotation omitted); *see also Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983) (where an agency "is making predictions, within its area of special expertise, at the frontiers of science, . . . a reviewing court must generally be at its most deferential").

Plaintiff's claim cannot satisfy this "exceedingly deferential" standard. *Van Antwerp*, 526 F.3d at 1360.  Mr. Wall's claim is largely premised on his own contrarian view of the scientific evidence: that "face masks are totally ineffective in reducing coronavirus spread (and are actually harmful in many circumstances)."  Compl. at 3.  But the CDC has amply supported its determination that mask wearing "is one of the most effective strategies available for reducing COVID-19 transmission." 86 Fed. Reg. at 8026.  And the CDC has "reasonably explained," *Prometheus Radio Project*, 141 S.

Ct. at 1158, that masks both (1) "help prevent people who have COVID-19, including those who are pre-symptomatic or asymptomatic, from spreading the virus to others," and (2) "also provide personal protection to the wearer by reducing inhalation of" "virus-laden droplets."   86 Fed. Reg. at 8028.   Under bedrock principles of administrative law, that is enough to resolve this claim, even if there were room for reasonable scientists to disagree.

That said, even a cursory review of the administrative record shows that CDC's judgment aligns with the widespread medical consensus that masks work to slow the spread of COVID-19.   *See* 86 Fed. Reg. at 8028 ("Seven studies have confirmed the benefit of universal masking in community level analyses," each of which "demonstrated that, following directives . . . for universal masking, new infections fell significantly.").   Although Mr. Wall may disregard that evidence in formulating his own beliefs, the CDC has greater responsibilities—both to the rigors of the scientific method, and to the American people.

The scientific consensus supporting mask-wearing to prevent transmission of COVID-19 is presumably why "[a] person not wearing a mask . . . will not be allowed in—or will be directed to leave—a courthouse" in the Middle District of Florida. Ex. 10, No. 3:20-mc-00023, ECF No. 4, COVID-19 Order (M.D. Fla. July 30, 2021) (Corrigan, C.J.).   And in the context of commercial air travel in particular, social distancing is often impossible, and there is a long history of federal regulation— including to protect passengers from being exposed to airborne contaminants.   *Cf.*

42

*Competitive Enter. Inst. v. Dep't of Transportation*, 863 F.3d 911, 919 (D.C. Cir. 2017) ("[E]-cigarette vapor in confined aircrafts could harm non-users.  Especially due to the involuntary nature of secondhand exposure on aircrafts, where individuals are often assigned seats, . . . [t]hose seated next to users may not want to expose themselves (or their babies or older children) to even small risks[.]") (citations omitted).

Mr. Wall points to a smattering of other sources, *see* Compl. ¶¶ 682-827, which he interprets to be inconsistent with the CDC's judgment about the safety and efficacy of masks—or what he considers to be "muzzling suffocation devices that science says are causing great harm." *Id.* ¶ 787.  Many of those "studies" are flawed and questionably sourced on their face,[17] but this Court need not wade into that morass. Even accepting the (dubious) premise that there is significant uncertainty about either the efficacy or safety of mask-wearing during a global pandemic of an airborne respiratory virus, the APA does not require unanimity or certainty in the scientific literature before an agency can act. *Cf. Prometheus Radio Project*, 141 S. Ct. at 1160 ("[T]he FCC did not have perfect empirical or statistical data.  Far from it.  But that is not unusual in day-to-day agency decisionmaking within the Executive Branch."). Congress has entrusted these judgments to the CDC—not to Mr. Wall, and, respectfully, not to the courts. *Cf. Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1000 (D.C. Cir. 2008) ("In an area characterized by scientific and technological

---

[17] As but one example, Plaintiff relies on sources like thegatewaypundit.com, *see* Pls.' Ex. 161, ECF No. 1-11, a website that is hardly known for its scientific rigor.  *See, e.g., What is Gateway Pundit, the conspiracy-hawking site at the center of the bogus Florida 'crisis actors' hype?*, THE WASHINGTON POST (Feb. 23, 2018), https://perma.cc/4LT2-CKXN.

uncertainty[,] . . . this court must proceed with particular caution, avoiding all temptation to direct the agency in a choice between rational alternatives.").

Mr. Wall emphasizes that he is fully vaccinated, and that COVID-19 vaccination dramatically reduces the risk of infection, transmission, hospitalization, and death. *See* Compl. ¶¶ 2, 329. But that does nothing to undermine the legality of the mask order. At the outset, it certainly does not affect this facial challenge, in which Plaintiff seeks an order that would prohibit "*any* requirement that *any* traveler or transportation employee cover their face unless the person is known to be infected by a communicable disease." Compl., Prayer for Relief ¶ Q (emphases added).

More fundamentally, the question here is whether the CDC acted rationally *in January*, when it issued the order—not whether CDC would rely on identical reasoning to justify it today. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) ("It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked *when it took the action*.") (emphasis added) (quotation omitted); *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). Plaintiff cannot dispute that in January, case counts were at or near "the[ir] highest peak," *see* Compl. ¶ 409, and vaccines were not yet widely available. In addition, "at th[at] time there [was] limited information on how much the available COVID-19 vaccines may reduce transmission in the general population and how long protection lasts." 86 Fed. Reg. at 8029.

Even if it were appropriate to consider subsequent developments (like increased vaccine availability) that post-date the action under review, only about half the country is fully vaccinated, *see* https://covid.cdc.gov/covid-data-tracker/#vaccinations (last visited August 9, 2021), and the CDC recently recommended that, in order "[t]o maximize protection from the Delta variant and prevent possibly spreading it to others," even fully vaccinated individuals should "wear a mask indoors in public if you are in an area of substantial or high transmission," CDC.gov, *When You've Been Fully Vaccinated* (updated July 27, 2021), https://perma.cc/C3LC-HMLF; *see also* Ex. 10, Middle District of Florida COVID-19 Order (requiring masks for "[e]very person age four or over seeking to enter a courthouse . . . regardless of vaccination status").

Case counts are rising once again. *See* CDC COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker (last visited August 9, 2021); *Norwegian Cruise Line Holdings, Ltd. v. Rivkees*, --- F. Supp. 3d ----, 2021 WL 3471585, at *3 (S.D. Fla. Aug. 8, 2021) ("Since the end of June, the number of new COVID-19 cases has increased dramatically in Florida, which now accounts for 20 percent of all new cases in the United States."). And, contrary to Mr. Wall's assertion that they face "zero risk," Pl.'s MSJ at 17, even fully vaccinated individuals face a risk of both infection and transmission of the Delta variant. *See Statement from CDC Director Rochelle P. Walensky* (July 30, 2021), https://perma.cc/X5MM-EV4G; Riemersman & Grogan *et al.*, *Vaccinated and unvaccinated individuals have similar viral loads in communities with a high prevalence of the SARS-CoV-2 delta variant* (July 31, 2021) (pre-print),

45

https://perma.cc/NCM6-JGDS.  Whether based on the facts before the CDC in January, or the facts before the CDC today, Mr. Wall's challenge fails.

### d.   The transportation mask order does not violate the APA's notice-and-comment requirements (Count 1).

Plaintiff contends that the transportation mask mandate is void because CDC did not comply with the notice-and-comment requirements that apply to legislative rules under the APA.  Compl. ¶ 965.  That claim fails because the mask order is not a "rule" to which those requirements apply, and even if it were, there was good cause to proceed without notice and comment given the urgent circumstances, as the APA expressly permits.  *See* 5 U.S.C. § 553(b)(B).  In addition, any error was harmless.

First, the APA's notice-and-comment requirements apply to "rule making," *see* 5 U.S.C. § 553, with the term "rule" defined to include "statement[s] of general or particular applicability and future effect" that are designed to "implement, interpret, or prescribe law or policy," *id.* § 551(4).  But the mask order is not a "rule" in the relevant sense; instead, it is an "an emergency action taken under the existing authority of 42 U.S.C. § 264(a) and 42 C.F.R. §§ 70.2, 71.31(b), 71.32(b)."  86 Fed. Reg. at 8030.  By contrast, 42 C.F.R. § 70.2 *is* a duly promulgated rule, and it permits the Director of CDC to take "such measures to prevent such spread of the diseases as he/she deems reasonably necessary" to prevent the further spread of disease.  Given that the very purpose of § 70.2 is to enable CDC to take swift steps to prevent the spread of communicable diseases, it cannot be that the actions it authorizes are also rules that require *another* round of notice and comment before they take effect.

46

Second, even if the mask order were a rule, notice-and-comment rulemaking is not required "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B).   This exception streamlines APA procedures in emergency situations, or where delay could result in serious harm.  *United States v. Dean*, 604 F.3d 1275, 1281 (11th Cir. 2010).  The finding here meets that standard: as CDC explained, "[c]onsidering the public health emergency caused by COVID-19, it would be impracticable and contrary to the public's health . . . to delay the issuance and effective date of this Order."  86 Fed. Reg. at 8030.  CDC thus acted quickly given the "public safety justification[s]" at stake, *Dean*, 604 F.3d at 1281, just as the APA permits.  If the good-cause exception does not apply to temporary public-health measures to protect our transportation systems during a pandemic that has already killed 614,000 Americans, it is hard to imagine when it would.

In any event, in the alternative, any notice-and-comment error was harmless. The APA provides that "due account shall be taken of the rule of prejudicial error," 5 U.S.C. § 706, which is like "an administrative law harmless error rule," *Little Sisters of the Poor v. Pennsylvania*, 140 S. Ct. 2367, 2385 (2020) (alteration and citation omitted). Accordingly, "[i]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand."  *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004).   "The party claiming injury bears the

burden of demonstrating harm; the agency need not prove its absence." *Combat Veterans for Cong. Political Action Comm. v. FEC*, 795 F.3d 151, 157 (D.C. Cir. 2015).

Here, Plaintiff never even attempts to explain what he would have said during a comment process, let alone how that could have made a difference to the outcome, given the emergency that CDC was (and is) facing in responding to COVID-19. For that reason "it would be senseless to vacate and remand," *PDK Labs.*, 362 F.3d at 799, given the likelihood that CDC would reach the same conclusion—particularly now, given the spread of the highly transmissible Delta variant. And what Plaintiff seems to be most interested in—namely, a medical exemption for those with disabilities who cannot wear a mask safely—is already provided by the order. *See* 86 Fed. Reg. at 8027.

## III.   Plaintiff's APA challenges to the TSA's Security Directives implementing the CDC's transportation mask order are meritless (Counts 9-12).

### a.   The TSA's Security Directives fall within TSA's statutory authority.

As discussed, *see supra* Section I(a), the Court lacks subject-matter jurisdiction over all of Plaintiff's claims against the TSA. But even if Plaintiff could overcome that problem, those claims are meritless. Contrary to Plaintiff's assertion (Count 12), Congress did not leave the TSA powerless to address a threat to the transportation system arising from a global pandemic. Instead, Congress has provided the TSA with several independently adequate, and mutually reinforcing, sources of authority upon which the agency properly relied in implementing the CDC's mask order.

First, Congress has vested in the TSA broad authority to develop plans and strategies for dealing with threats to transportation security. *See* 49 U.S.C. § 114(f)

(enumerating the TSA's functions and duties); *id.* § 114(f)(3) (directing the TSA to "develop policies, strategies, and plans for dealing with threats to transportation security"); *id.* § 114(f)(4) (directing the TSA to additionally "make other plans related to transportation security, including coordinating countermeasures with appropriate departments, agencies, and instrumentalities of the United States Government"); *id.* § 114(f)(13) (authorizing the TSA to coordinate with the FAA "with respect to any actions or activities that may affect aviation safety"). Second, the TSA has additional responsibilities in the transportation sector where, as here, the Secretary of Homeland Security has declared a national emergency. 49 U.S.C. § 114(g). During a declared emergency like this one, the TSA becomes responsible for "coordinat[ing] domestic transportation," and "oversee[ing] the transportation-related responsibilities of other departments and agencies of the Federal Government." *Id.* In other words, the TSA is specifically empowered to coordinate with the CDC and other agencies to take common action and address a threat to transportation, as it did here.

Plaintiff mistakenly suggests that "TSA's sole mission . . . is to ensure transportation *security*, i.e. to prevent planes, trains, buses, subways and ferries from being blown up or hijacked." Compl. ¶ 1028 (emphasis added). The distinction Plaintiff tries to draw between "security" and "safety," however, ignores the statutory text, which repeatedly tasks the TSA with ensuring both "safety" and "security." *See* 49 U.S.C. § 44903(h)(3) (authorizing deployment of law-enforcement personnel at airports to address "aviation safety and security concerns"); *id.* § 44903(h)(4)(C)(i)

(requiring the TSA to "establish procedures to ensure the safety" of "all persons providing services with respect to aircraft"); *id.* § 44901(h) (authorizing TSA to deploy police at airport security checkpoints "to ensure passenger safety and national security"), *id.* § 44902(b) (permitting carriers to refuse transportation to passengers or property "inimical to safety"); *id.* § 44903(b) (passenger screening regulations to "ensure . . . their safety"); *id.* § 44903(e) (responsibility to direct police activity "related to the safety of passengers"); *id.* § 44905(a) (empowering TSA to cancel a flight if a threat to "the safety of passengers and crew of a particular flight" cannot be mitigated).

In short, the TSA's authorizing statute embraces a broad and holistic understanding of transportation safety *and* security that encompasses responding to any type of threat to travelers and transportation workers. And the challenged directives are directly related to transportation safety and security. First, as explained above, *see supra* Section II(c), the transportation mask order can mitigate the risk of travelers spreading COVID-19, and in turn, reduce the loss of life. *See* 86 Fed. Reg. at 8029. Second, the TSA's mandate to protect the security of transportation systems also extends to ensuring that potential threats do not disturb the operational viability of transportation providers. The nature of transportation requires that workers "frequently come into close contact with other people," including passengers, placing them at increased risk of contracting the virus. *Id.* at 8029. If those workers fall ill, transportation providers will have to cut service, and if the service cuts become severe, it could threaten the nation's domestic and global supply chain, and consequently, our

economic and national security. *Id.* Likewise, if too many TSA screening employees fall ill from close contact with infected passengers and are unavailable for work, the TSA's ability to effectively conduct screening operations that are critical to the safety and security of the traveling public would be drastically impaired. That concern is not a hypothetical one: to date, over 8,800 screening employees have been infected with COVID-19, and eighteen employees (and one contractor) have died. *See* TSA, *Coronavirus (COVID-19) Information*, https://www.tsa.gov/coronavirus (last visited August 9, 2021).

In any event, Plaintiff's unduly narrow interpretation of the TSA's general responsibility to maintain transportation security under 49 U.S.C. § 114(f) ignores TSA's additional responsibilities in the transportation sector where, as here, the Secretary of Homeland Security has declared a national emergency. 49 U.S.C. § 114(g). That provision empowers the TSA to "oversee the transportation-related responsibilities of other departments and agencies"; coordinate with other federal agencies "about threats to transportation"; and carry out "such other duties . . . relating to transportation during a national emergency as the Secretary of Homeland Security shall prescribe"—all without regard to whether the actions taken in the transportation sector are related to matters of "security." *Id.*

The directives at issue here were properly promulgated pursuant to TSA's authorities to impose security or safety requirements in the aviation and surface transportation sector. On January 27, 2021, the Acting Secretary of Homeland

51

Security announced he had "consult[ed] with public health officials" and determined that "a national emergency exists" with respect to the continued threat of COVID-19. Ex. 2, DHS Emergency Decl. at 1. In light of this emergency, he directed TSA to take all actions "consistent with" its emergency authorities "to promote safety in and secure the transportation system," including by "supporting the CDC in the enforcement of any orders" designed to "mitigate the spread of COVID-19 through the transportation system." *Id.* at 1-2.

Shortly thereafter, the CDC issued the transportation mask order, which expressly contemplated that the TSA would follow the direction of the Secretary of Homeland Security and exercise TSA's authority to assist in enforcement of the CDC's order. *See* 86 Fed. Reg. at 8030; *see also* Ex. 2, DHS Emergency Decl. at 1 (directing the TSA to "support[] the CDC in the enforcement of any" transportation-related order). That is exactly what the TSA did when it issued the challenged directives.

### b. The TSA's Security Directives do not violate the APA's notice-and-comment requirements.

Plaintiff's claim (Count 9) that the TSA's Security Directives violate the APA's notice-and-comment requirements likewise has no merit. Under 49 U.S.C. § 114(*l*)(2)(A), if the TSA determines that a regulation or security directive "must be issued immediately in order to protect transportation security," the TSA can issue it "without providing notice or an opportunity for comment and without prior approval of the Secretary [of Homeland Security]." Regulations and security directives issued under this authority are subject to review by the Transportation Security Oversight

Board, *see* 49 U.S.C. § 115(b), and "shall remain effective for a period not to exceed 90 days" unless submitted to and ratified by the Board.  *Id.* § 114(*l*)(2)(B).

Here, whether or not it was required, TSA requested that the Board review and ratify all of the challenged Security Directives as "a practical measure to validate" their implementation.  *See* Ex. 11, Action Mem. for TSOB Chairman, *Transportation Security Oversight Board Ratification of TSA Security Directives 1542-21-01, 1544-21-02 & Emergency Amendment 1546-21-01 Imposing Mask Requirements in Aviation Transportation* (Mar. 30, 2021).  The Board ratified each of the directives, effective April 20, 2021.  *See id.*; *see also* 86 Fed. Reg. at 26,826.  That resolves this claim.[18]

## IV.  Plaintiff's APA challenges to the CDC's international traveler testing order are meritless (Counts 19-23).

Plaintiff also challenges the CDC's international traveler testing order, a January 2021 order that (with certain exceptions) generally requires international air travelers to provide proof of a negative COVID-19 test (or documentation of recovery from COVID-19) before departing for the United States.  *See* Ex. 9.  As discussed above, *see supra* Section I(d), Mr. Wall's claims challenging this order seem to request an advisory opinion forbidden by Article III, as there is no evidence in the record that Mr. Wall has any "concrete plans" for future international travel in which he would be subject to the testing order.  *Lujan*, 504 U.S. at 564.  But even if the court had

---

[18] Count 11 (APA arbitrary-and-capricious claim) against TSA fails for all the same reasons as Plaintiff's arbitrary-and-capricious claims against CDC, *see supra* Section II(c), as well as the additional reasons set forth earlier in this section—for example, the importance of maintaining the health and safety of TSA's own employees, without whom our nation's air-transportation systems could not function safely.

jurisdiction (or if Mr. Wall is able to cure that defect), these claims are meritless, for many of the same reasons that apply to the transportation mask order.

a.   **The international traveler testing order is authorized by the Public Health Service Act (Count 22).**

As explained at length above in the context of Plaintiff's statutory challenge to the transportation mask order, *see supra* Section II(a), the Public Health Service Act authorizes the CDC "to make and enforce such regulations as in [its] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession."   42 U.S.C. § 264(a).   And at a minimum, CDC's reasonable interpretation of any ambiguity in that provision is entitled to *Chevron* deference.   All of those same arguments apply equally to the testing requirement, and are sufficient to sustain it.

The second sentence of 42 U.S.C. § 264(a) also plainly authorizes the testing requirement, particularly given the explicit reference to "inspection."   The inspection of arriving passengers to determine whether they are bringing something dangerous into the United States is hardly a novel concept for international travelers.   It makes no difference whether the goal of this inspection is to find something small (*i.e.*, a virus), rather than something large (*e.g.*, narcotics, or plants or animals carrying disease).   And this authority is also consistent with longstanding regulations that Mr. Wall appears not to directly challenge here.   *See also* 42 C.F.R. § 71.32(b) ("Whenever the Director has reason to believe that any arriving carrier . . . is or may be infected

54

. . . with a communicable disease, he/she may require detention, disinfection, . . . or other related measures respecting the carrier or article or thing as he/she considers necessary to prevent the introduction, transmission, or spread of communicable diseases."); *id*. § 71.31(b) (similar).  Indeed, those regulations have long authorized the CDC to "conduct public health prevention measures," including non-invasive testing, on arriving passengers "to detect the potential presence of communicable diseases." *Id*. § 71.20(a); *see id.* § 71.1 (definitions).  So, much like the mask order, *see supra* Section II(a), even if this Court were to adopt a narrow reading of 42 U.S.C. § 264(a), authorizing only measures like "inspection, fumigation, disinfection, [and] sanitation," the testing order would still qualify, whether as an inspection or, at a minimum, a measure akin to one.

Finally, the propriety of CDC's interpretation of its authority is even clearer in the context of *international* travelers entering the United States, given the President's independent authority under Article II of the Constitution.  "The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004); *see also, e.g.*, *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (discussing the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress").  So with respect to the international traveler testing order, it would be even more problematic to adopt Plaintiff's cramped

interpretation of the authority that Congress expressly delegated to the Executive Branch "to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into" the United States. 42 U.S.C. § 264(a).

### b.   The international traveler testing order is not arbitrary and capricious (Count 21).

Plaintiff's arbitrary-and-capricious challenge to the international traveler testing order fails because CDC "reasonably considered the relevant issues and reasonably explained the decision," which is all that the APA requires. *Prometheus Radio Project*, 141 S. Ct. at 1158. The agency's justification was straightforward: "The COVID-19 pandemic has spread throughout the world. Individuals who travel may be at risk for exposure to SARS-CoV-2 before, during, and after travel. This could result in U.S.-bound travelers further spreading the virus to others during travel, upon arrival in the United States, and at their destinations." 86 Fed. Reg. at 7389. No more need be said.

To be sure, as CDC expressly acknowledged, "[p]re-departure testing does not eliminate all risk." *Id.* at 7390. But "when pre-departure testing is combined with other measures such as self-monitoring for symptoms of COVID-19, wearing masks, social distancing, and hand hygiene, it can make travel safer by reducing spread on conveyances, in transportation hubs, and at destinations." *Id.* And Plaintiff does not (and cannot) dispute the obvious and critical benefit: "Pre-departure testing may detect travelers infected with SARS-CoV-2 *before* they initiate their travel" to the United

States.  *Id.* (emphasis added).  There is no basis to second-guess this straightforward, and comparatively non-intrusive, public-health precaution.[19]

### c.    The international traveler testing order does not violate the APA's notice-and-comment requirements (Count 19).

For many of the same reasons that the mask order did not have to go through the APA's notice-and-comment process, *see supra* Section II(d), neither did the testing order, which was also "an emergency action taken under the existing authority of 42 U.S.C. § 264(a) and 42 C.F.R. §§ 70.2, 71.31(b), 71.32(b)."  86 Fed. Reg. at 8030 (transportation mask order); *accord* 86 Fed. Reg. at 7391 (international traveler testing order) (citing 42 U.S.C. § 264(a) and 42 C.F.R. §§ 71.31(b), 71.32(b)).

In addition, the international traveler testing order was exempt from the APA's notice-and-comment requirements for an additional, independent reason: 5 U.S.C. § 553(a)(1)'s explicit textual exception for agency actions that "involve[] . . . a military or foreign affairs function of the United States."  Unlike the transportation mask order, the *international* traveler testing order applies only in the context of *international* travel to the United States, and indeed it operates almost exclusively overseas, given the requirement for a "pre-departure" negative test.  86 Fed. Reg. at 7388.  It is thus "linked intimately with the Government's overall political agenda concerning

---

[19] Although Plaintiff alleges that his refusal to wear a mask is grounded in a medical justification, his objection to (and alleged Article III injury from) the international testing order is harder to identify.  The closest he comes is the statement that he does not wish to "pay[] for a costly COVID-19 test," Compl. at 6, but the overall cost of international air travel dwarfs the cost of a COVID-19 test—in fact, so does the filing fee for this lawsuit.  For example, in Frankfurt, Germany, where Mr. Wall previously planned to travel, COVID-19 testing appears to be available at the airport for €29.  *See COVID-19 testing at the airport* (Rapid Test), https://perma.cc/WWM8-EWE9.

57

relations with []other countr[ies]." *Am. Ass'n of Exps. & Imps. Textile and Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985).   In particular, the testing order began as a UK-specific measure, *see* Ex. 7, and continues to play an important role in the United States's global response to an ongoing global crisis.   It thus (at least) "involve[s]" a "foreign affairs function of the United States," 5 U.S.C. 553(a)(1), and is therefore exempt from notice and comment.

Finally, as with the mask order, even if there was some notice-and-comment obligation, any error was harmless, and Plaintiff has not carried his burden to show otherwise.   *See supra* Section II(d).

## V.   **All of Plaintiff's constitutional claims are meritless.**

Plaintiff brings a wide variety of constitutional claims challenging the CDC's transportation mask order and international traveler testing order.   Each fails.   *Cf. Klaassen v. Trs. of Ind. Univ.*, --- F. 4th ----, 2021 WL 3281209, at *1 (7th Cir. Aug. 2, 2021) ("[P]laintiffs just need to wear masks and be tested, requirements that are not constitutionally problematic.").

### a.   **Plaintiff's right-to-travel claim is meritless (Count 8).**

Plaintiff challenges the transportation mask order as a violation of "the freedom to travel."   Compl. ¶ 1005.   This claim fails because, although the Constitution "protects the right of a citizen of one State to enter and to leave another State," *Saenz*

*v. Roe*, 526 U.S. 489, 500 (1999), "reasonable restrictions on the right to interstate travel are permissible," *Abdi v. Wray*, 942 F.3d 1019, 1029 (10th Cir. 2019).[20]

At the outset, Plaintiff's constitutional right to interstate travel is not threatened here, for the simple reason that he is free to leave Florida at any time—by land, air, or sea. As the Court has already held, "[t]here is nothing stopping Plaintiff from traveling from state to state." TRO Opinion at 4. Mr. Wall is free to travel with a mask (if he wants to use public transportation conveyances), or without a mask (if he either (1) uses any other means of transportation, or (2) obtains a medical exemption). That is fatal to his interstate-travel claim from the start: Mr. Wall's "right . . . to enter and to leave another State," *Saenz*, 526 U.S. at 500, is not infringed by the temporary requirement that he wear a mask (or obtain an exemption) when using public transportation during a once-in-a-century global pandemic.

Even if the mask order has made Mr. Wall's travel marginally less convenient, "mere burdens on a person's ability to travel from state to state are not necessarily a violation of their right to travel." *Doe v. Moore*, 410 F.3d 1337, 1348 (11th Cir. 2005); *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 54 (2d Cir. 2007) ("[M]inor restrictions on travel simply do not amount to the denial of a fundamental right."). The Eleventh Circuit has squarely held that merely alleging that "it is inconvenient to travel" in light of some otherwise-reasonable government restriction is not enough.

---

[20] "The Supreme Court has distinguished between the right to travel interstate and the right to travel internationally." *Abdi*, 942 F.3d at 1029. Although international travel features in some of Mr. Wall's other claims, his right-to-travel claim is limited only to domestic, interstate travel. *See* Compl. ¶¶ 1004, 1005.

*Moore*, 410 F.3d at 1348.  And here, for all the reasons above, *see supra* Section II(c), the transportation mask order is not only reasonable, but the CDC "has a strong interest," *Moore*, 410 F.3d at 1348, in temporarily requiring masks (or a medical exemption) on public-transportation conveyances.  Courts around the country have upheld far more severe travel-related burdens, inconveniences, and limitations.  *See, e.g.*, *Abdi*, 942 F.3d at 1024 (plaintiff "systematically subject to extra screening at airports and land border crossings"); *Beydoun v. Sessions*, 871 F.3d 459, 468 (6th Cir. 2017) ("While Plaintiffs may have been inconvenienced by the extra security hurdles they endured in order to board an airplane, these burdens do not amount to a constitutional violation."); *Moore*, 410 F.3d at 1348 (in-person sex-offender notification required "when [plaintiff] change[s] permanent or temporary residences").

Although that is more than enough to decide this claim under existing Eleventh Circuit precedent, the Second, Fifth, Sixth, Ninth, and Tenth Circuits have also all expressly held that a traveler does not have a constitutional right to the most convenient *form* of travel, such as traveling by airplane as opposed to car.  *See Abdi*, 942 F.3d at 1030-31 (alleged placement on terrorist screening list "affects only one mode of transportation" and "places no restrictions on Abdi's ability to drive, bus, or otherwise commute interstate" and is therefore constitutional); *Beydoun*, 871 F.3d at 468 ("Importantly, Plaintiffs have not actually been prevented from flying altogether or from traveling by means other than an airplane."); *Town of Southold*, 477 F.3d at 54 ("[T]ravelers do not have a constitutional right to the most convenient form of

travel."); *Gilmore*, 435 F.3d at 1137 ("Gilmore does not possess a fundamental right to travel by airplane even though it is the most convenient mode of travel for him."); *Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999) (no "right to drive" because "burdens on a single mode of transportation do not implicate the right to interstate travel"); *Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991) (same).

That is independently fatal to Plaintiff's right-to-travel claim, because he has not been categorically excluded from *any* form of travel—he can fly with a mask or an exemption. And, with or without a mask, he remains entirely free to drive across state lines, for example. As the Court put it, although "flying may be Plaintiff's preferred mode of transportation," "it is by no means the *only* reasonable mode of transportation available to him." TRO Opinion at 4.

In response, Mr. Wall has represented in prior filings that he does not own a car. *See* ECF No. 58 at 15. Whatever the reason for that,[21] the CDC is not stopping him from buying a car (or renting or borrowing one), if exercising his right to interstate travel is sufficiently important to him.[22]

---

[21] Mr. Wall appears to have obtained driver's licenses in (at least) Massachusetts and the District of Columbia, according to a published opinion from separate constitutional litigation brought by Mr. Wall against the D.C. Department of Motor Vehicles, arising out of a dispute over a speeding ticket in Maine. *See Wall v. Babers*, 82 A.3d 794, 797 n.4 (D.C. 2014).

[22] On a recent talk-radio appearance, Mr. Wall described having recently traveled by car to attend a family member's funeral in Tampa. *See* Mid-Morning Coffee Break with Adam, at 44:30-44:44 (July 26, 2021), http://radioshows.net/WWGH/ATCG-Lucas-Wall-072621.mp3. And on a YouTube video, Mr. Wall suggested that flying is simply his *preferred* method of transportation, rather than a necessity: "Folks say oh, well you could just drive. It's like, well, that's not the point. I don't want to drive. I want to fly." CODE WIND TALK, Triplevibes Radio, 15:10-15:19, (Jul. 21, 2021) *available at* https://www.youtube.com/watch?v=AWzx-VryzdA.

**b.    Plaintiff's non-delegation claims are meritless (Counts 5 and 23).**

Plaintiff asserts in Counts 5 and 23 that 42 U.S.C. § 264 is an unconstitutionally broad delegation of legislative power, but "Congress does not violate the Constitution merely because it legislates in broad terms." *Touby v. United States*, 500 U.S. 160, 165 (1991).  Instead, as long as Congress provides "an intelligible principle to which" the agency "is directed to conform, such legislative action is not a forbidden delegation of legislative power." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

42 U.S.C. § 264 easily clears that low bar.  Over the past century, the Supreme Court has repeatedly upheld far broader (and vaguer) standards than this one.  *See, e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475-76 (2001) ("protect the public health"); *Touby*, 500 U.S. at 166 ("imminent hazard to the public safety") (citation omitted); *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 216 (1943) ("public interest"). In fact, the Supreme Court has not invalidated a statute on nondelegation grounds since 1935, *Gundy*, 139 S. Ct. at 2129 (plurality opinion), *rehearing denied*, 140 S. Ct. 579; the CDC's authority to issue public-health orders necessary to prevent the spread of disease during a global pandemic should not be the first.  *See, e.g.*, *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 447 (5th Cir. 2020) (rejecting nondelegation challenge under existing Supreme Court precedent, because it is not the province of the lower courts to "reexamine or revive the nondelegation doctrine"), *cert. denied* 2021 WL 2302098 (U.S. June 7, 2021).

c.    Plaintiff's Due Process claim is meritless (Count 7).

Plaintiff brings what appears to be a Due Process Clause challenge to the fact that (1) the CDC's mask order allows for medical exemptions, but (2) leaves much of the implementation of those exemptions to airlines, in the first instance.  At the outset, this claim fails because there is no evidence in the record that Mr. Wall has actually attempted to take advantage of those exemption provisions—to the contrary, it is undisputed that (at least with respect to his failed attempt to fly on June 2) he (1) did not submit the exemption form in the time required by the airline, Compl. ¶ 57, (2) did not provide the requisite documentation, ECF No. 50 at 3-4 (letter from Southwest), and (3) has not filed any complaint with DOT.  Plaintiff should not be heard to complain of administrative procedures that he has not even tried to take advantage of. *Cf. Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1335, 1339-40 (11th Cir. 2005) ("claim is not ripe" because plaintiff "never properly pursued its claim through the administrative process" that was "made available to them").  At least theoretically, it is possible that Mr. Wall could have received an exemption through those procedures, which underscores why it would be inappropriate to review them in this abstract context.

In any event, even if Mr. Wall had fully pursued a medical exemption in good faith and had still been denied, Plaintiff's due process claims all fail for the lack of any protected interest.  Citing no authority, Plaintiff claims to have "constitutionally protected liberty interests" in: (1) "being able to breath[e] without the obstruction a face mask," (2) "to make [his] own medical decisions without government

63

interference," (3) "to not have a policy imposed on [him] that results in numerous adverse health effects," and (4) his "purchased airline and other transportation tickets that can't be infringed upon by government mandates made contrary to the Constitution, laws, and regulations." Compl. ¶¶ 999-1000.

As for "being able to breath[e] without the obstruction a face mask," *id.* ¶ 999, that is not a liberty interest that is protected by the Constitution. *Cf. Abdi*, 942 F.3d at 1032 (being "reasonably encumbered" in one's "ability to travel" "by only one mode of transportation" does not violate due process); *Klaassen*, 2021 WL 3281209, at *1 (requirement "to wear masks" is "not constitutionally problematic"). As for his "purchased" tickets, Mr. Wall purchased his (apparently refundable) tickets with full awareness of the mask order, and in any event the mask order is not "contrary to the Constitution, laws, and regulations," Compl. ¶ 1000—and if it were, a Due Process claim would be unnecessary. Mr. Wall can certainly still "make [his] own medical decisions," *id.* ¶ 999, but any such right does not extend to placing others at risk of communicable diseases while traveling in interstate commerce. And there is no constitutional right "to not have a policy imposed on [him]," *id.*, that he thinks is harmful—that is one of the basic tradeoffs of living in a society, with a government that is authorized to make policy choices that individual citizens may not support.

Finally, even if this claim could somehow overcome Mr. Wall's failure to pursue the administrative process and the lack of any protected liberty or property interest, the exemption process is fully satisfactory, leaving flexibility to airlines to

implement on a case-by-case basis.  And Mr. Wall is incorrect to suggest that allowing private-sector entities to assist with *implementation* of a federal regulatory order (as compared with delegating *policymaking authority* to a private actor) is either unusual or unlawful.  *See, e.g.*, *Cospito v. Heckler*, 742 F.2d 72, 87 n.25 (3d Cir. 1984) ("[E]ven *Schechter*, which is perhaps the furthest extension of the hostility to delegations of authority to nonpublic organizations, acknowledges that Congress may seek private assistance in 'matters of a more or less technical nature.'" (quoting *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935)).

### d.   Plaintiff's Tenth Amendment claim is meritless (Count 6).

The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend X.  The Tenth Amendment "is essentially a tautology," in that it "confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States."  *New York v. United States*, 505 U.S. 144, 157 (1992).   Those limits on federal power, however, are "not derived from the text of the Tenth Amendment itself," but rather derive from all of the *other* "limitations contained in the Constitution."  *Id.* at 156; *accord United States v. Darby*, 312 U.S. 100, 124 (1941) ("The amendment states but a truism that all is retained which has not been surrendered.").

Plaintiff's Tenth Amendment claim is thus largely duplicative of his other claims.  As discussed *supra*, Sections II(a), V(b), the CDC is exercising authority that

has been properly delegated by Congress.  So the only remaining question is whether *Congress* has the constitutional authority to legislate to prevent the spread of communicable disease, as it did in the Public Health Service Act.

That question answers itself: Congress may "regulate Commerce with foreign Nations, and among the several States," and "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers."  U.S. Const., art. I, s. 8, cl. 3 and 18.  42 U.S.C. § 264(a) falls squarely in that wheelhouse: it authorizes measures that "are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession."  As that text makes clear, this is a classic exercise of the interstate and foreign commerce powers (including as supplemented by the Necessary and Proper Clause, to the extent necessary).

Plaintiff argues that "[m]ost modes of transportation . . . such as city buses, school buses, subways, light rail, commuter trains, and rideshare cars never cross state lines."  Compl. ¶ 994.  Even if the premise were true, this is a curious argument for Plaintiff to rely on—particularly in a *facial* challenge, arising out of his attempts to fly across both state and international borders—but it ultimately does not matter that some public conveyances do not cross state lines.  What matters is that *communicable diseases* do not respect borders, and thus especially in this context, even wholly intrastate activity can "exert[] a substantial economic effect on interstate commerce," *Wickard v. Filburn*, 317 U.S. 111, 125 (1942)—as is obvious from the economic turmoil

that COVID-19 has created.  And Plaintiff's basic argument—that wholly intrastate activity is beyond the reach of the commerce power—was rejected long ago.  *See, e.g.,* *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937) (cited favorably in *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 551 (2012)).  If wholly intrastate wheat production may "be reached by Congress if it exerts a substantial economic effect on interstate commerce," *Wickard*, 317 U.S. at 125, then so can commercial air travel. [23]

Plaintiff's suggestions that the mask order violates the anti-commandeering doctrine also lack merit.  That doctrine places some limits on federal authority to command *state officers* or *state legislatures* to create or operate a federal regulatory program.  *See, e.g., Murphy v. NCAA*, 138 S. Ct. 1461, 1475-79 (2018); *Printz v. United States*, 521 U.S. 898, 933 (1997); *New York*, 505 U.S. at 144.  Tellingly, no State has raised such an objection, likely because the mask order does no such thing.  And that the order may incidentally require some state employees, like "drivers on school buses," Pl.'s MSJ at 22, to wear masks does not amount to commandeering.

Nor does it matter that some states have withdrawn prior mask mandates, or tried to prohibit them as a matter of state law—if anything, that underscores the need for a uniform federal policy, at least in the transportation sector.  And as a legal matter, "[a]s long as it is acting within the powers granted it under the Constitution," the

---

[23] Without much explanation, Plaintiff suggests that the mask order "regulat[es] noneconomic intrastate activity," Pl.'s MSJ at 21, presumably to try and squeeze within precedents like *United States v. Lopez*, 514 U.S. 549 (1995).  The premise is wrong: public transportation is economic activity (literally requiring a commercial transaction, in most instances), but even if it were not, the spread of COVID-19 has (obvious and massive) economic significance, and all of the challenged orders are ultimately designed to reduce the spread of COVID-19.

federal government "may impose its will on the States" by preempting conflicting state enactments through the Supremacy Clause. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (citing U.S. Const., art. VI, cl. 2). It has done so here, as explicitly authorized by Congress. *See* 42 U.S.C. § 264(e) (preemption clause of the PHSA).

## VI. Plaintiff's complaint violates the Federal Rules of Civil Procedure.

As other defendants have argued, *see* ECF Nos. 49, 82, Plaintiff's complaint is an impermissible "shotgun pleading"—not the "short and plain statement" required by Federal Rule of Civil Procedure 8(a)(2). The complaint is 206 pages long, contains 1,085 paragraphs, and was accompanied by more than 1,000 pages of exhibits. To make matters worse, the first 182 pages and 960 paragraphs comprise one omnibus "Statement of Facts," which apparently applies to 23 different counts, against all defendants. *See* Compl. ¶ 961; *but see* Fed. R. Civ. P. 10(b); *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1356 (11th Cir. 2018) (affirming dismissal of pleading that "employs a multitude of claims and incorporates by reference all of its factual allegations into each claim, making it nearly impossible for Defendants and the Court to determine with any certainty which factual allegations give rise to which claims").[24]

The Eleventh Circuit has "condemned shotgun pleadings time and again, and . . . [has] repeatedly held that a District Court retains authority to dismiss a

---

[24] Those factual allegations stray far from the operative facts that are core to Mr. Wall's claims—everything from one-off stories about non-parties who believe they were treated rudely by flight attendants, Compl. ¶¶ 482-85; to the lower risk of COVID-19 in children (even though Mr. Wall is not a child and the mask order exempts young children), *id.* ¶ 837; to a high-school track-and-field anecdote from Oregon, *id.* ¶¶ 843-45.

shotgun pleading on that basis alone." *Jackson*, 898 F.3d at 1357.  And the Eleventh Circuit has applied this rule to *pro se* plaintiffs. *See, e.g.*, *Arrington v. Green*, 757 F. App'x 796, 797 (11th Cir. 2018) (per curiam).  Accordingly, although Federal Defendants believe this case can (and should) be resolved on the basis of the jurisdictional and merits arguments above, in the alternative and at a minimum, the Court should dismiss the complaint, without prejudice to re-filing in compliance with the Federal Rules.

## VII.   **Plaintiff's requested relief is overbroad.**

Even if the Court were to disagree with all of Federal Defendants' other arguments, the relief that Plaintiff has requested here—that is, a "worldwide" injunction, ECF No. 77 at 3, which would prevent enforcement of any of the challenged orders, in any context, against anyone—is significantly overbroad.

As required both by Article III of the Constitution and traditional principles of equity, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).  Nationwide injunctions, by contrast, "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct.

2392, 2425 (2018) (Thomas, J., concurring).  Accordingly, although all of Plaintiff's claims are meritless, at the most, any relief should be limited to Plaintiff himself.[25]

Relatedly, should the Court determine that CDC committed procedural errors under the APA (such as by failing to engage in notice and comment or by failing to adequately explain its reasoning), the Court should at most remand to the agency *without* vacatur.  *See Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engr's*, 781 F.3d 1271, 1289-90 (11th Cir. 2015).  The alleged procedural errors that Plaintiff relies on could all be cured on remand, and even temporary (or partial) vacatur of these orders could have disruptive and dangerous consequences.

## CONCLUSION

For these reasons, Plaintiff's claims against the Federal Defendants should be dismissed (either for lack of subject-matter jurisdiction, or failure to state a claim).  In the alternative, summary-judgment should be entered for Federal Defendants on all claims.

---

[25] In addition, even a successful APA plaintiff is *not* typically entitled to an injunction.  *See, e.g.*, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010) ("If a less drastic remedy (such as partial or complete vacatur of [the agency] decision) was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted.").

Dated: August 9, 2021                    Respectfully submitted,

                                          BRIAN M. BOYNTON
                                          Acting Assistant Attorney General

                                          KARIN HOPPMANN
                                          Acting United States Attorney

                                          ERIC B. BECKENHAUER
                                          Assistant Branch Director

By:   */s/ Stephen M. Pezzi*
      MARCIA K. SOWLES
        Senior Trial Counsel
      STEPHEN M. PEZZI
        Trial Attorney
      United States Department of Justice
      Civil Division
      Federal Programs Branch
      1100 L Street NW
      Washington, DC 20005
      Telephone: 202-305-8576
      Email: stephen.pezzi@usdoj.gov

      ADAM R. SMART
      Assistant United States Attorney
      USA No. 195
      400 W. Washington Street, Suite 3100
      Orlando, Florida 32801
      Telephone: (407) 648-7500
      Facsimile: (407) 648-7588
      Email: adam.smart@usdoj.gov

      *Counsel for the Federal Defendants*

## <u>LOCAL RULE 3.01(g) CERTIFICATION</u>

Pursuant to Local Rule 3.01(g), during the week of August 2, 2021, counsel for the Federal Defendants conferred with Mr. Wall by phone and email, and with counsel for all other parties by email.

Counsel for Defendants Greater Orlando Aviation Authority and Central Florida Regional Transportation Authority each reported that they do not oppose the relief requested in Federal Defendants' motion to dismiss.

Plaintiff reported that he opposes most of the relief requested in Federal Defendants' motion to dismiss except that, per an agreement reached by all parties during the meet and confer process, all parties (including Plaintiff) now consent to the dismissal of Counts 2, 10, 13, 16, and 20.  As a result of that agreement and Plaintiff's concession, Federal Defendants do not address those counts further in this filing.

**<u>CERTIFICATE OF SERVICE</u>**

Although Plaintiff is proceeding *pro se*, he has been authorized by the Court to use the CM/ECF system. ECF No. 14. Accordingly, Plaintiff will receive service of this filing through the CM/ECF system.

<u>/s/ Stephen M. Pezzi</u>
STEPHEN M. PEZZI
Trial Attorney
United States Department of Justice

73