**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | | |
|---|---|---|
| **LUCAS WALL,** | : | |
| | : | |
| Plaintiff, | : | Case No. 6:21-cv-975-PGB-DCI |
| | : | |
| v. | : | District Judge Paul Byron |
| | : | |
| **CENTERS FOR DISEASE** | : | Magistrate Judge Daniel Irick |
| **CONTROL & PREVENTION** *et al.* | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFF'S COMBINED BRIEF REPLYING TO FEDERAL
DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AS WELL AS OPPOSING THEIR CROSS-
MOTION FOR SUMMARY JUDGMENT & MOTION TO DISMISS**

COMES NOW plaintiff, *pro se*, and files this combined brief (authorized by the Court at Doc. 105) in response to the Federal Defendants'[1] 88-page brief[2] (Doc. 125): 1) opposing my Motion for Summary Judgment (amended at Doc. 127-1); 2) cross-moving for summary judgment; and 3) moving to dismiss certain counts of the Complaint. The Federal Defendants unwisely chose to file dispositive motions on all 16 charges[3] against them although there are some material facts in dispute.

---

[1] The Federal Defendants named in this case are: Centers for Disease Control & Prevention, Department of Health & Human Services, Transportation Security Administration, Department of Homeland Security, Department of Transportation, and President Joseph Biden.

[2] Doc. 125, inclusive of all parts, is 18 pages longer than the 70-page limit agreed to by the parties and allowed by the Court. Doc. 105. However, given my desire for the Court to rule on my Motion for Summary Judgment as expeditiously as possible, I will not quibble over the Federal Defendant's slight procedural violation.

[3] Counts 2, 10, 13, 16, & 20 were dismissed Aug. 9 by agreement of all parties. Doc. 126.

# I. REPLY ARGUMENT ON MY MOTION FOR SUMMARY JUDGMENT ON COUNTS 1, 4-6, 9, 12, 19, & 22-23, & OPPOSING FEDERAL DE-FENDANTS' MOTIONS TO DISMISS & FOR SUMMARY JUDGMENT

## A. CDC lacks statutory authority for the FTMM & ITTR (Counts 4 & 22).

The Federal Defendants' major premise is that the Federal Transportation Mask Mandate[4] and International Traveler Testing Requirement[5] should be upheld because "Congress has authorized … the Centers for Disease Control & Prevention ('CDC') to adopt 'such ***regulations*** as in [the agency's] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases…" under 42 USC § 264(a). Doc. 125 at 1 (emphasis added). To start, it's important to understand the statute authorizes the Department of Health & Human Services ("HHS") secretary only to "make and enforce such ***regulations***…" (emphasis added). The FTMM and ITTR are *orders*, not *regulations*. Therefore they are not authorized by the statute, regardless of how the Court interprets it. Orders have not been promulgated by Administrative Procedure Act ("APA")-required procedures (proposed rulemaking, notice and comment, then final rulemaking).

---

[4] The Federal Transportation Mask Mandate consists of: 1) Executive Order 13998, 86 Fed. Reg. 7205 (Jan. 26, 2021); 2) Department of Homeland Security Determination 21-130 (Jan. 27, 2021); 3) Centers for Disease Control & Prevention Order "Requirement for Persons To Wear Masks While on Conveyances & at Transportation Hubs," 86 Fed. Reg. 8,025 (Feb. 3, 2021); 4) Transportation Security Administration Security Directives 1542-21-01A, 1544-21-02A, and 1582/84-21-01A (May 12, 2021); and 5) TSA Emergency Amendment 1546-21-01A (May 12, 2021).

[5] The International Traveler Testing Requirement is the CDC Order "Requirement for Negative Pre-Departure COVID–19 Test Result or Documentation of Recovery from COVID–19 for All Airline or Other Aircraft Passengers Arriving into the United States From Any Foreign Country," 86 FR 7,387 (Jan. 28, 2021). It was mandated by "Executive Order Promoting COVID-19 Safety in Domestic & International Travel." E.O. 13998, 86 Fed. Reg. 7205 (Jan. 26, 2021).

**1. The Public Health Service Act doesn't authorize the FTMM or ITTR.**

Even if § 264(a) authorized HHS to issue *orders* as opposed to promulgating *regulations*, the government's argument about its scope ignores that six federal courts[6] have disagreed with CDC's interpretation of the Public Health Service Act ("PHSA"). And the only court to tentatively concur with CDC's position[7] was essentially overturned by the Supreme Court.[8] "[T]he Supreme Court's recent decision in this case strongly suggests that the CDC is unlikely to succeed on the merits." *Alabama Ass'n of Realtors*, No. 20-cv-3377 (D.D.C. Aug. 13, 2021). The 11th Circuit also strongly signaled it disagrees with CDC's broad reading of § 264(a).[9] "[A]n administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress. … Courts must be guided by a degree of common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 151 (2000).

This Court two months ago declared CDC's interpretation of § 264(a) dead wrong, using strong language to condemn the agency for acting unlawfully:

---

[6] *Tiger Lily v. HUD*, No. 2:20-cv-2692, 2021 WL 1171887 (W.D. Tenn. Mar. 15, 2021); *Tiger Lily v. HUD*, No. No. 21-5256 (6th Cir. July 23, 2021); *Alabama Ass'n of Realtors v. HHS*, No. 20-cv-3377 (D.D.C. May 5, 2021); *Skyworks v. CDC*, No. 5:20-cv-2407 (N.D. Ohio March 10, 2021); *Terkel v. CDC*, No. 6:20-cv-564, 2021 WL 742877 (E.D. T Feb. 25, 2021); and *State of Florida v. Becerra*, No. 8:21-cv-839-SDM-AAS (M.D. Fla. June 18, 2021).

[7] *Alabama Ass'n of Realtors v. HHS*, No. 21-5093 (D.C. Cir. June 2, 2021)

[8] *Alabama Ass'n of Realtors v. HHS,* No. 20A169 (June 29, 2021)

[9] *Brown v. HHS*, No. 20-14210 (11th Cir. July 14, 2021)

> "[N]ever has CDC implemented measures as extensive, disabling, and exclusive as those under review in this action. However, in this action CDC claims a startlingly magnified power. ... CDC's assertion of a formidable and unprecedented authority warrants a healthy dose of skepticism. ... Both text and history confirm that the conditional sailing order exceeds the authority granted to CDC by Section 264(a). And if Section 264 fails to confer the statutory authority for the conditional sailing order, the regulations implementing Section 264 can grant no additional authority. *State of Florida v. Becerra*, No. 8:21-cv-839-SDM-AAS (M.D. Fla. June 18, 2021).

The 11th Circuit just addressed CDC's powers under § 264(a). Although not a merits decision, the dissenting judge on a 2-1 panel concluded CDC exceeded its authority by ordering a nationwide Eviction Moratorium due to COVID-19. And the two judges who denied a preliminary injunction wrote: "We have doubts about the district court's ruling on the first factor: whether the plaintiffs are likely to succeed on the merits. ... the second sentence of § 264(a) appears to clarify any ambiguity about the scope of the CDC's power under the first." *Brown v. HHS*, Doc. 109.

> "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984).

The Federal Defendants and I agree that "Congress has directly spoken to this precise question at issue. ... Here, only *Chevron*'s first step is necessary..." Doc. 125 at 28. Congress has never enacted a law authorizing a national mask mandate or international testing requirement. The PHSA confers no such authority. Therefore, the FTMM and ITTR are *ultra vires*. The Court need not given any deference to the agencies' interpretation. It's laughable for the Federal Defendants to claim that "conventional sanitation measures" include "masking." *Id*. There is no evidence

that any federal agency has ever in the history of this nation required masking in any scenario. And maskwearing certainly does not comport to the statute's allowance for CDC to require the "sanitation … of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings." 42 USC § 264(a). Wearing a mask does not reduce the transmission of viral particles (Index at Ex. 103) and the statute directs that any "sanitation" be directed at "animals or articles," not the faces of human beings. The use of the exact words "human beings" in the same sentence of § 264(a) conclusively shows Congress did not conceive the word "animals" as including humans. Plus "sanitation" measures may be directed solely to things "found to be so infected or contaminated…," not at every single person (the vast majority of which do not have coronavirus).

Likewise the government's ITTR argument fails because it is an order, not a regulation; and § 264(a) authorizes "inspection … of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings." Humans are not animals or articles, and the testing is directed at *all* international air passengers, not those "found to be so infected or contaminated" with a disease. Even if the statute did authorize such "inspection," the government admits it would only be allowed for "arriving passengers," not those air travelers *departing* foreign nations. Doc. 125 at 54. And I do directly challenge 42 CFR § 71.32(b) as again it applies only to *arriving* transportation carriers.

> "[§ 264(a)] does not grant the CDC the power it claims. … [T]he first sentence grants the Secretary rulemaking authority. But that authority is not as capacious as the government contends. When we interpret statutes, we must give effect to each clause and word. … Plainly, the second sentence

> narrows the scope of the first. … There is no clear expression of congressional intent in § 264 to convey such an expansive grant of agency power, and we will not infer one. … [CDC's] interpretation is both textually implausible and constitutionally dubious." *Tiger Lily v. HUD*, No. 21-5256 (6th Cir. July 23, 2021).

All courts that have reviewed CDC's pandemic policies promulgated under § 264(a) (including this Court) have reached the same conclusion I urge here, disagreeing with the Federal Defendants' argument that the specific measures CDC may take enumerated in § 264(a) "are illustrative, not exhaustive." Doc. 125 at 29. The Congressional Research Service ("CRS") advised the House and Senate that "mask wearing is arguably dissimilar to the specific measures listed in" § 264(a). Ex. 159. In the context of cruiseships, this Court agreed.

> "[T]he [PHSA] codifies the limited regulatory power typical of preventing diseases caused by a discrete item or a person at a major port of entry. … The text of the [PHSA] lends support to a narrower quarantine power for CDC. … The second sentence of Section 264(a) discloses, illustrates, exemplifies, and limits to measures similar in scope and character the measures contemplated and authorized by Congress when enacting the statute. *Yates v. United States*, 574 U.S. 528, 546 (2015) (applying specific statutory terms to cabin the meaning of a broad statutory term)." *State of Florida*.

The government's claim that "cases caused by the Delta variant of COVID-19 are surging" (Doc. 125 at 2) is irrelevant to the Court's determination that CDC exceeded its statutory authority. If anything, this "surge" proves the FTMM and ITTR are failed policies.[10] If masks and testing are effective, then why do we read

---

[10] Defendant CDC's claim that it has "unquestionable public-health expertise" (Doc. 125 at 34) is dubious. CDC has been under constant attack by numerous scientists, doctors, politicians, and the general public for its terrible decisionmaking regarding COVID-19 that has allowed the pandemic to claim more than a half-million American lives. "18 months of ever-changing pandemic messaging have left Americans skeptical of public health advice." Ex. 184.

I could flood the Court with thousands of documents and articles wherein CDC's supposed "expertise" is severely questioned. But it's sufficient to refer it to the 115 scientific studies and medical articles I've submitted into evidence indexed at Ex. 103 plus Exs. 15 & 122.

that the U.S. "could soon see more than 200,000 new cases of COVID-19 every day…"? Ex. 183. This Court shall not allow the government's fearmongering. Although coronavirus cases are rising, the most important metric (deaths) continues falling to new lows. Ex. 185. Congress has not passed any law authorizing the FTMM or ITTR, and CDC lacks any statutory authority to issue these orders, therefore the Court need not consider what the current state of the pandemic is.

Furthermore, 42 USC §§ 264(b)-(d) grants CDC power "for the apprehension, detention, and conditional release of individuals to prevent the introduction or spread of communicable diseases." Ex. 161. No authority exists for CDC to require masks or anything beyond temporary detention. CDC's prior use of § 264 confirms this: "Until the COVID-19 pandemic, the CDC primarily invoked its Section [264] authority to issue and refine regulations relating to quarantine and isolation," according to CRS. *Id.* "The Public Health Service Act grants the CDC powers to detain and medically examine potentially infected persons arriving into the United States and traveling between states, but this authority is unlikely to extend to regulatory actions such as requiring masks." Ex. 172.

## 2. Congress has not enacted a mask mandate or testing requirement.

If Congress believes it needs to pass a mask mandate or testing requirement, it could do so (although such actions would still be subject to legal challenges). Even though advised by CRS it should consider it, Congress has not taken any action during the pandemic to make laws mandating masks or requiring international

flyers get tested for COVID-19. "[T]he scope of federal agencies' existing statutory authority to mandate masks … is an open legal question. If Congress wishes to eliminate uncertainty over the scope of federal agencies' statutory authority to implement and enforce public health measures in the transportation sector, Congress could consider legislation that expressly authorizes or precludes such measures." Ex. 159. A "federal public health order may implicate major economic or political questions … Congress may need to act legislatively, within constitutional limits, to supply the necessary additional authority." Ex. 161.

Congress has not "prudently delegated broad authority to the CDC to take reasonable public-health measures to prevent the spread of communicable disease." Doc. 125 at 2. Even if Congress did, it "would run into both constitutional and practical hurdles." Ex. 4. Congress has vigorously debated mask mandates but failed to pass a single one. In fact, many lawmakers have pushed to terminate the CDC mandate. Doc. 1 at ¶¶ 339-353; Docs. 83-8, -10, & -12; Exs. 108-113. There's a huge dispute in the House of Representatives over its mask mandate, which has led to litigation. Ex. 114. The Supreme Court has ruled that on questions of "deep economic and political significance," an agency's interpretation of a statute must be scrutinized. "Because the statute did not expressly delegate that decision to the agency, the Court gave no deference to the agency's interpretation and analyzed the statute independently of the agency's position." Ex. 158, cf. *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015). "CDC claims authority to impose nationwide any measure, unrestrained by the second sentence of Section 264(a), to reduce to 'zero'

the risk of transmission of a disease – all based only on the director's discretionary finding of 'necessity.' That is a breathtaking, unprecedented, and acutely and singularly authoritarian claim." *State of Florida*.

## 3. The FTMM and ITTR are motivated by politics unsupported by law.

The FTMM and ITTR are about politics, not public health. "There appears to be no legal authority that would allow a US president to enact a nationwide mask mandate." Ex. 4. Defendant Biden, when campaigning for the presidency last year, pledged to impose by fiat a nationwide mask mandate anyway. Ex. 1. "He even said in his acceptance speech at the Democratic National Convention that a mask mandate would be part of his national strategy to fight ... coronavirus..." Ex. 12.

But Defendant Biden later admitted Sept. 6, 2020, he had no power to do it: "[T]here's a constitutional issue whether the federal government could issue such a mandate. *I don't think constitutionally [it] could*," Biden said. Video at Ex. 2 (emphasis added); Exs. 6 & 12. "*I wouldn't issue a mandate*," Biden added, "but I'd plead with [people to cover their faces], I'd carry my mask with me everywhere I go..." Ex. 12 (emphasis added); Ex. 163.

But then Defendant Biden acted in bad faith by signing the FTMM and ITTR executive order Jan. 21, 2021, (his second day in office) anyway – just as he thumbed his nose at the Constitution and the Judicial Branch earlier this month in allowing Defendant CDC to extend the Eviction Moratorium even though the Supreme Court ruled it would have to be authorized by new congressional

legislation[11] – and the president himself said numerous times publicly that extending the moratorium would be illegal.

"Until he backtracked in September, Biden had been promising that he would 'do everything possible' from 'an executive standpoint' to 'make it required that people had to wear masks in public.'" Ex. 5. Legal scholars, CRS, and a former CDC director agree with my argument that the PHSA "does not give the CDC much power beyond quarantining infected individuals." Ex. 3. "This authority is unlikely to extend to regulatory actions such as requiring masks," they wrote. *Id*. Others said: "*NFIB v. Sebelius* would not allow the federal government to require people to put on a mask." Ex. 7.

The Federal Defendants' bad-faith actions in imposing the FTMM and ITTR have resulted in devastating consequences for the tens of millions of Americans such as myself who medically can't – or simply don't want to – cover our faces and refuse to pay for an unnecessary and illegal COVID-19 test[12] prior to flying home. The ITTR violates international law: "No one shall be arbitrarily deprived of the right to enter his own country." International Covenant on Civil & Political Rights Art. 12 § 4, Treaty Doc. 95-20 (ratified by the Senate April 2, 1992). Ex. 166.

## 4. The FTMM and ITTR are not necessary or based on science.

To sustain the government's interpretation, the Court would have to first find

---

[11] *Alabama Ass'n of Realtors v. HHS,* No. 20A169 (June 29, 2021)

[12] The cost of the test is irrelevant. Even if the test cost a penny, if it's not authorized by law, it still must be vacated. Many COVID-19 tests cost upward of $150-200 in various countries.

that an "order" is "regulation," then agree with Defendant HHS secretary's determination that the FTMM is "necessary." 42 USC § 264(a). But the scientific evidence shows otherwise: Masks do nothing to prevent coronavirus spread but harm human health. *See* discussion in the Complaint, Doc. 1 at ¶¶ 513-855; *see also* the 115 scientific studies and medical articles I've submitted indexed at Ex. 103. The FTMM and ITTR are not "necessary," "reasonable," or "science-based." "[O]rdering masks to stop Covid-19 is like putting up chain-link fencing to keep out mosquitos." *Ridgeway Properties v. Beshear*, No. 20-CI-678 (Ky. Cir. June 8, 2021); Ex. 216.

Canadian arbitrators found twice in favor of the Ontario Nurses Association, which challenged policies at various hospitals requiring certain staff wear masks. In lengthy decisions, both concluded science doesn't support forced masking. "ONA has established, on its own evidence and through the admissions of the [hospital] experts in cross-examination, that there is scant scientific evidence … of the use of masks in reducing the transmission of influenza virus to patients." 2015 CanLII 55,643 (ON LA); Ex. 175. "I also find that the weight of scientific evidence said to support the [Vaccine or Mask] Policy on patient safety grounds is insufficient to warrant the imposition of a mask-wearing requirement for up to six months every year." 2018 CanLII 82,519 (ON LA); Ex. 176.

The only thing "necessary" about HHS secretary's finding was that he was forced to do it because his boss, Defendant Biden, needed to fulfill a campaign promise. CDC itself admits a mask does "NOT provide the wearer with a reliable

11

level of protection from inhaling smaller airborne particles and is not considered respiratory protection." Ex. 124. A top CDC official acknowledged "we mask because it's the way we take care and express our concern for each other" – not because masks stop the spread of COVID-19. Ex. 125.

The FTMM and ITTR are not "comparatively minor imposition[s]" – they have stopped tens of millions of Americans including myself from using any form of public transportation since Feb. 1. Justice Kavanaugh cited this case in his June 29 concurring opinion on the eviction moratorium in ruling that CDC lacks the authority it claims under 42 USC § 264(a):

> "EPA's interpretation is also unreasonable because it would bring about an enormous and transformative expansion in EPA's regulatory authority without clear congressional authorization. When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism. We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance. ... An agency has no power to tailor legislation to bureaucratic policy goals by rewriting unambiguous statutory terms. ... We reaffirm the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (citations and quotation marks omitted).

## 5. There's no regulatory authority for the FTMM or ITTR.

Regulations cited by the Federal Defendants don't help their case at all. When "the measures taken by health authorities of any State ... are insufficient to prevent the spread of any of the communicable diseases ... [the CDC director] may take such measures to prevent such spread of the diseases ... including ... sanitation ... of animals or articles believed to be sources of infection." 42 CFR § 70.2. First, the

director did not issue a determination that measures taken by the health authorities of any specific state are insufficient. Also, like the statute, the regulation only allows sanitation "of animals or articles," not measures such as forced masking and testing directed at human beings.

42 CFR § 71.31(b) likewise provides no authority for the FTMM or ITTR. This provision states the CDC director "may require detention of a carrier until the completion of the measures outlined in this part that are necessary to prevent the introduction or spread of a communicable disease." This applies *after* a plane or ship arrives in the United States. It does not authorize masking during the trip nor pre-departure virus testing. The government also points to 42 CFR § 71.32(b), which allows CDC's director when he/she "has reason to believe that any ***arriving carrier or article or thing*** on board the carrier is or may be infected or contaminated with a communicable disease, he/she may require detention, disinfection, disinfestation, fumigation, or other related measures…" (emphasis added). A human being is not a transportation "carrier" nor an "article or thing." And the reg only applies to an arriving transportation carrier. No authorization for masking or pre-departure testing can be found here. The title of this subpart confirms my contentions: "42 CFR Subpart D – Health Measures at U.S. Ports: Communicable Diseases." The regs apply only upon arrival at *U.S. ports of entry*, not to pre-departure testing or in-transit masking. Finally, the other three regs cited (42 CFR §§ 70.3, 70.6, and 70.12) only apply to "A person who has a communicable disease," not every single person traveling on any form of public transportation.

**B. Even if CDC had the statutory and/or regulatory authority it claims to impose the FTMM and ITTR, the orders would be an unconstitutional delegation of legislative power (Counts 5 & 23).**

The way Defendants HHS and CDC interpret their authority under 42 USC § 264(a), they could impose any policy upon all Americans that they deem "necessary" to protect public health. That is obviously not "an intelligible principle" Congress has given the Executive Branch. Hence if the Court somehow agrees with the government's reading of the PHSA (which no federal court has done so far during the pandemic), it would be an unconstitutional improper delegation of legislative power. "The Supreme Court has interpreted this constitutional requirement, under the nondelegation doctrine, as generally prohibiting Congress from delegating its legislative power to another branch," according to CRS. Ex. 161, cf. *Mistretta v. United States*, 488 U.S. 361, 371–72 (1989); *see also Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality).

> "Were we to recognize the authority claimed by EPA in the Tailoring Rule, we would deal a severe blow to the Constitution's separation of powers. Under our system of government, Congress makes laws and the President, acting at times through agencies like EPA, faithfully executes them. The power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration. But it does not include a power to revise clear statutory terms that turn out not to work in practice. ... We are aware of no principle of administrative law that would allow an agency to rewrite such a clear statutory term, and we shudder to contemplate the effect that such a principle would have on democratic governance." *Utility Air Regulatory Group* (citations and quotation marks omitted).

This Court recently spoke on this precise issue:

> "This practically unbounded interpretation causes separation-of-powers problems, discussed in greater depth below, and naturally stirs suspicion about the constitutionality of Section 264(a). ... Forbidding that sort of del-

egation seems the least that is required by, and the least that is unmistakably implicit in, the Constitution's bestowing the entire legislative power on the legislative branch. ... Unaccountable administrative law, unbounded by ascertainable directives from the legislative branch, is not the product of an ascendant and robust constitutional republic." *State of Florida*.

So have other courts:

"[T]o put extra icing on a cake already frosted, the government's interpretation of § 264(a) could raise a nondelegation problem. Under that interpretation, the CDC can do anything it can conceive of to prevent the spread of disease. That reading would grant the CDC director near-dictatorial power for the duration of the pandemic, with authority to shut down entire industries as freely as she could ban evictions. In applying the nondelegation doctrine, the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred. Such unfettered power would likely require greater guidance than 'such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases.'" *Tiger Lily* (6th Cir. July 23, 2021) (citations and quotation marks omitted).

## C. The FTMM and ITTR must be vacated for failing to abide by APA's notice-and-comment requirement (Counts 1 & 19).

The Federal Defendants incorrectly argue the FTMM and ITTR are not subject to APA's notice-and-comment requirements and that there was "good cause to proceed without notice and comment given the urgent circumstances... In addition, any error was harmless." Doc. 125 at 46. "Rules that carry the force and effect of law are known as legislative rules." Ex. 157. "Legislative rules have the 'force and effect of law' and may be promulgated only after public notice and comment. *INS v. Chadha*, 462 U.S. 919, 986..." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014). The FTMM and ITTR carry severe legal consequences including fines and refusal to allow boarding of flights, buses, trains, etc. They are not interpretive rules or policy statements that can evade public comment. Ex. 157.

The FTMM and ITTR are not "emergency action[s] taken under the existing authority" of the PHSA and its underlying regulations. As this Court explained in June, COVID-19 began in December 2019 and was declared a global pandemic in March 2020. The Federal Defendants had nearly 11 months to put the FTMM and ITTR through APA's required notice-and-comment procedures, but failed to do so. Their inaction and procrastination does not constitute an "emergency." The only "emergency" was the inauguration of a new president, Defendant Biden, who for purely political reasons demanded the illegal and unconstitutional policies be put into place swiftly without hearing from the public as the APA demands.

> "[T]he conditional sailing order carries identifiable legal consequences, such as the prospect of criminal penalties, substantial fines, and suspension of sailing. … the conditional sailing order carries the force of law and bears all of the qualities of a legislative rule. Accordingly, the conditional sailing order's prospective, generalized application invites the conclusion that the order is a 'rule.' In plain words, if it reads like a rule, is filed like a rule, is treated like a rule, and imposes the consequences of a rule, it's probably a rule. Because the conditional sailing order is a rule, CDC was obligated to follow the procedures applying to the promulgation of a rule…" *Id.*

Likewise the FTMM and ITTR carry the prospect of severe penalties. Myself and tens of millions of other Americans have been banned from using any form of public transportation nationwide. Wall Decl. at Doc. 83-1; Declarations of 33 passengers and flight attendants indexed at Ex. 187. Any U.S. citizen who refuses to submit a negative COVID-19 test before boarding a flight to the United States is **_banned from entering our own country_**.

> "The conditional sailing order is a rule … The APA therefore obligates CDC to treat the conditional sailing order as a rule and to provide notice and comment. 5 U.S.C. § 553(b). To satisfy its notice-and-comment obligations

under the APA, 'an agency must consider and respond to significant comments received during the period for public comment.' *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Therefore, the conditional sailing order violates the APA…" *State of Florida*.

The FTMM and ITTR were not authorized under 42 USC § 264(a) or 42 CFR § 70.2, 71.31(b), or 71.32(b). Therefore the government's argument that the policies didn't require notice and comment is far-fetched. Likewise, the government can't claim the "good cause" exemption found in 5 USC § 553(b)(3)(B) because it can't self-create an "emergency" 10½ months into a declared pandemic. Had CDC promulgated as regulations the FTMM and ITTR in March 2020 rather than January 2021, perhaps the Court could have excused the failure to provide notice and comment. But the law does not consider public comment for orders imposed nearly 11 months into a health emergency as "impracticable" or "unnecessary." This is not acting "quickly." Delay would not have resulted in any "serious harm." As the government admits, COVID-19 is again surging out of control despite the FTMM and ITTR – proving these policies have failed and were not in the public interest. The government's beg for a "good cause" exception would be more plausible if the policies actually worked. Like masks themselves, the evidence is clear: they don't.

> "Precedent demonstrates how infrequently the exception should receive acceptance. *See, e.g., Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1158 (D.C. Cir. 1981) ('[A]dministrative agencies should remain conscious that such emergency situations are indeed rare.'); *N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 767 (4th Cir. 2012) (explaining that the circumstances permitting reliance on the 'good cause' exception are exceedingly 'rare'). … The 'good cause' exception, 'narrowly construed and only reluctantly countenanced,' *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (quoting *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001)), excuses the APA's notice-and-comment procedures in an 'emergency situation.' *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004)." *State of Florida*.

The Court should ignore the suggestion that "any notice-and-comment error was harmless." Doc. 125 at 47. Tell that to the tens of millions of Americans such as myself who are banned from using public transportation or even entering ***our own country*** because of the FTMM and ITTR. An exception for the ITTR does not apply because testing Americans flying home hardly qualifies as a "foreign affairs function of the United States." Doc. 125 at 57. It involves no relations with the governments of other nations.

The Federal Defendants falsely state that "Plaintiff never even attempts to explain what he would have said during a comment process, let alone how that could have made a difference in the outcome…" *Id.* at 48. I know my Complaint is long, but you think the government would have read it before making false allegations:

> "[T]he agency failed to consider numerous problems associated with mask wearing including: (1) data showing states without mask mandates suffered fewer deaths than states that imposed such requirements; (2) the FTMM is out of step with the current policies of numerous private businesses who no longer require their customers cover their faces; (3) requiring masks in the transportation sector leads to widespread chaos in the skies and on the ground, endangering aviation and transit safety; (4) the FTMM unlawfully discriminates against travelers such as myself who can't wear a face covering due to a disability; (5) the gargantuan amount of scientific and medical evidence showing that masks have proven to be totally ineffective in reducing COVID-19 spread and deaths; (6) scientists have known for a long time that masks aren't effective in reducing transmission of respiratory viruses; (7) masks pose serious health risks to humans forced to wear them; (8) many experts consider forcing kids to wear masks child abuse; (9) masks have contributed to a surge in serious crime; (10) masks contribute to the huge problem of racism in America; (11) masks are damaging the environment; (12) unlike masks, vaccines are extremely effective in reducing COVID-19 infections and deaths; (13) people who have recovered from COVID-19 have long-lasting immunity; and (14) airplane cabins pose little risk for coronavirus spread and there have been few, if any, reports of widespread coronavirus spread on aircraft. These problems could have come to light if Defendant CDC followed the APA's notice-and-comment requirements prior to ordering the FTMM." Doc. 1 at ¶ 981.

"[B]ald assertions that the agency does not believe comments would be useful cannot create good cause to forgo notice-and-comment procedures." *Action on Smoking & Health v. Civil Aeronautics Bd.,* 713 F.2d 795, 800 (D.C. Cir. 1983); *see also Nat. Res. Def. Council v. Evans*, 316 F.3d 904, 906 (9th Cir. 2003). Finally, the Federal Defendants are disingenuous when claiming "a medical exemption for those with disabilities who cannot wear a mask safely [] is already provided by the [FTMM]." Doc. 125 at 48. As explained in detail throughout the Complaint, the mask mandate allows airlines to violate the Air Carrier Access Act ("ACAA") by requiring numerous hurdles for a disabled person to jump through that aren't allowed under Defendant Department of Transportation ("DOT") regulations, making it pretty much impossible for anyone with a medical condition who can't tolerate wearing a mask to get such an exemption. Declarations indexed at Ex. 187.

## D. The FTMM must be vacated because it violates the 10th Amendment (Count 6).

Defendant CDC is not exercising authority that "has been properly delegated by Congress." Doc. 125 at 66. Even if it were, the FTMM runs afoul of the 10th Amendment because it applies to noncommercial intrastate transportation and commandeers state employees to enforce a federal order. The mandate also overrules state laws prohibiting anyone from wearing a mask in public (to prevent crime). For example, South Carolina, which never imposed a statewide mask mandate, makes it illegal for any person over 16 to conceal their identity in public. Ex. 173. Although it's true no state has sued to overturn the FTMM, that doesn't mean there aren't

numerous states who oppose it and/or refuse to enforce it.[13] In fact, there are presently 40 states that don't enforce a mask mandate. Ex. 107. Of these, only five are as extreme as the FTMM in requiring the fully vaccinated don masks.

> "Our reading of the statute's text accords with the principle that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority. That principle has yet greater force when the administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power" such as public health and intrastate transportation. "Agencies cannot discover in a broadly worded statute authority to supersede state ... law. Instead, Congress must 'enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property'" such as rideshare cars and privately owned buses, trains, ferries, airplanes, etc. *Tiger Lily* (6th Cir. July 23, 2021).

"[P]ublic health powers belong to the states, not the federal government," said Lawrence Gostin, director of Georgetown University's O'Neill Institute for National & Global Health Law. "The federal government couldn't implement its own mask mandates, nor could it force the states to do it." Ex. 163. When an "administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power," there must be "a clear indication that Congress intended that result." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-73 (2001). "[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. at 230." *Hillsborough County v. Automated Medical Labs*, 471 U.S. 707, 720 (1985).

---

[13] These include Florida (Doc. 1 at Ex. 55), Utah (*Id.* at Ex. 71), Texas (*Id.* at Exs. 72-73; Ex. 116), Arizona (Doc. 1 at Ex. 74), South Carolina (*Id.* at Ex. 75), New Hampshire (Ex. 11), South Dakota (Ex. 104), North Dakota (Ex. 105), Mississippi (Ex. 106), and Tennessee (Ex. 218).

> "The power to quarantine and take even more stringent measures in the name of public health has belonged largely to the states for nearly 200 years. In 1824, the Supreme Court drew a clear line in *Gibbons v. Ogden* between the state and federal governments when it came to regulating activities within and between states. In a unanimous ruling, then-Chief Justice John Marshall cited the 10th Amendment in saying that police powers are largely reserved to states for activities within their borders" such as intrastate transportation, according to the American Bar Association ("ABA"). Ex. 171.

> "[U]nder the U.S. Constitution's 10th Amendment and U.S. Supreme Court decisions over nearly 200 years, state governments have the primary authority to control the spread of dangerous diseases within their jurisdictions. The 10th Amendment, which gives states all powers not specifically given to the federal government, allows them the authority to take public health emergency actions, such as setting quarantines and business restrictions," according to ABA. Ex. 168.

The Federal Defendants try to get around the problem of enforcing a national mask mandate by unconstitutionally commandeering state officials such as the heads of airport and transit authorities (as well as their subordinates) to require face coverings on state-owned transportation conveyances and in state-operated transport hubs. The Federal Defendants suggest "the order may incidentally require some state employees" to enforce the FTMM. But it's not "incidental" for hundreds of thousands of state workers such as bus drivers, train conductors, airport staff, and police officers to be commandeered to enforce a mask mandate that in goes against state law in 40-45 states. Ex. 107. "We have already seen local law enforcement be reluctant to enforce state mask orders." Ex. 162.

> "Under the Constitution, the federal government is limited to specifically enumerated powers, which do not include a general authority to protect the public from communicable diseases. That responsibility lies primarily with the states, which retain a broad 'police power' that goes far beyond the authority vested in the president or Congress. Federalism leaves most decisions in this area to officials who are more accountable and more familiar with local conditions, allows instructive policy experimentation, and avoids concentrating power in a national government…" Ex. 5.

> The FTMM "covers some transportation that arguably does not involve a 'channel' or 'instrumentality' of interstate commerce. For example, the order covers cars transporting passengers for hire locally within a state. ... The Supreme Court has ruled in a number of cases that legislation exceeded this aspect of Congress' Commerce Clause power when Congress relied on aggregating the effects of noneconomic intrastate activities." Ex. 159.

Students riding a school bus and individuals using public transportation such as subways to travel short distances within a state for noncommercial purposes do not create "a substantial economic effect on interstate commerce" as the government argues. Doc. 125 at 67. Because the FTMM regulates intrastate transportation and commandeers state officials, it must be struck down. "Pursuant to the principles of federalism, the Supreme Court has interpreted the Tenth Amendment to prevent the federal government from commandeering or requiring state officers to carry out federal directives. This principle thus prevents Congress from requiring states or localities to mandate masks," according to CRS. Ex. 160.

> "[E]ven if the law could be interpreted as ... the United States suggest[s], it would still violate the anticommandeering principle ... The anticommandeering doctrine may sound arcane, but it is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States." *Murphy v. NCAA*, 138 S. Ct. 1461 (2018).

It is unquestioned the Federal Defendants have issued an order (FTMM) directly to states to prohibit anyone from using public transportation without wearing a mask. Thus, the FTMM unconstitutionally commandeers state officials – especially as here where state police officers are ordered by the federal government to enforce a federal mandate that violates the mask laws of nearly all the states.

**E. The FTMM must be vacated because it violates federal law prohibiting the mandatory use of any medical device approved under an EUA by Defendant HHS' Food & Drug Administration.**

The government ignores that the FTMM is illegal because it forces Americans to use a medical device (face masks), most of which are approved by FDA under Emergency Use Authorization ("EUA"). Individuals to whom any EUA product is offered must be informed "of the option to accept **or refuse administration of the product**, of the consequences, if any, of refusing administration of the product..." 21 USC § 360bbb-3(e)(1)(A)(ii)(III) (emphasis added). The Federal Defendants can't force travelers to use EUA products including masks. CDC may only **recommend** masks (as it has done for the rest of society excluding the transportation sector) and advise passengers if they refuse to wear a mask, the consequence *might* be a higher risk for contracting COVID-19. Ex. 75. When courts review the legal interpretations of an agency (such as CDC) regarding its compliance with statutes it does not administer, "such review can be more stringent: Courts sometimes review such matters *de novo*, or without any deference at all to the agency's interpretation." Ex. 158, cf. *Freeman v. DirecTV*, 457 F.3d 1001, 1004 (9th Cir. 2006).

There's good reason for the law prohibiting forced use of EUA medical devices. Requirements for EUA products are waived for, among other things, "current good manufacturing practice otherwise applicable to the manufacture, processing, packing ... of products subject to regulation under this chapter..." 21 USC § 360bbb-3(e)(3)(A). "Nothing in this section provides the [HHS] Secretary any authority to require any person to carry out any activity that becomes lawful pursuant to an

authorization under this section…" 21 USC § 360bbb-3(l). This is consistent with HHS regulations requiring that participants in trials of experimental medical devices must be informed that "participation is voluntary, refusal to participate will involve no penalty…" 45 CFR § 46.116(a)(8).

The law is crystal clear: The Federal Defendants have no authority to require any passenger wear a mask authorized under EUA. But most masks being used by Americans to comply with the FTMM meet the legal definition of an EUA "eligible product" that is "intended for use to prevent … a disease…" 21 USC § 360bbb-3(a). FDA regulates most face masks under EUAs. Ex. 26. HHS and FDA state:

> "On April 18, 2020, in response to concerns relating to insufficient supply and availability of face masks, [FDA] issued an [EUA] authorizing the use of face masks for use by members of the general public… A face mask is a device … that covers the user's nose and mouth and may or may not meet fluid barrier or filtration efficiency levels. It includes cloth face coverings as a subset. … Face masks are regulated by FDA when they meet the definition of a 'device' under section 201(h) of the Act. Generally, face masks fall within this definition when they are intended for a medical purpose. … Face masks are authorized under this EUA when they are intended for use as source control, by members of the general public … to cover their noses and mouths, in accordance with CDC recommendations, to help prevent the spread of SARS-CoV-2 during the COVID-19 pandemic." Ex. 16.

The HHS secretary authorized EUAs for COVID-19 countermeasures (85 Fed. Reg. 17,335; Ex. 127) including respiratory devices (85 Fed. Reg. 13,907; Ex. 128). FDA published the EUA for face masks July 14, 2020. 85 Fed. Reg. 42,410; Ex. 18. Another mask EUA was published Nov. 20, 2020. 85 Fed. Reg. 74,352; Ex. 19. HHS Secretary Xavier Becerra renewed the public-health emergency for COVID-19 July 19, 2021, allowing EUAs for masks and other devices to continue. Ex. 129. FDA confirms my argument that face masks are worthless. Masks must not be

> "labeled in such a manner that would misrepresent the product's intended use; for example, the labeling must not state or imply that the product is intended for antimicrobial or antiviral protection or related uses or is for use such as infection prevention or reduction… No printed matter, including advertising or promotional materials, relating to the use of the authorized face mask ***may represent or suggest that such product is safe or effective for the prevention or treatment of patients during the COVID-19 pandemic****." Ex. 16 (emphasis added).

"Face masks are not personal protective equipment." Ex. 17. The instruction manual for a 3M N95 respirator mask, which is FDA approved, makes clear its wearing still has risks: "Misuse may result in sickness or death. … [It] cannot eliminate the risk of contracting infection, illness, or disease… Individuals with a compromised respiratory system, such as asthma or emphysema, should consult a physician and must complete a medical evaluation prior to use." Ex. 123.

Despite the lack of data that masks are effective, FDA issued an umbrella EUA for 41 types of surgical masks, many of which are used by passengers to comply with the FTMM. Ex. 20. Notably five types of masks have been withdrawn from the EUA after FDA found them to be defective. *Id.* FDA has also revoked the EUA for respirator masks made in China for being faulty. Ex. 21. CDC's National Institute for Occupational Safety & Health ("NIOSH") found many masks made in China "authorized under the April 3, 2020, EUA did not meet the expected performance standards." *Id.* An astounding 167 respirator mask brands from China had their EUAs revoked by FDA last month. Another 54 were previously revoked. *Id.* FDA revokes EUAs when "appropriate to protect the public health or safety." Ex. 24. Surgical masks (typically light blue in color) made in China are also not authorized by FDA. Ex. 25.

Although these 221 respirator mask brands (plus all surgical masks) manufactured in China may no longer be legally sold in the United States, there are likely tens of millions of these face coverings still being used by passengers due to the FTMM. My mother is among the numerous Americans who have worn surgical masks made in China because of the FTMM. Ex. 22. So not only are quality masks worthless in CDC's goal of reducing transmission of COVID-19, but the vast majority sold in the United States are actually *defective*, according to FDA. Ex. 23. "The 'may be effective' standard for EUAs provides for a lower level of evidence than the 'effectiveness' standard that FDA uses for product approvals." Ex. 24. Even a well-informed consumer would find it nearly impossible to understand what types and brands of face masks have been authorized and which – if any – are regarded as safe to use for extended periods of time by NIOSH. The administrative record shows no indication these issues were considered.

When a mask manufacturer applies for an EUA, it must agree it may not "misrepresent the product or create an undue risk in light of the public health emergency. For example, the labeling must not include any express or implied claims for: ... antimicrobial or antiviral protection or related uses, (3) infection prevention, infection reduction, or related uses, or (4) viral filtration efficiency." Ex. 30.

**F. This Court has jurisdiction to adjudicate my claims against DHS and TSA because their orders were issued at the direction of CDC and are part of one unified federal policy (Counts 9 & 11-12).**

The government falsely claims the Court lacks jurisdiction over my claims

against Defendants Department of Homeland Security ("DHS") and its agency Transportation Security Administration ("TSA"). Doc. 125 at 17. First, it cites 49 USC § 46110, but this provision contains no mention of DHS.  Second, this statute vests the Court of Appeals with jurisdiction only for "an order" of the TSA administrator "with respect to *security duties*..." (emphasis added). TSA's part of the FTMM is not "an order" "with respect to security duties," it's enforcing a CDC health mandate. Therefore, the Court of Appeals' exclusive jurisdiction does not apply. Third, because TSA's FTMM comprises of three *directives* and one *emergency amendment*, not *orders*, the Court of Appeals' statutory jurisdiction likewise doesn't apply to this lawsuit. The cases cited by the government apply only to TSA *security orders*, not public-health enforcement directives, and thus are irrelevant here. Fourth, § 46110 does not apply to "order[s]" related to foreign air carriers. But one part of TSA's FTMM, EA 1546-21-01A, targets foreign airlines. So at minimum, this Court has jurisdiction to adjudicate EA 1546-21-01A.

This appears to be a question of first impression nationwide because never before has TSA attempted to enforce public-health rules. The Court should reject the government's arguments regarding Court of Appeals exclusive jurisdiction because, it in addition to being legally unsound, it would produce absurd results: 1) Any plaintiff seeking to challenge the FTMM would have to file suits both in a District Court and a Court of Appeals. This is far from the goal of "judicial economy" this Court seeks. Doc. 67 at 6; and 2) If I succeed in winning *vacatur* of the FTMM only as applied to CDC, then TSA could possibly continue enforcing its own *ultra*

*vires* mask mandate even though CDC no longer authorizes it. That would result in more litigation at the Court of Appeals, which could take a year or longer. This Court's decision vacating the CDC part of the FTMM would have little effect if TSA is permitted to continue enforcing its mask directives and emergency amendment. The Court must not allow this illogical result.

## G. TSA failed to abide by APA's notice-and-comment requirement (Count 9).

The Federal Defendants claim that if TSA determines a regulation or security directive "must be issued immediately … to protect transportation ***security***," notice and comment are waived. Doc. 125 at 52 (emphasis added). Because the FTMM is not a *security* policy but a *public-health* policy, the mask mandate does not fall under this exemption. The approval of the Transportation Security Oversight Board has no effect on TSA's duty to engage in notice and comment.

## H. TSA lacks statutory authority to enforce a mask mandate (Count 12).

There are at least four reasons why TSA can't enforce a mask mandate: 1) No statute authorizes TSA to enforce public-health rules; 2) Congress recognized this when the House passed a bill to permit TSA to implement a mask mandate, but it died in the Senate; 3) The chairman of the House Homeland Security Committee acknowledged TSA lacks authority to perform temperature checks of passengers, let alone require masks; and 4) TSA did not adhere to APA's notice-and-comment requirement. Ex. 154. Defendant TSA's position

"raises the interpretive question whether 'transportation security' measures under sections 114(f) and (l) include measures aimed at preventing disease transmission. Under a narrower construction, 'security' – which is not statutorily defined – connotes the prevention of deliberate harms, such as terrorism or other intentional criminal acts. Some aspects of the larger statutory context could potentially support this narrower construction. Congress enacted the [Aviation and Transportation Security Act] in response to the September 11, 2001, terrorist attacks, establishing the TSA and giving it responsibility for 'security in all modes of transportation.' Reflecting a counterterrorism focus, some of the TSA's statutory authorities expressly reference 'terrorism' or 'criminal violence.'" Ex. 159.

TSA is not entitled to *Chevron* deference because the statute is unambiguous: Congress has not assigned TSA the duty of enforcing public-health dictates. Defendant Biden "can't require masks on interstate buses and trains because only the U.S. Congress can regulate interstate commerce by law, not the president by directive." Ex. 174. Also, 49 USC § 44902(a) only permits TSA to deny boarding to "a passenger who does not consent to a search" or "property of a passenger who does not consent to a search." No denial of boarding is authorized for passengers not wearing masks. 49 USC § 44903 allows TSA to prevent "violence and piracy," not a disease. It hard to imagine Congress had enforcing a mask mandate in mind when it gave TSA the authority to deploy "police at airport security checkpoints 'to ensure passenger safety and national security.'" Doc. 125 at 50.

TSA is tasked with items that only logically apply to protection from intentional attacks. The irony here, regardless of "safety" or "security" terminology, is that the FTMM has made flying ***much more dangerous*** due to the chaos in the skies over enforcing masks. Doc. 1 at ¶¶ 424-479; Declarations of flight attendants at Exs. 190, 209-210, & 215. Finally, the government admits more than "8,000 [TSA]

screening employees have been [infected] with COVID-19…" Doc. 125 at 51. TSA employees are forced to wear face coverings. If masks are effective, why have so many TSA workers tested positive for coronavirus?

## II. ARGUMENT OPPOSING MOTIONS FOR SUMMARY JUDGMENT OR TO DISMISS COUNTS 3, 7-8, 11, 14-15, & 21

### A. The Court must not grant summary judgment for the Federal Defendants on my arbitrary-and-capricious claims because there is a genuine dispute as to any material fact and they are not entitled to judgment as a matter of law (Counts 3, 11, & 21).

The Federal Defendants' actions in promulgating the FTMM and ITTR are not "rational," "reasonably considered," or "reasonably explained." Doc. 125 at 41. In addition to lacking regulatory, statutory, and constitutional authority, they are arbitrary and capricious. Whether an agency decision is arbitrary and capricious is largely a fact-based and situation-specific question. *Troy Corp. v. Browner*, 120 F.3d 277, 284 (D.C. Cir. 1997). Therefore summary judgment in favor of the government is not appropriate here as there is a genuine dispute over material facts. Fed.R.Civ.P. 56. Although the 11th Circuit gives "an extreme degree of deference to the agency when it is evaluating scientific data," a court may not ignore contrary evidence such as 115 scientific studies and medical articles[14] demonstrating that

---

[14] The Federal Defendants disparage the source of one article I submitted attached to the Complaint (Doc. 125 at 43, FN 17) but fail to acknowledge that the other 42 scientific studies and medical articles attached to Doc. 1 (322 pages total) come from numerous prestigious and well-respected publications including Annals of Family Medicine; Annals of Internal Medicine; Association of American Physicians & Surgeons; British Medical Journal; CDC Emerging Infectious Diseases; European Journal of Medical Research; Frontiers in Public Health; International Journal of Environmental Research & Public Health; Lancet Infectious Diseases; Medical News Today; National Academies of Sciences, Engineering, & Medicine; and University of New South Wales. The same is true with the additional 72 studies and articles I attach to this brief (Exs. 31-102).

masks are ineffective and harmful. Index at Ex. 103. An agency policy created due to politics and not reasoned scientific endeavor is arbitrary and capricious. Ex. 158, cf. *Midwater Trawlers Coop. v. Dep't of Commerce*, 282 F.3d 710, 720 (9th Cir. 2002). It's frankly a lie (perpetrated by politics) for CDC to claim mask wearing "is one of the most effective strategies available for reducing COVID-19 transmission." Doc. 125 at 41. The evidence shows otherwise. Ex. 103. COVID-19 cases surged last winter despite 40 states having a mask mandate and 85% of Americans surveyed saying they wore masks "all or most of the time." Exs. 117 & 164. The U.S. experience (huge coronavirus infections despite universal masking) has occurred in countries all over the globe including India. Ex. 118. Meanwhile Sweden, which eliminated its transport mask mandate in early July, is now down to almost zero COVID-19 deaths. Ex. 186. I have not moved for summary judgment on Counts 3, 11, and 21 because the government and I greatly differ about the scientific facts regarding the efficacy of mask wearing and the harms of forced muzzling.

When the government cites seven studies[15] supporting mask wearing vs. the 115 I've submitted detailing how masks are ineffective and harm our health (Ex. 103), the Court must favor the evidence that overwhelmingly discredits CDC's political position it attempts to justify by science. *See* Exs. 8-9, 25, 27, 28-29, 119-120, 125,

---

[15] I actually count 12 studies in the administrative record: 1) Doc. 114 at 16-20; 2) *Id*. at 21-40; 3) *Id*. at 44-48; 4) *Id*. at 49-52; 5) *Id*. at 53-70 & Doc. 115 at 1-13; 6) Doc. 115 at 14-17; 7) *Id*. at 18-24; 8) *Id*. at 25-38; 19) *Id*. at 39-74 & Doc. 116 at 1-32;  10) Doc. 116 at 33-93; 11); Doc. 117 at 1-12; 12) Doc. 118 at 2-4. Nonetheless, 115 is still nearly 10 times more evidence than 12, showing the Court there is a genuine dispute over material facts that doesn't warrant summary judgment at this time.

130-147, 148-153, 155-157, 177-178, 180, & 217.

An agency decision is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view…" *Motor Vehicle Manufacturers Ass'n v. State Farm Auto Mutual Ins. Co.*, 463 U.S. 29, 43 (1983). All three factors are in play here with the FTMM.

Finally, the ITTR is arbitrary and capricious, *inter alia*, for violating the Equal Protection Clause because it applies to fully vaccinated Americans flying home but not illegal aliens (who are mostly unvaccinated) and others crossing the land border from Mexico when the evidence shows these unauthorized immigrants are much more likely to be infected with COVID-19. The ITTR also has not "reduce[d] introduction and spread of these and future SARS-CoV-2 variants into the United States" as the government admits the delta variant is surging. "[W]hile courts must be deferential to the need to protect public health, courts must also be vigilant against abuses of public health powers." Ex. 165.

**B. The Court must not grant summary judgment for the Federal Defendants on my Fifth Amendment claim because they are not entitled to judgment as a matter of law (Count 7).**

The government argues that "there is no evidence in the record that Mr. Wall has actually attempted to take advantage of those [mask] exemption provisions" and that I "did not submit the exemption form in the time required by the airline

... [and] did not provide the requisite documentation." Doc. 125 at 63. This is a ludicrous argument. There is documentation in the record that I tried to get a mask exemption from Southwest Airlines. Doc. 1 at Ex. 204. It was denied because Southwest – like every other airline as illegally permitted by the FTMM – puts onerous requirements on passengers seeking mask exemptions that are explicitly prohibited by federal regulations. Doc. 1 at ¶¶ 231-272. I pursued a medical exemption in good faith but was illegally denied. Defendant TSA forbade me passage through its checkpoint June 2 solely because a private company (Southwest) acting illegally would not grant me a mask exemption. A complaint to Defendant DOT would be futile because DOT itself told the airlines it could violate the regulations. *Id.* at Ex. 208. I was given no opportunity to contest TSA's decision, let alone in a timely manner that would have allowed me to make my flight. This is a classic violation of the Due Process Clause and far from "fully satisfactory."

Delegating FTMM decisionmaking to private companies such as airlines and then telling them they may violate federal regulations in doing so is not seeking private enforcement of a federal order in "matters more or less of a technical nature." Doc. 125 at 65. The FTMM removes the government completely from the mask-exemption process and hands that task entirely to private companies, at least in the aviation sector (in other sectors, it unconstitutionally commandeers state officials to enforce the mask mandate; *see* 10th Amendment discussion *supra*.)

**C. The Court must not grant summary judgment for the Federal Defendants on my freedom-to-travel claim because they are not entitled to judgment as a matter of law (Count 8).**

The Federal Defendants contend "reasonable restrictions on the right to interstate travel are permissible." Doc. 125 at 59. But the FTMM is unreasonable as it imposes an impossible burden on tens of millions of travelers – having to wear a face covering that is medically dangerous and intolerable – for no public benefit (masks are not effective in reducing COVID-19 spread and actually harm human health; Ex. 103). I am not free to leave Florida by land (bus or train), air, or sea[16] because the FTMM applies to all of these transit modes. I could only leave by driving myself, but I don't own a car.[17] Using public transport is my only way of traveling interstate and internationally.[18] "The original conception of the right to travel embodies it as a broadly-based freedom that encompasses all modes of transport. … abridgement of any mode of transportation undermines the constitutionally enshrined travel right." Ex. 169. Should this issue reach the 11th Circuit, it appears to be a question of first impression. This Court must declare the right to interstate

---

[16] I am not aware of any ferry or other passenger-ship service from Florida to other states. And there is very little interstate ship service anywhere in the nation.

[17] The Federal Defendants suggest that because I recently traveled by car to an aunt's funeral in Tampa, I could drive elsewhere. They fail to note I rode in the car with my mother (who owns the vehicle) and that Tampa is only a 75-minute drive from The Villages, where she resides. They fail to explain how it would be reasonable to drive to a place such as Salt Lake City, Utah – which would be an estimated 34-hour one-way drive – or how I could drive a car across the Atlantic Ocean to visit my brother and his wife in Germany. Flying is absolutely a necessity for me.

[18] The government falsely suggests that my right-to-travel claim is limited only to interstate travel. As one of my trips postponed because of the FTMM and ITTR is to Germany, this is a ridiculous statement. In fact, I have rebooked my flight to Germany for Sept. 12. Ex. 13.

travel includes one's choice on the best or most reasonable mode to utilize. "Travel embodies a broadly based personal, political, and economic right that encompasses all modes of transportation and movement. ... The right to travel, inherent in intercourse among the states, is one of the implied and unenumerated rights reserved [under the Constitution] to the People." *Id.*, cf. *Crandall v. Nevada*, 73 U.S. 35, 48-49 (1867).

The Federal Defendants misrepresent Second Circuit precedent on the issue of having a constitutional right to a convenient mode of transport – especially when it comes to traveling across oceans to foreign nations:

> "To make one choose between flying to one's destination and exercising one's constitutional right appears to us, as to the Eighth Circuit, *United States v. Kroll*, 481 F.2d 884, 886 (8th Cir. 1973), in many situations a form of coercion, however subtle. Cf. *Lefkowitz v. Turley*, 414 U.S. 70, 79-82, 94 S. Ct. 316, 38 L. Ed. 2d 274 (1973). While it may be argued there are often other forms of transportation available, it would work a considerable hardship on many air travelers to be forced to utilize an alternate form of transportation, assuming one exists at all." *United States v. Albarado*, 495 F.2d 799 (2nd Cir. 1974).

The Eighth Circuit held in *Kroll* that "flying may be the only practical means of transportation;" when limited, it often deprives an individual of the right to travel. A District Court also addressed this issue recently:

> "The impact on a citizen who cannot use a commercial aircraft is profound. He is restricted in his practical ability to travel substantial distances within a short period of time, and the inability to fly to a significant extent defines the geographical area in which he may live his life. ... An inability to travel by air also restricts one's ability to associate more generally, and effectively limits educational, employment and professional opportunities." *Mohamed v. Holder*, 2014 WL 243115, at *6 (E.D.Va. Jan. 22, 2014).

Although "mere burdens on a person's ability to travel from state to state are not necessarily a violation of their right to travel," a complete ban on interstate and

international travel because I medically can't wear a mask is much more than a burden, minor restriction, or inconvenience – it is an unconstitutional prohibition.

"The Supreme Court has consistently applied strict scrutiny to restrictions on the right to interstate travel." Ex. 167. "Undoubtedly the right of locomotion, the right to remove from one place to another according to inclination, is an attribute of personal liberty, and the right, ordinarily, of free transit from or through the territory of any State is a right secured by the ... Constitution." *Williams v. Fears*, 179 U.S. 270, 274 (1900).

I am not "free to travel with a mask" because it would be detrimental to my health. Wall Decl. at Doc. 83-1 and medical records at Doc. 12, Exs. 1-6; *see also* 115 mask studies indexed at Ex. 103. In addition, airlines and Defendant DOT have illegally made getting a mask exemption virtually impossible. Dec. 1 at ¶¶ 231-272 and Ex. 208. "[C]ourts recognize the unique nature of flight as a necessarily accessible and protected mode of transportation under the travel right and federal law. ... An individual's liberty may be harmed by an act that causes or reasonably threatens a loss of physical locomotion ***or bodily control***" such as forced masking. Ex. 169 (emphasis added). The Supreme Court recently disdained pandemic restrictions that violate constitutional rights. An American is "irreparably harmed by the loss of [constitutionally protected] rights 'for even minimal periods of time'; the State has not shown that 'public health would be imperiled' by employing less restrictive measures." *Tandon v. Newson*, No. 20A151 (April 9, 2021).

I also have a statutory right to fly: "A citizen of the United States has a public

right of transit through the navigable airspace." 49 USC § 40103(a)(2). "The constitutional right to travel from one State to another, and necessarily to use the highways *and other instrumentalities of interstate commerce* in doing so, occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized." *United States v. Guest*, 383 U.S. 745, 757 (1966) (emphasis added). Thus, the right to travel can't be limited to driving a vehicle on the highways, as the government argues.

My constitutional right to freedom of movement can't be restricted when there is no evidence that airplanes have contributed to the spread of COVID-19 and there are less restrictive systems already in place (the Do Not Board and Lookout databases; Doc. 1 at ¶¶ 354-365). Reducing coronavirus spread could be adequately addressed by means which, when compared with the FTMM, are more discriminately tailored to the constitutional liberties of individuals.

> "The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment. ... Freedom of movement is basic in our scheme of values. *See Crandall v. Nevada*, 6 Wall. 35, 44; *Williams v. Fears*, 179 U. S. 270, 274; *Edwards v. California*, 314 U.S. 160. ... Since we start with an exercise by an American citizen of an activity included in constitutional protection, we will not readily infer that Congress gave the Secretary ... unbridled discretion to grant or withhold it." *Kent v. Dulles*, 357 U.S. 116 (1958).

**D. The Court has jurisdiction over my two claims against DOT. It must not grant summary judgment because there is a genuine dispute as to any material fact and the Federal Defendants are not entitled to judgment as a matter of law (Counts 14-15).**

The government misleadingly argues the Court lacks jurisdiction over my claims against Defendant DOT and my mandamus prayers for relief. Doc. 125 at

16, 19-25, & 37-40. It also is not entitled to summary judgment because there is a genuine dispute over the material facts. It's a bald-face lie to claim "DOT has issued an enforcement policy precisely to ensure protection under the [Air Carrier Access Act] for those who cannot wear a mask for legitimate reasons." *Id.* at 19. DOT's Notice of Enforcement Policy ("NEP") (Ex. 1 at 208) violates the ACAA (49 USC § 41705) and these regulations: 14 CFR §§ 382.19(a), 382.23(a), 382.23(c)(1), 382.23(d), and 382.25. DOT admits it failed to enforce the ACAA from Spring 2020 to February 2021. Ex. 1 at ¶ 243. Its own publications describe now the Feb. 5, 2021, NEP contradicts the law. Doc. 1 at Exs. 209 & 210; ¶¶ 231-272.

Jurisdiction is not limited to the Court of Appeals because 49 USC § 46110 only applies to "an order issued by the Secretary of Transportation…" DOT's NEP is a "notice," not an "order." And it was issued by Blane Workie, assistant general counsel, not the secretary. I am not challenging one "order" of DOT. I am challenging its failure to perform its statutory duty of protecting airline passengers with disabilities from discrimination. "The Secretary shall investigate each complaint of a violation…" 49 USC § 41705(c)(1). I allege DOT is not doing this when it comes to mask complaints. And CDC has no authority to issue a mask order (which is not duly promulgated as a regulation) with provisions that violate sections of the Code of Federal Regulations. The government's assertion CDC may ignore the CFR (Doc. 125 at 37) is disingenuous and dangerous.

To prove this claim, I require discovery to obtain all complaints filed with DOT

during the pandemic (March 2020 to present) regarding passengers denied boarding and/or harassed by airlines for not wearing masks as well as showing how the department resolved those complaints.[19] DOT claims it's enforcing the ACAA; I assert it's not. This is based on my experience as well as that of other passengers. Declarations indexed at Ex. 187. This is a genuine dispute over material facts that prohibits summary judgment under Fed.R.Civ.P. 56.

DOT's nonenforcement of its own regulations regarding mask exemptions is part of a comprehensive package of Executive Branch orders, directives, amendments, and notices that make up the broad-sweeping FTMM. To force a litigant to file separate challenges to each part of the mask mandate in a District Court and a Court of Appeals runs against this Court's desire for judicial economy and prevents this Court from resolving all claims concerning the same comprehensive government scheme. The government's position would deprive this Court of its mandamus jurisdiction: "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel ... any [U.S.] agency ... to perform a duty owed to the plaintiff." 28 USC § 1361. Here, the DOT secretary owes me (and all other disabled passengers similarly situated) a "clear nondiscretionary duty" to enforce the ACAA and its own regulations. I'm excused from having to "exhaust[] all other avenues of relief" because it would be futile. The Court shall not divest itself

---

[19] I requested these documents Aug. 17 from DOT counsel Stephen Pezzi so we can avoid the need for formal discovery in this case. He is checking with DOT about providing the materials.

of its jurisdiction under 28 USC § 1651(a): "[A]ll courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

The doctrine of exhaustion must be balanced with the interests of the individual "in retaining prompt access to a federal judicial forum…" *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992). There are equitable exceptions to the exhaustion rule including when "the challenge is to the adequacy of the agency procedure itself" and when the agency is biased or has predetermined the issue such that exhaustion would be futile. *Id*. I am not required to exhaust airlines' exemption policies or ACAA's administrative remedy of filing a complaint with DOT because it would be pointless – as I expect to prove during discovery and as dozens of passengers have already testified to. Index of Declarations at Ex. 187. At least one passenger has made nine complaints to DOT regarding airlines refusing to honor his doctor's note that he is exempt from wearing a mask; none of them have resulted in DOT taking any action. Ex. 170. Excusal of the exhaustion requirement is proper "when resort to the administrative remedies would be futile or the remedy inadequate." *Counts v. Am. Gen. Life & Accident Ins. Co.*, 111 F.3d 105, 108 (11th Cir. 1997). DOT has also acted in bad faith by neglecting its statutory duty to protect the rights of disabled airline passengers, further excusing any exhaustion requirement. This Court must issue a writ of mandamus compelling DOT to the job Congress entrusted to it the department.

### III. ARGUMENT OPPOSING UMBRELLA ASSERTIONS IN THE GOVERNMENT'S MOTIONS FOR SUMMARY JUDGMENT & TO DISMISS

## A. Defendant Biden should not be dismissed because his unconstitutional executive order set in motion the FTMM and ITTR.

The government untruthfully contends the Court lacks jurisdiction over my claims against Defendant Biden. Doc. 125 at 16 & 25. "Legal scholars overwhelmingly agree that despite his insistence to the contrary, Biden's calls from the campaign trail for a mask mandate imposed by the federal government were unconstitutional." Ex. 11. Defendant Biden himself acknowledged this but then acted in bad faith when signing the challenged executive order anyway. Exs. 1-13.

> "Two questions are always asked whenever an executive order is challenged: (1) where does the President get the authority to enact the order? (2) Does it violate any constitutional rights? ... State and local governments have 'police powers' to enact measures that will protect the general health and safety of the public. However, the federal government does not have such powers and the Constitution does not give the President the power to enact a mask mandate. Therefore, the White House must point to a law passed by Congress that gives the President such a power or the mask mandate will be unconstitutional." Ex. 10.

The government wrongly asserts that I haven't alleged "that the President ... engaged in any unlawful conduct." Doc. 125 at 26. Biden's E.O. 13998 for the FTMM and ITTR is illegal and unconstitutional, as I've argued throughout this case. Doc. 1 at 202, ¶¶ A & B. And although it's true the president is not considered an "agency" under the APA, the judiciary has the power to declare executive orders unconstitutional and/or illegal and enjoin their enforcement. *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579 (1952). "[I]t is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of

the United States." *Nixon v. Fitzgerald*, 457 U.S. 731, 753–54 (1982). *See also Clinton v. Jones*, 520 U.S. 681, 703 (1997); *Bond v. United States*, 564 U.S. 211, 225–26 (2011); and *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 (2010). Notably Defendant Biden did not cite any constitutional or statutory authority for the FTMM and ITTR in E.O. 13988. Doc. 1 at Ex. 6. Federal court review of executive orders helps to define the scope of presidential powers and serves as a significant aspect of the checks and balances woven into the American constitutional system. E.O. 13998 contains no expiration date or sunset provision, and fails to provide any guidance as to when or under what conditions it will expire.

Courts may strike down executive orders not only on the grounds that the president lacked authority to issue them but also in cases where the order is found to be unconstitutional in substance. And because Defendant Biden acted in bad faith, the Court must not just vacate his executive order but also shall employ the extraordinary remedy of enjoining him from again ordering any mask mandate or traveler testing requirement because he has shown a total disregard for both the Constitution and our laws. An injunction would not order Biden to "perform particular ... acts" but would prohibit him from again issuing *ultra vires* executive orders pertaining to masks, testing, and other pandemic restrictions.

## B. I have standing to contest both the ITTR and the FTMM.

The government falsely claims the Court lacks jurisdiction over my ITTR claims (Doc. 125 at 16) and suggests I don't even have standing on my FTMM claims (*Id.*

at 27, FN 12). These arguments are absurd because there's no dispute that I was denied the ability to fly by Defendant TSA on June 2 solely because I can't wear a mask. Doc. 125 at 13-14. It's also uncontested that I was not able to fly June 16, 18, 20, 22, 24-25, and 30 as well as July 3, 10, and 15 because of the FTMM and (for the June 30 flight home from Germany) the ITTR. Doc. 1 at ¶¶ 4-10. Were it not for the FTMM and ITTR, I would have taken all these trips. These are concrete injuries that give me Article III standing to challenge both policies.

Even if the government's position were correct, it fails to acknowledge I re-scheduled (for a third time) my trip to Germany to see my brother and his wife for Sept. 12-22. Ex. 13. While booking my ticket, United warned me I will be subject to the ITTR and the FTMM (including that there are "no exceptions" to the mask rule but for eating and drinking as well as kids under two years old; disproving the government's allegations that I can follow administrative channels to obtain a mask exemption). Ex. 14. It's critical this Court vacate these policies before Sept. 12.

## C. My Complaint is not an impermissible shotgun pleading.

The Federal Defendants incorrectly assert that my "complaint is an impermissible 'shotgun pleading…'" that makes it "nearly impossible for Defendants and the Court to determine with any certainty which factual allegations give rise to which claim." Doc. 125 at 68. Just like with the two Local Defendants, this argument is bogus. Based on the extreme detail in their 88-page brief asking for dismissal of and summary judgment on the merits of all 16 pending charges against them, it's

obvious the Federal Defendants understand with certainty the facts of the case and how they are applied to each claim. They cite facts in the Complaint they contend are irrelevant, but all are actually on point regarding the arbitrary and capricious nature of agency action taken, *inter alia*, despite: A) numerous health problems caused by masks (e.g. the Oregon athlete collapsing while masked due to low oxygen levels); and B) chaos in the skies caused by airlines having to enforce mask mandates (e.g. families being treated rudely and thrown off planes because their autistic children can't keep a mask on).

The government whines about my Complaint being long as well as full of facts and exhibits supporting those facts, but there is no inability to comprehend what they have been charged with as evidenced by their thorough arguments in opposition. The Federal Defendants themselves acknowledge "this case can (and should) be resolved" on the merits. Doc. 125 at 69.

Lastly, they filed an administrative record totaling 633 pages. Does that make their motions the equivalent of a disallowed "shotgun pleading" simply because of the large volume of exhibits included? As painful as it was to read all those 633 pages, I don't think so. The same goes for my Complaint.

**D. My prayers for relief are not overbroad.**

The Federal Defendants complain my prayers for relief, if I prevail, would be overbroad because the judgments and orders I seek from the Court "would prevent enforcement of any of the challenged orders, in any context, against anyone…" Doc.

125 at 69. But under the APA, when a Court determines government agencies have exceeded their regulatory, statutory, and/or constitutional authority; failed to abide by notice and comment; promulgated arbitrary and capricious policies; etc., the proper remedy is to "hold unlawful and set aside" the *ultra vires* orders. 5 USC § 706. This means nationwide *vacatur* is the appropriate remedy. *Alabama Ass'n of Realtors v. HHS* (D.D.C. May 5, 2021). Because the ITTR applies abroad to all air carriers preventing them from boarding any passenger to the United States who fails to present a negative COVID-19 test, worldwide *vacatur* is the relief required.

> "[A] federal district judge has authority and subject matter jurisdiction to grant plaintiffs an injunction that bars the federal executive from implementing an unconstitutional or illegal federal government program anywhere ...The federal courts keep the federal executive in constitutional line. In a system without the nationwide national government injunction, the federal executive could develop and implement policies and programs that avoid obeying the law." Ex. 182.

To set aside the *ultra vires* FTMM and ITTR only for myself would violate the Equal Protection Clause. An illegal, unconstitutional order may not be enforced by the government against any person. To declare that only Lucas Wall, one of the estimated 66 million Americans every day who use public transportation, is exempt from the unlawful orders would lead to an crazy result: the Federal Defendants being allowed to enforce the FTMM and ITTR against the other 65,999,999 people who were not a plaintiff in this case. And if those 65,999,999 had to file their own lawsuits, it would completely overwhelm the federal judiciary to accomplish the same result. As the Court can plainly see by the declarations of 33 other passengers and flight attendants (Index at Ex. 187) and all the news stories about

others being banned from flying I've submitted into evidence, these policies have a negative impact on tens of millions of Americans every day. The government quotes only one Supreme Court justice objecting to a nationwide injunction as the proper remedy when the government acts unlawfully. But that's not what the plain text of the APA states. "National government injunctions respond to ... the federal executive's practice of issuing executive orders and administrative regulations to make major unilateral policy changes that bypass the legislative process. Separation of powers and judicial review together enable courts to prevent the executive's improper and arbitrary exercise of power." Ex. 182.

If the Court holds unlawful and sets aside the FTMM and ITTR, a permanent injunction prohibiting their enforcement and any future orders by the Federal Defendants to achieve the same political goals is absolutely necessary given the bad faith that Defendant Biden has engaged in multiple times, saying he knows the CDC orders are unconstitutional but putting them in place anyhow. Ex. 115. The Judicial Branch has a constitutional responsibility to a stop this power grab by the Executive Branch. Separation of powers demands it. Defendant CDC has already disrespected this Court by saying it will enforce its mask rule on cruiseships even though such restrictions were preliminary enjoined. *State of Florida*; Ex. 121. CDC Director Dr. Rochelle Walensky admitted were it not for political interference, her agency would be leaving it up to states and local health officials to set guidelines concerning maskwearing. The CDC has "always said that local policymakers need to make policies for their local environment," she said. Ex. 126.

Remand to the agencies is not an appropriate remedy as the Federal Defendants suggest (Doc. 125 at 70) because there is no way they could cure all the errors made in issuing these *ultra vires* orders. Remand without *vacatur* would allow the government to continue enforcing unlawful policies. Finally, the Court should not buy the hysteria the government is selling that "even temporary (or partial) *vacatur* of these orders could have disruptive and dangerous consequences." As I have demonstrated, the mask mandate and testing requirement are not based on science, but politics. Vacating these two orders would not be disruptive; it would simply restore the status quo to our public-transportation system that existed prior to January 2021. The government acknowledges that COVID-19 cases are again surging, illustrating how ineffective these policies are. It would be dangerous for the Court to leave the FTMM in place given the strong body of scientific evidence showing how harmful masks are to human health. Index at Ex. 103.

## IV. CONCLUSION

WHEREFORE, I request this Court issue an order granting me summary judgment on Counts 1, 4–6, 9, 12, 19, & 22–23 (Doc. 127-1) and denying the Federal Defendant's Cross-Motion for SJ and Motion to Dismiss (Doc. 125).

Respectfully submitted this 18th day of August 2021.

*Lucas Wall*

Lucas Wall, plaintiff
435 10th St., NE
Washington, DC 20002
Telephone: 202-351-1735
E-Mail: Lucas.Wall@yahoo.com