## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**LUCAS WALL,**

        **Plaintiff,**

v.                                 **Case No: 6:21-cv-975-PGB-DCI**

**CENTERS FOR DISEASE
CONTROL & PREVENTION,
DEPARTMENT OF HEALTH &
HUMAN SERVICES,
TRANSPORTATION SECURITY
ADMINISTRATION,
DEPARTMENT OF HOMELAND
SECURITY, DEPARTMENT OF
TRANSPORTATION, JOSEPH
R. BIDEN, JR. , GREATER
ORLANDO AVIATION
AUTHORITY and CENTRAL
FLORIDA REGIONAL
TRANSPORTATION
AUTHORITY,**

        **Defendants.**

_____/

## ORDER

This cause comes before the Court on the following filings:

1.     Defendant Greater Orlando Aviation Authority's ("**GOAA**") Motion to

        Dismiss (Doc. 49), Plaintiff Lucas Wall's response in opposition (Doc.

        100), and Defendant GOAA's reply thereto (Doc. 129);

2.     Defendant Central Florida Regional Transportation Authority's

        ("**LYNX**") Motion to Dismiss (Doc. 82), Plaintiff's response in

opposition (Doc. 101), and Defendant LYNX's reply thereto (Doc. 146);

3.  Plaintiff's Motion for Summary Judgment against Defendants Centers for Disease Control and Prevention ("**CDC**"), Department of Health and Human Services ("**HHS**"), Transportation Security Administration ("**TSA**"), Department of Homeland Security ("**DHS**"), Department of Transportation ("**DOT**"), and Joseph Biden, Jr. (the "**President**") (collectively, the "**Federal Defendants**") (Doc. 83), the Federal Defendants' response in opposition (Doc. 125), and Plaintiff's reply thereto (Doc. 130);

4.  The Federal Defendants' Motion to Dismiss and Cross Motion for Summary Judgment (Doc. 83), Plaintiff's response in opposition (Doc. 130), and the Federal Defendants' reply thereto (Doc. 147); and

5.  Magistrate Judge Daniel Irick's Report and Recommendation as to these filings (Doc. 155 ("**Report**")), Plaintiff's Objection thereto (Doc. 171), and Defendants' responses in opposition (Docs. 172, 179, 180).

The Report recommends that the Court dismiss the claims against the DHS, the TSA, the DOT, the President, the GOAA, and LYNX with prejudice. (Doc. 155). The Report further recommends that the Court dismiss the claims against the CDC and HHS without prejudice and deny the Motions for Summary Judgment as moot. (*Id.*). The Court finds that the Report is due to be adopted in part.

## I.    BACKGROUND

In response to the COVID-19 pandemic, the President directed agencies with relevant regulatory authority to "immediately take action, to the extent appropriate and consistent with applicable law, to require masks to be worn in or on . . . all forms of public transportation," including airports and commercial aircraft. Exec. Order 13,998, 86 Fed. Reg. 7,205 (Jan. 21, 2021) (the "**Executive Order**"). The Executive Order further stated, "To the extent permitted by applicable law, the heads of agencies shall ensure that any action taken to implement this section does not preempt State, local, Tribal, and territorial laws or rules imposing public health measures that are more protective of public health than those required by the heads of agencies." *Id.* at 7,205–06. Subsequently, the CDC promulgated two orders to effectuate the President's Executive Order.

The first is the federal transportation mask mandate ("**FTMM**"), which requires individuals traveling via public transportation to wear a mask. Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs, 86 Fed. Reg. 8,025 (Feb. 3, 2021). In support of the CDC's mandate, the TSA issued security directives (the "**Security Directives**") and an emergency amendment (the "**Emergency Amendment**"), applying the FTMM to airport operators, domestic aircraft operators, surface transportation systems, and foreign air carriers, respectively, and invoking its authority under 49 U.S.C. § 114 and Part A of that title as the statutory basis for these regulatory actions. TRANSP. SEC. ADMIN., SD 1542-21-01, SD 1544-21-02, SD 1582/84-21-01, SECURITY

MEASURES—MASK REQUIREMENTS (2021); TRANSP. SEC. ADMIN., EA 1546-21-01, SECURITY MEASURES—MASK REQUIREMENTS (2021).

The second CDC order is the international traveler testing requirement ("**ITTR**"), which requires international travelers to obtain a negative COVID-19 test prior to departure to the United States from a foreign country. Requirement for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery From COVID-19 for all Airline or Other Aircraft Passengers Arriving Into the United States From Any Foreign Country, 86 Fed. Reg. 7,387 (Jan. 28, 2021). The CDC has since amended the ITTR twice.

The second version of the ITTR imposed more stringent COVID-19 testing parameters on unvaccinated individuals, explicitly invoked the good cause exception to the Administrative Procedure Act's ("**APA**") rulemaking procedure, and provided supplemental data on COVID-19. 86 Fed. Reg. 61,252 (Nov. 5, 2021). The third, and most recent, version of the ITTR eliminates the distinction between vaccinated and unvaccinated individuals in terms of qualifying COVID-19 tests. 86 Fed. Reg. 69256 (Dec. 7, 2021).

In the interim, Florida Governor Ron DeSantis issued an executive order that: suspended "all local COVID-19 restrictions and mandates on individuals and businesses"; "eliminate[d] and supersede[d] any existing emergency order or ordinance issued by a county or municipality that imposes restrictions or mandates upon business or individuals due to the COVID-19 emergency"; prohibited any "county or municipality" from "renew[ing] or enact[ing] an emergency order or

ordinance, using a local state of emergency or using emergency enactment procedures under [Florida law] that imposes restrictions or mandates upon businesses or individuals due to the COVID-19 emergency"; and clarified that "a political subdivision . . . [could] enact[] ordinances pursuant to regular enactment procedures to protect the health, safety, and welfare of its population." STATE OF FLA. OFF. OF THE GOVERNOR, EXEC. ORD. NO. 21-102: SUSPENDING ALL REMAINING LOC. GOV'T MANDATES & RESTRICTIONS BASED ON THE COVID-19 STATE OF EMERGENCY (2021) (the "**Florida Executive Order**"). Notably, the Florida Executive Order is silent as to whether it confers a private right of action, but it references FLA. STAT. § 768.38, a law designed to protect certain entities from liability for COVID-19-related claims. *Id.*

After the issuance of these orders and rules, on May 31, 2021, Plaintiff scheduled several domestic and international flights and applied for a medical exemption to the FTMM. (Doc. 1, pp. 6–19). Two days later, Plaintiff arrived at the Orlando International Airport for the first of these flights, a trip to Fort Lauderdale, without a mask and without a decision on his FTMM medical exemption application, passing the notices posted by the GOAA regarding its enforcement of the FTMM. (*Id.*).

At the security checkpoint, Plaintiff informed GOAA and TSA officials that he could not wear a mask due to his anxiety and that he had received the COVID-19 vaccine. (*Id.*). Although the GOAA agents permitted Plaintiff to proceed into the terminal, TSA agents refused to let him pass because he did not have a documented

medical exemption to the FTMM. (*Id.*). Plaintiff left the facility immediately afterwards and attempted to board a bus, but a LYNX employee refused to let Plaintiff ride without a mask, also citing the FTMM. (*Id.* at pp. 19–20).

Plaintiff initiated this action on June 7, 2021, alleging the following causes of action:

- o   HHS and the CDC's enactment of the FTMM and the ITTR violates the APA (Counts 1–4, 19–22).

- o   The FTMM violates the separation of powers doctrine, the Fifth and Tenth Amendments, the right to travel, and the Air Carrier Access Act, 49 U.S.C. § 41705 ("**ACAA**"), asserted against "all Federal Defendants" (Counts 5–8, 14).

- o   The ITTR violates the separation of powers doctrine, asserted against HHS, the CDC, and the President (Count 23).

- o   The DHS and the TSA's Security Directives and Emergency Amendment violate the APA (Counts 9–12).

- o   The DOT's withholding of funds from state, regional, and local authorities that fail to enforce the FTMM violates the separation of powers doctrine (Count 13), the DOT "allow[s] airlines and other transportation providers to illegally refuse transport to any disabled customer unable to don a face covering" in violation of the ACAA (Count 15), and the DOT's regulations requiring enforcement of the FTMM on railroads, school buses, and other modes of transportation violates the APA (Count 16).

- o   The GOAA's and LYNX's enforcement of the FTMM violates the Florida Executive Order (Counts 17–18).

(*Id.* at pp. 182–206). Thereafter, the parties filed a Notice of Agreement to Dismiss Counts 2, 10, 13, 16, and 20 of the Complaint and, accordingly, those Counts are dismissed and not addressed further in this Order. (Doc. 126).

Meanwhile, the parties filed their respective Motions and response briefs,[1] culminating in Magistrate Judge Irick's Report on October 7, 2021. (Docs. 49, 82, 83, 100, 101, 125, 129, 130, 146, 147, 155). Plaintiff filed a 55-page Objection to the Report on October 21, 2021 (Doc. 162), and the Court granted the Federal Defendants' Motion to Strike the Objection as a violation of the page limitations established by the Local Rules, giving Plaintiff leave to refile, an extension of time to do so, and an additional 10 pages (Docs. 163, 168, 169, 170). Plaintiff timely refiled his Objection (Doc. 171), all Defendants responded in opposition (Docs. 172, 179, 180), and the Court gave Plaintiff leave to file a brief reply to a new argument raised in the Federal Defendants' response (Docs. 183, 184). The matters are now ripe for review.

## II.    STANDARD OF REVIEW

When a party objects to a magistrate judge's "recommended disposition" and "proposed findings of fact," the district court must "determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." FED. R. CIV. P. 72(b); 28 U.S.C. § 636(b)(1)(C). The district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the

---

[1] This case has an extensive procedural history. Over the course of this litigation, Plaintiff has: filed an Emergency Motion for a Temporary Restraining Order, which the Court denied (Docs. 8, 28); filed, and then abandoned, a request for preliminary injunctive relief (Docs. 33, 36, 48, 55, 56, 67); objected to the Court's referral of this case to Magistrate Judge Irick for his recommendations (Docs. 31, 46, 47); moved to disqualify Magistrate Judge Irick (Docs. 61, 98); contested several rulings related to the Court's Local Rules (Docs. 2, 3, 33, 36, 55, 56, 67, 141, 144, 152, 159, 168); and filed appeals, which were thereafter dismissed, with the Eleventh Circuit and with the Supreme Court (Docs. 58, 59, 60, 70, 74, 89, 91). Because this procedural history is not relevant to the resolution of the instant matters, the Court simply notes that these filings are available on its docket.

magistrate judge. § 636(b)(1)(C). The district court must consider the record and factual issues independent of the magistrate judge's report, as *de novo* review is essential to the constitutionality of § 636. *Jeffrey S. v. State Bd. of Educ.*, 896 F.2d 507, 512–13 (11th Cir. 1990).

## III.   DISCUSSION

The Report tackles the plethora of pending requests, responses, and replies in two parts. First, the Report recommends that the Court dismiss the entire Complaint without prejudice as a shotgun pleading. (Doc. 155). Second, the Report recommends that the Court dismiss certain claims and parties with prejudice. (*Id.*). The Court follows suit and divides its analysis below accordingly.

### A.   Dismissal Without Prejudice

The Report correctly concludes that the Complaint is a shotgun pleading, and, therefore, the Court must dismiss it, in its entirety, with leave to replead, despite the leniency afforded to *pro se* litigants. (Doc. 155, pp. 5–10, 18–19). The Report also draws attention to the ITTR claims and suggests repleader for lack of standing, but, upon inspection, the Court believes Plaintiff satisfies the constitutional requirements to bring these causes of action. (*Id.* at pp. 15–16). The Court explains its findings below in detail.

#### i.   *The Entire Complaint: Shotgun Pleading Doctrine*

Federal Rules of Civil Procedure 8 and 10 require pleadings to contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and to "state its claims or defenses in numbered paragraphs, each limited as far as

practicable to a single set of circumstances." FED. R. CIV. P. 8(a)(2), 10(b). Shotgun pleadings violate these established pleading principles. *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015). There are four categories of shotgun pleadings:

> The most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The next most common type . . . is a complaint that . . . is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief. Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against. The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.

*Id.* at 1321–23. "When presented with a shotgun complaint, the district court should order repleading *sua sponte*." *Ferrell v. Durbin*, 311 F. App'x 253, 259 n.8 (11th Cir. 2009) (per curiam)[2] (citing *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1280 (11th Cir. 2006)).

Here, the Complaint spans 206 pages, and the 210 accompanying exhibits cover 1,007 pages. (Docs. 1, 1-3, 1-4, 1-5, 1-6, 1-7, 1-8, 1-9, 1-10, 1-11, 1-12, 1-13). The

---

[2]   "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 n.7 (11th Cir. 2007).

factual allegations, alone, total 176 pages, beginning with a cumbersome narrative of the incident at issue that includes repetitive conversations between Plaintiff and a variety of government and airline officials, hyperlinks to the videos Plaintiff filmed during these interactions, Plaintiff's musings during the event, and other unnecessary embellishments such as the size of the crowd forming to watch the scene. (Doc. 1, pp. 6–20). The rest of the factual allegations similarly flounder in frill where succinct summaries would suffice, and some assertions are completely tangential to the questions presented here. For example:

- o  The Complaint uses almost 50 pages to describe the President's mask mandate for federal buildings and lands (which the President has since lifted and, therefore, is not even a subject of this action), the President's issuance of the FTMM and the ITTR and the other Federal Defendants' actions in response to these mandates, the Federal Defendants' failure to consider "better options" than the FTMM and the ITTR, the states' imposition (or refusal to impose) similar mandates, the decision by numerous businesses to lift mask requirements for patrons, and the ways in which the FTMM discriminates against disabled individuals. (*Id.* at pp. 21–54, 70–79, 93–99).

- o  The Complaint uses about 13 pages to provide histories of the World Health Organization's and the CDC's respective mask guidelines. (*Id.* at pp. 54–67).

- o  The Complaint uses close to three pages to detail Congress' reluctance to pass a mask mandate or an international traveler testing requirement into law, commenting on proposed legislation that failed to gain traction, statements by members of both Houses on the propriety of masks, and the "outright rebell[ion]" by members of the House of Representatives against "muzzling themselves." (*Id.* at pp. 67–70).

- o  The Complaint uses over 75 pages for data (*i.e.*, data showing that states without mask mandates reported fewer COVID-19-related deaths, general data on COVID-19 infection, vaccination, and death rates, data "documenting how masks

are totally ineffective in reducing COVID-19 infections, hospitalizations, and deaths," studies showing "scientists have known for a long time that masks [are not] effective in reducing transmission of respiratory viruses," data on "the serious health risks to human beings of forced muzzling," data showing that COVID-19 vaccinations are highly effective, data on the natural immunity obtained by those who recover from COVID-19, data on the unlikelihood of achieving herd immunity to COVID-19, and the correlation between masks and crime, racism, and damage to the environment). (*Id.* at pp. 77–82, 99–158, 164–79).

o   The Complaint uses about 15 pages to recite stories of "unruly behavior" and violence by airline passengers against airline staffs' enforcement of the FTMM, statements by airline industry representatives about this "chaos," a discussion about the effect of alcohol on airline passenger agitation regarding the FTMM, and the low risk posed by airplane cabins for the spread of COVID-19. (*Id.* at pp. 82–93, 179–82).

o   The Complaint uses five pages to regurgitate "expert" opinions that "forcing kids to wear masks" is tantamount to "child abuse," studies on the lower risk of COVID-19 in children, and anecdotes of the effects of masks on child health, such as an Oregon high school student's collapse from complete oxygen debt from wearing a mask during a track competition. (*Id.* at pp. 159–64).

Consequently, the Complaint falls within the second category of shotgun pleading. Far from a "short and plain statement," the Complaint resembles a novel, both in size and style. On repleader, Plaintiff must omit superfluous stories and cumulative information, condense allegations to those at the heart of this dispute, and curb the urge to use pleading as an opportunity to soliloquize at length. Brevity is a virtue.

The Complaint also falls within the first category of shotgun pleading. The first paragraph under Count 1 prefaces the delineated causes of action with the following: "For this and all other causes of action, I reallege and incorporate by

reference the allegations and facts contained in all of the preceding paragraphs as though set forth fully herein." (*Id.* at p. 182). Because this incorporation paragraph applies to "all other causes of action," and because it realleges "all of the preceding paragraphs," each successive cause of action adopts the allegations of the prior causes of action, to the point where the last cause of action is a sum of the Complaint. This gradual "building" of allegations is the defining characteristic of this category of shotgun pleading, and it is an easy fix. In repleading, the Complaint should include a paragraph at the beginning of each cause of action that specifies the relevant incorporated factual allegations by paragraph number, cognizant to exclude the allegations contained in other causes of action.[3]

In justifying the length of his Complaint, Plaintiff emphasizes the number of claims asserted, the number of Defendants involved, the number of actions challenged, and his status as a *pro se* party. (Doc. 171, pp. 8–9). But none of these

---

[3]  To illustrate, each cause of action may incorporate the factual allegations contained in paragraphs 1–10. Alternatively, Count 1 may incorporate the factual allegations contained in paragraphs 1–10, and Count 2 may incorporate the factual allegations contained in paragraphs 11–20. But, importantly, Count 2 cannot incorporate the allegations contained in Count 1.

Relatedly, the Report finds that the Complaint falls within the fourth category of shotgun pleading because Counts 5, 6, 7, 8, and 14 assert violations by "all Federal Defendants" without specifying which of them are responsible for what acts or omissions. (Doc. 155, pp. 7–8; *see* Doc. 1, pp. 186–89, 194–95). Likewise, Count 23 conclusively states that the HHS, the CDC, and the President violated the separation of powers doctrine by enacting the ITTR. (Doc. 1, pp. 201–02). This is technically true—however, this deficiency stems from the voluminousness of the Complaint and the improper incorporation of all the preceding factual allegations, described above. The Complaint can certainly assert claims against "all Federal Defendants" or multiple Defendants, and even a cursory review of the Complaint reveals sufficient factual detail regarding each individual Defendant to accuse them collectively. Thus, paring down the pages of the Complaint and properly incorporating relevant factual allegations into each Count should rectify this error.

factors exempt Plaintiff from the pleading requirements established by Rules 8 and 10. *See Arrington v. Green*, 757 F. App'x 796, 797–98 (11th Cir. 2018) (per curiam) (concluding that the district court acted within its discretion in dismissing a *pro se* plaintiff's complaint as a shotgun pleading).

Plaintiff argues that repleader is unnecessary because Defendants have notice of his claims, as evidenced by their "extensive" responsive filings. (*Id.* at pp. 6–7, 10–11). But, regardless of Defendants' prowess in deciphering this mammoth Complaint, Eleventh Circuit case law holds that shotgun pleadings, by definition, fail to provide the type of notice contemplated under Rules 8 and 10 and thus require dismissal. *Weiland*, 792 F.3d at 1321–23.

Plaintiff also asserts that repleader comes at the cost of judicial economy. (*Id.* at p. 7–8). Not so. Repleader is *essential* to the maintenance of judicial economy because shotgun pleadings "exact an intolerable toll on the trial court's docket, lead to unnecessary and unchanneled discovery, [] impose unwarranted expense on the litigants, the court and the court's parajudicial personnel and recourse," delay justice, and frustrate the appellate courts. *Cramer v. Florida*, 117 F.3d 1258, 1263 (11th Cir. 1997).

Finally, Plaintiff avers the Complaint is "comprehensible," highlighting that the Report reached "merits decision[s]" on some of his claims. (*Id.* at pp. 6–7, 11). But there is a difference between the *form* of the allegations under Rules 8(a)(2) and 10(b) and the *substance* of those allegations under Rule 12(b)(6). *Barmapov v. Amuial*, 986 F.3d 1321, 1331 n.4 (11th Cir. 2021) (Tjoflat, J., concurring). When

the allegations are "not so impenetrable as to prohibit a close look at the claims [the plaintiff] attempted to plead," there is no rule preventing the district court from evaluating the plausibility of those claims. *Id.* at 1331 (Tjoflat, J., concurring) (engaging in a Rule 12(b)(6) analysis despite the dismissal of the whole complaint as a "'rambling, dizzying array of nearly incomprehensible pleading'"). Likewise, the district court can—and must—reach discernable jurisdictional questions. *See Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999) ("A necessary corollary to the concept that a federal court is powerless to act without jurisdiction is the equally unremarkable principle that a court should inquire into whether it has subject matter jurisdiction at the earliest possible stage in the proceedings. Indeed, it is well settled that a federal court is obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking."). Tackling such glaring defects at the outset, when possible, further streamlines the pleading process. *See Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc.*, 556 F.3d 1232, 1240 (11th Cir. 2009) ("A district court has inherent authority to manage its own docket 'so as to achieve the orderly and expeditious disposition of cases.'" (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)). Thus, the Report properly recommends, and this Court adopts, the dismissal of some Counts and some parties (discussed below in more detail) that have such patently obvious Rule 12(b)(6) issues and jurisdictional problems.[4]

---

[4]   Plaintiff objects to the Court's dismissal of Counts 3, 7, 8, and 14 as part of the shotgun pleading. (Doc. 171, pp. 14, 18–19, 22; *see* Doc. 130). To the extent Counts 7, 8, and 14 allege violations against "all Federal Defendants," the Court, as explained *supra*, dismisses the

Finally, Plaintiff's requests for summary judgment on Counts 1, 4, 5, and 6 are moot. (Doc. 171, pp. 12–18; *see* Docs. 127-1, 130). As of this Order, there is no operative pleading at this time.[5]

ii.     *Claims Regarding the ITTR: Counts 19, 21, 22, and 23*

To possess standing under Article III of the Constitution, "the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotations and citations omitted).

As to the first element, concreteness demands a "*de facto* harm," but this "actually exist[ing]" injury "need be only an 'identifiable trifle,'" and intangible injuries suffice. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–41 (2016); *Salcedo v. Hanna*, 936 F.3d 1162, 1167–68 (11th Cir. 2019) (quoting *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 689 n.14 (1973)). "In determining whether an intangible harm constitutes an injury in fact, . . . it is instructive to

---

President as a party to these claims. Otherwise, the Court does not address Counts 3, 7, 8, and 14 at this time because they are among the claims that do not present easily perceivable Rule 12(b)(6) or jurisdictional issues. These Counts are subject to the Court's ruling under the shotgun pleading doctrine and may be repled in compliance with the directives of this Order.

[5]  The Report notes that Plaintiff moved for summary judgment before the Federal Defendants responded to the Complaint and that the Federal Defendants moved for summary judgment as they responded to the Complaint, and it observes that "[t]he result is much spilled ink on judgment prior to the pleadings being set." (Doc. 155, p. 20 n.12). The Court agrees and advises the parties against a repetition of this odd procedural posture on repleader. *See Bey v. Am. Honda Fin. Servs. Corp.*, No. 8:17-cv-759, 2017 WL 11017804, at*1 (M.D. Fla. Apr. 27, 2017) (stating that the district court may exercise its discretion in managing the filings of summary judgment motions and citing *Wilson v. Farley*, 203 F. App'x 239, 250 (11th Cir. 2006)).

consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 578 U.S. at 340–41. Additionally, particularization means this concrete harm "must affect the plaintiff in a personal and individual way." *Id.* at 339 (internal quotations omitted). Moreover, as to the second element, "[s]ome day intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the actual or imminent injury that our cases require." *Lujan*, 504 U.S. at 564 (internal quotations omitted). These elements are "indispensable part[s] of the plaintiff's case," and therefore the plaintiff must establish it "with the manner and degree of evidence required at the successive stages of the litigation":

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest of such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

*Id.* (internal quotations and citations omitted).

Here, the Complaint alleges that, on May 31, 2021, Plaintiff scheduled a roundtrip flight to Germany, departing on June 24, 2021 and arriving back in the United States on June 30, 2021. (Doc. 1, p. 6). The Complaint further alleges that, after the incident at the Orlando International Airport on June 2, 2021, Plaintiff

was "unable to use" his airline ticket to Germany "because of the . . . ITTR." (Doc. 1, p. 6; *see* Doc. 184, p. 2). Although the Complaint does not appear to allege that Plaintiff suffered economic damages as a result, the lost opportunity to go to Germany, alone, constitutes a concrete, particularized, actual injury in fact. *Cf. Kent v. Dulles*, 357 U.S. 116 (1958) (recognizing a liberty right to international travel subject to regulation within the bounds of the Fifth Amendment's Due Process Clause).[6]

Furthermore, while the Complaint does not allege the existence of any other pending international trips, the record shows that Plaintiff has rescheduled his flight to Germany several times over the course of this litigation, and, recently, Plaintiff notified the Court of his upcoming flight to Germany for December 20, 2021. (Docs. 130, 173, 174, 186). Thus, the record demonstrates that Plaintiff also possesses a concrete, particularized, imminent injury in fact.[7]

The Federal Defendants argue that Plaintiff must amend his pleading each time the CDC amends the ITTR because each amendment moots his claims. (Doc. 172, pp. 18–19). Using the second version of the ITTR, the Federal Defendants

---

[6] "Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values. Our nation . . . has thrived on the principle that, outside areas of plainly harmful conduct, every American is left to shape his own life as he thinks best, do what he pleases, go where he pleases." *Id.* at 126 (internal quotations omitted).

[7] Notably, since Plaintiff must file an Amended Complaint anyways, he can include allegations regarding his forthcoming international flights as well as his plan to reschedule this trip until the disposition of this action. Such allegations, amounting to more than "some day intentions," would obviate the need for future notices during the pleading stage of this litigation. Regardless, the Complaint sufficiently alleges an actual injury in fact, so these allegations are not required (but would further solidify Plaintiff's standing).

posit that it is "materially different" from the original ITTR because: (1) it explicitly invokes the good cause exception to the APA's rulemaking procedure, which "resolves" Plaintiff's APA claim; (2) it distinguishes between vaccinated and unvaccinated individuals, allowing vaccinated persons to provide an older COVID-19 test result; and (3) it "reflects nine additional months of data and experience dealing with COVID-19, including wider availability of vaccines and the rise of the Delta variant," and, therefore, "it would be necessary to produce a new administrative record." (*Id.*).

However, "a superseding statute or regulation moots a case only to the extent that it removes challenged features of the prior law. To the extent that those features remain in place, and changes in the law have not so fundamentally altered the statutory [or regulatory] framework as to render the original controversy a mere abstraction, the case is not moot." *Naturist Soc., Inc. v. Fillyaw*, 958 F.2d 1515, 1520 (11th Cir. 1992) (finding that amended regulations to a park permitting scheme did not moot a constitutional challenge to that scheme because "the challenged aspects . . . remain essentially as they were before the amendments"). This rule makes sense because if the only exception to the mootness doctrine is the enactment of "the *selfsame* statute," "a defendant could moot a case by repealing the challenged statute [or regulation] and replacing it with one that differs only in some insignificant respect." *Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville, Fla.*, 508 U.S. 656, 660–62 (1993) (holding that an amended

ordinance did not render the case moot because it disadvantaged the plaintiff "in the same fundamental way").

First, the Federal Defendants' offer no authority supporting their dubious position that an agency's invocation of the good cause exception automatically shields its actions from judicial review. *See Fla. v. Dep't of Health & Hum. Servs.*, No. 21-14098, 2021 WL 5768796, at *13–14 (11th Cir. Dec. 6, 2021) (evaluating the Secretary of Health and Human Services' invocation of the good cause exception for an interim rule that requires healthcare facilities providing Medicare and Medicaid to ensure their staff is fully vaccinated against COVID-19 in the context of a district court's denial of a preliminary injunction); 5 U.S.C. 706(2)(D) ("To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law . . .").

Second, even setting aside the fact that newest edition of the ITTR eliminated the second edition's distinction between vaccinated and unvaccinated individuals, the regulatory scheme still involves the imposition of a COVID-19 testing requirement on international travelers seeking entry into the United States, "and it still operates in the same allegedly unconstitutional fashion." *Naturist Soc.*, 958 F.2d at 1520. It is immaterial whether the new ITTR "differs in certain respects

from the old one." *Ne. Fla. Chapter of Associated Gen. Contractors*, 508 U.S. at 662.

And because these amendments to the ITTR do not alter the substance of the mandate, the fact that the CDC predicates each new amendment to the ITTR on its augmented COVID-19 research is also inapposite. Fundamentally, the CDC's motivation for enacting the ITTR and each amendment thereto remain constant: the goal of eradicating, or least quelling the spread of, COVID-19.

**B.    Dismissal With Prejudice**

After determining that repleader is necessary, the Report narrows the number of parties that can be named and claims that can be asserted in the amended filing. First, the Report recommends that the Court dismiss the DHS, the TSA, and the DOT, and the claims as to those parties, with prejudice for lack of jurisdiction, and the Court agrees. (Doc. 155, pp. 8–18). Second, the Report recommends dismissal of the President with prejudice because "the Complaint contains no plausible allegations supporting a request for relief against the President," emphasizing that several Counts broadly allege that the FTMM and the ITTR are illegal without mentioning any particular action by the President. (Doc. 155, pp. 14–15; *see* Doc. 1, pp. 186–89, 194–95, 201–02).[8] The Court finds that

---

[8]  The Report recognizes that the Complaint requests the Court to vacate the President's Executive Order and that some factual allegations reference that Executive Order, asserting that it "set" the challenged mask mandates and testing requirement "in motion." (Doc. 155, p. 15; *see* Doc. 1, pp. 16, 21, 28, 30, 46, 68, 85). However, the Report concludes that the request for relief has no connection to any of the claims and that the Complaint ultimately focuses on the agencies' implementation of the Executive Order rather than the Executive Order itself. (Doc. 155, p. 15). Nevertheless, the Court finds that the challenge to the Executive Order is apparent.

neither Rule 12(b)(6) nor the shotgun pleading doctrine justify dismissal *with* prejudice, but it nonetheless agrees with the recommendation on a different basis: the President's general immunity from lawsuits seeking injunctive relief against him in the performance of his official duties. Lastly, the Report recommends dismissal of the GOAA and LYNX with prejudice on several grounds, but the Court finds disposition of these claims premature. (Doc. 155, pp. 16–18). The Court addresses each conclusion below.

>    i.    *Claims Against the DHS, the TSA, and the DOT: Counts 9, 11, 12, and 15*

49 U.S.C. § 46110 provides:

> Except for an order related to a foreign air carrier subject to disapproval by the President under section 41307 or 41509(f) of this title,[9] a person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Administrator of the [TSA] with respect to security duties and powers designated to be carried out by the Administrator of the TSA . . . ) in whole or in part under this part [*i.e.*, Part A], part B, or subsection (l) or (s) of section 114[10] may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or

---

[9]  Title 49 governs transportation, Subtitle VII of Title 49 governs aviation programs, and Part A of Subtitle VII governs air commerce and safety. Under Part A, § 46110 governs judicial review, § 41307 governs the President's review of actions relating to foreign air transportation, and § 41509 governs the Secretary of Transportation's authority to suspend, reject, and cancel tariffs for foreign air transportation. Section 41307 provides: "The Secretary of Transportation shall submit to the President for review each decision of the Secretary to issue, deny, amend, modify, suspend, revoke, or transfer a certificate . . . authorizing an air carrier, or a permit . . . authorizing a foreign air carrier, to provide foreign air transportation." Section 41509(f) provides: "The Secretary shall submit to the President an order made under this section suspending, canceling, or rejecting a price for foreign air transportation, and an order rescinding the effectiveness of such an order, before publishing the order."

[10]  Subtitle I of Title 49 organizes the DOT, and § 114 of Subtitle I organizes the TSA. Among other things, § 114(l) authorizes the Administrator of the TSA "to issue, rescind, and revise such regulations as are necessary to carry out the functions of the [TSA]" and establishes emergency procedures. Section 114(s) requires the DHS and the TSA to implement a National Strategy for Transportation Security.

> in the court of appeals of the United States for the circuit in
> which the person resides or has its principal place of business.
> . . . the court has exclusive jurisdiction to affirm, amend,
> modify, or set aside any part of the order . . .

Importantly, "where a statute commits review of agency action to the Court of Appeals, any suit seeking relief that might affect the Circuit Court's future jurisdiction is subject to *exclusive* review of the Court of Appeals." *George Kabeller, Inc. v. Busey*, 999 F.2d 1417, 1420 (11th Cir. 1993) (quotations omitted).

Here, Counts 9, 11, and 12 challenge the Security Directives and the Emergency Amendment issued by the TSA, explicitly, under § 114 and Part A,[11] and Count 15 asserts that the DOT neglected its duties under the ACAA, which falls within Part A. (Doc. 1, pp. 189–193, 195; *see* Docs. 125-2, 125-3, 125-4, 125-5, 125-6). Thus, this Court quite simply lacks jurisdiction to adjudicate these Counts. And although Count 15 challenges the DOT's failure to act under Part A—rather than an action taken under Part A—this claim, at the very least, may affect the Eleventh Circuit's future jurisdiction and therefore is subject to its exclusive review.

In his Objection, Plaintiff asserts the TSA exceeded its statutory authority because the Security Directives and the Emergency Amendment address health threats rather than security threats and, thus, the Eleventh Circuit does not have exclusive jurisdiction. (Doc. 171, pp. 19–22; *see* Doc. 127-1, pp. 15–18; Doc. 130, pp. 26–28). Plaintiff conflates the *substantive* question of whether the TSA

---

[11] Specifically, in addition to § 114, the TSA's regulations either invoke § 44902 (governing air carriers' refusal to transport passengers and property), § 44903 (governing air transportation security), or both. (Docs. 125-3, 125-4, 125-6). Sections 44902 and 44903 fall within Part A.

exceeded its statutory authority in taking the challenged regulatory actions with the *procedural* question of whether the Eleventh Circuit has exclusive subject matter jurisdiction over these claims. This Court simply cannot reach the substantive question because, as a matter of procedure, only the Eleventh Circuit has the power to do so.

Plaintiff also states that this Court, at a minimum, has jurisdiction over the TSA's Emergency Amendment because it is "an order related to a foreign air carrier." (Doc. 171, pp. 21–22). But that exception explicitly covers certain economic decisions by the Secretary of Transportation under §§ 41307 and 41509(f). And because the Emergency Amendment expressly cites to § 114 and other sections of Part A, and because the Eleventh Circuit has exclusive jurisdiction over orders issued "in or whole *or in part*" under those statutes, the exception does not apply. § 46110(a) (emphasis added).

As to Count 15, Plaintiff objects that the Report "mislabels [the] DOT's [February] 5, 2021[] Notice of Enforcement Policy regarding the FTMM as an enforcement order issued under the ACAA" and reasons that this Court has jurisdiction because the DOT only issued a policy "telling the airlines not to enforce the ACAA" instead of an "order" under § 46110. (Doc. 171, p. 23; *see* Doc. 130, p. 38) (quotations and emphasis omitted). The difference between the Report's discussion of the DOT's *inaction* and Plaintiff's discussion of the DOT's *policy of inaction* seems to be one without distinction: regardless of the semantics used to

describe the claim, the challenge is to the DOT's failure to comply with the ACAA, and therefore the Eleventh Circuit has exclusive jurisdiction over Count 15.[12]

ii.      *Claims Against the President: Counts 5, 6, 7, 8, 14, and 23*

The Court must also dismiss the President as a party to this action with prejudice. Generally, this Court "lack[s] 'jurisdiction of a bill to enjoin the President in the performance of his official duties.'" *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017)[13] (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992)). "Injunctive relief, however, may run against executive officials," and, therefore, Plaintiff's injuries "can be redressed fully by injunctive relief against the remaining Defendants, and [] the extraordinary remedy of enjoining the President is not appropriate here." *Hawaii*, 859 F.3d at 788; *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (ruling that President Truman's executive order directing the Secretary of Commerce to take possession and operate most of the nation's steel mills fell outside the scope of his powers under Article II of the

---

[12]   The Report also recommends, in the alternative, that the Court dismiss Count 15's request for a writ of mandamus because the Complaint does not demonstrate that the DOT owes a clear, nondiscretionary duty to Plaintiff or that Plaintiff exhausted all other avenues of relief. (Doc. 155, pp. 12–14). Because the Court finds it lacks jurisdiction for the reasons stated *supra*, it does not need to address this recommendation.

[13]   In *Trump v. Hawaii*, 138 S. Ct. 377 (2017), the Supreme Court vacated the Ninth Circuit's decision because the challenged executive order had expired on its own terms, and it remanded the case to the Ninth Circuit with instructions to dismiss the case as moot for lack of a live case or controversy.

Constitution and affirming the district court's decision to enjoin the Secretary of Commerce from carrying out the executive order).[14]

### iii.      Claims Against the GOAA and LYNX: Counts 17 and 18

As a preliminary matter, there is no dispute that this Court has original federal question subject matter jurisdiction over the challenges to the FTMM (and the ITTR) because it arises under the Constitution and federal law. 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). However, Counts 17 and 18 assert the same state law claim, namely, that the GOAA and LYNX, respectively, violated the Florida Executive Order by complying with the FTMM. (Doc. 1, pp. 196–98). Moreover, the Complaint fails to expressly state a basis for original subject matter jurisdiction over these Counts, and the parties do not argue any such grounds. (Doc. 1, pp. 4–5; Doc. 171, pp. 26–27; Doc. 179, pp. 4–6; Doc. 180, pp. 13–14). Rather, the parties only contest whether the Court has supplemental jurisdiction over these claims.

Under 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." "The constitutional 'case or controversy' standard

---

[14]  In light of this case law, the Federal Defendants' argument that Plaintiff cannot challenge the Executive Order for lack of standing is perplexing. (Doc. 172, pp. 22–23).

confers supplemental jurisdiction over all state claims which arise out of a common nucleus of operative fact with a substantial federal claim." *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 743 (11th Cir. 2006) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966)). "In determining whether state law claims satisfy this standard, courts examine 'whether the claims arise from the same facts, or involve similar occurrences, witnesses or evidence.'" *Cruz v. Winter Garden Realty, LLC*, No. 6:12-cv-1098, 2012 WL 6212909, at *2 (M.D. Fla. Nov. 27, 2012) (quoting *Hudson v. Delta Airlines, Inc.*, 90 F.3d 451, 455 (11th Cir. 1996)). Importantly, district courts may decline supplemental jurisdiction in four circumstances: (1) where "the claim raises a novel or complex issue of State law"; (2) where "the claim substantially predominates over the claim or claims over which the district court has original jurisdiction"; (3) where "the district court has dismissed all claims over which it has original jurisdiction"; or (4) where there are "exceptional circumstances" or "other compelling reasons for declining jurisdiction." § 1367(c).

Here, this Court has the power to exercise supplemental jurisdiction over Counts 17 and 18 under § 1367(a). These claims arise out of the same operative nucleus of fact as the FTMM claims because they involve the same series of events: Plaintiff's inability to board his flight or ride the bus due to the enforcement of the FTMM by the TSA, the GOAA, and LYNX. (Doc. 1, pp. 6–20). Consequently, the resolution of these state law claims will involve the same or similar facts, witnesses, and evidence as the FTMM claims—indeed, Counts 17 and 18 *rely on* the legality

of the FTMM, which will raise significant questions of preemption.[15] Thus, the Court retains jurisdiction for now, with the caveat that it will remain "continuously mindful" of whether relinquishment of supplemental jurisdiction is appropriate "'at every stage of the litigation.'" *Ameritox, Ltd. v. Millennium Labs., Inc.*, 803 F.3d 518, 537 (11th Cir. 2015) (quoting *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997)).

The Report submits that the Court should exercise its discretion to decline supplemental jurisdiction over Counts 17 and 18 under § 1367(c)(1), positing that these claims raise the following "novel and complex" issues of Florida law: (1) whether the Florida Executive Order explicitly or implicitly confers a private right of action; and (2) if a private right of action exists, whether the Complaint states a claim for relief against the GOAA and LYNX under the Florida Executive Order, which only applies to enactments by Florida's political subdivisions. (Doc. 155, p.

---

[15] Without touching the substance of these preemption questions, the Court notes that, generally, a case is not removable to federal court on the basis of a federal defense, including the defense of preemption, even if the complaint anticipates this defense and even if the parties concede that this defense is the only question truly at issue. *Catepillar Inc. v. Williams*, 482 U.S. 386, 393 (1987). However, the complete preemption doctrine is an exception to this general rule that "converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule" where the preemptive force of a federal law is "extraordinary." *Id.* (internal citations omitted). It is not clear, at this time, whether the Executive Order and the FTMM completely preempt the Florida Executive Order, but, if so, Counts 17 and 18 would be considered, from their inception, federal claims arising under federal law. *Id.*

In other words, the Court's ruling on the legitimacy of the FTMM controls the outcome of Counts 17 and 18. If the FTMM is legal and preempts the Florida Executive Order, then the GOAA and LYNX may have a defense to the alleged violations of state law. If the FTMM is illegal and does not preempt the Florida Executive Order, then this Court may decline to exercise its supplemental jurisdiction under § 1367(c) because it would no longer have any claims invoking its original subject matter jurisdiction (it expects to resolve the ITTR claims at the same time as the FTMM claims).

17 n.8; *see also* Doc. 179, pp. 4–5). Alternatively, the Report asserts that the Complaint fails to state a claim for relief under Rule 12(b)(6) because: (1) the GOAA and LYNX are not municipalities or local governments; (2) neither entity enacted any restriction or enforced any restriction by a municipality or local government but rather enforced federal regulations; and (3) "even if Plaintiff's claims were otherwise cognizable," he failed to adhere to FLA. STAT. § 768.38, which requires civil liability claims against governmental entities that "arise[] from or [] relate[s] to COVID-19" to be pled with particularity and to be accompanied by "an affidavit signed by a physician actively licensed in this state which attests to the physician's belief . . . that the plaintiff's COVID-19-related damages, injury, or death occurred as a result of the defendant's acts or omissions." (Doc. 155, pp. 17–18). But for the reasons stated above, the Court does not need to evaluate the novelty, complexity, or viability of these claims.

Finally, in his Objection, Plaintiff improperly attempts to recharacterize Counts 17 and 18 as violations of the Florida Constitution, petitions for a writ of *quo warranto*, and infringements of FLA. STAT. § 252.38, none of which appear in the Complaint. (Doc. 171, pp. 26–28; *see* Doc. 1); *see Menzie v. Ann Taylor Retail Inc.*, 549 F. App'x 891, 895–96 (11th Cir. 2013) (stating that it is "well-settled" in the Eleventh Circuit that a plaintiff cannot amend his complaint via an opposition brief). The Court notes that repleader is not an opportunity to add new claims; rather, it is a chance for Plaintiff to remedy the pleading deficiencies identified herein. *See, e.g.*, *Huff v. Regions Bank*, No. 5:13-cv-63, 2013 WL 12091681, at *1–

2 (M.D. Fla. May 21, 2013). The addition of new claims in violation of this Order will result in the Court striking the Amended Complaint without further notice.

## IV. CONCLUSION

For the reasons set forth herein, it is **ORDERED AND ADJUDGED** as follows:

1.  Counts 2, 10, 13, 16, and 20 of the Complaint are **DISMISSED WITHOUT PREJUDICE** in accordance with the parties' Notice of Agreement (Doc. 126).

2.  The Report (Doc. 155) is **ADOPTED and CONFIRMED in part** and made a part of this Order.

3.  Plaintiff's Objection thereto (Doc. 171) is **OVERRULED**.

4.  The Complaint is **DISMISSED WITHOUT PREJUDICE**. On or before Monday, January 3, 2022, Plaintiff may file an Amended Complaint consistent with the directives of this Order. Failure to timely file an Amended Complaint will result in dismissal of this action without further notice.

5.  The Federal Defendants' Motion to Dismiss and Cross Motion for Summary Judgment (Doc. 125) is **GRANTED IN PART and DENIED IN PART**.

    a.  Defendants the DHS, the TSA, the DOT, and the President are **DISMISSED WITH PREJUDICE**. The Clerk of Court is **DIRECTED** to terminate these parties from the file.

b.   Counts 9, 11, 12, and 15 of the Complaint are **DISMISSED WITH PREJUDICE**.

c.   The Federal Defendants' requests for summary judgment and other forms of relief are otherwise **DENIED AS MOOT**.

6.   Plaintiff's Motion for Summary Judgment against the Federal Defendants (Doc. 83) is **DENIED AS MOOT**.

7.   Defendant GOAA's Motion to Dismiss (Doc. 49) is **DENIED**.

8.   Defendant LYNX's Motion to Dismiss (Doc. 82) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on December 18, 2021.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

30