## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**LUCAS WALL,**

    **Plaintiff,**

v.           **Case No: 6:21-cv-975-PGB-DCI**

**CENTERS FOR DISEASE
CONTROL & PREVENTION,
DEPARTMENT OF HEALTH &
HUMAN SERVICES, GREATER
ORLANDO AVIATION
AUTHORITY and CENTRAL
FLORIDA REGIONAL
TRANSPORTATION
AUTHORITY,**

    **Defendants.**

_____/

## ORDER

  This cause comes before the Court on the following filings:

1.  Plaintiff Lucas Wall's Motion for Summary Judgment on Counts I–XII of the Amended Complaint (Doc. 230);

2.  Defendants the Centers for Disease Control and Prevention (the "**CDC**") and the Department of Health and Human Services' ("**HHS**")[1] Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment (Doc. 263);

---

[1] The CDC is a component of the HHS. The Court refers to them collectively as "the Federal Defendants."

3.     Plaintiff's Combined Opposition to the Federal Defendants' Motion for Summary Judgment and Reply in Support of his Motion for Summary Judgment (Doc. 269); and

4.     The Federal Defendants' Reply in Support of their Motion for Summary Judgment (Doc. 270).

Upon consideration, Plaintiff's Motion for Summary Judgment is due to be denied, and the Federal Defendants' Motion for Summary Judgment is due to be granted.

## I.     BACKGROUND

In response to the COVID-19 pandemic, the CDC issued two "orders"[2] to quell the transmission of the deadly SARS-CoV-2 virus. The first is the federal transportation mask mandate ("**FTMM**"), which requires individuals traveling via public transportation to wear a mask. *See* Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs, 86 Fed. Reg. 8,025 (Feb. 3, 2021). The second is the international traveler testing requirement ("**ITTR**"), which requires international travelers to obtain a negative COVID-19 test prior to departure to the United States from a foreign country. *See* Requirement for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery From COVID-19 for all Airline or Other Aircraft Passengers Arriving Into the

---

[2]    The fact that the CDC classed the FTMM and the ITTR as "orders" rather than "rules" is immaterial. The FTMM and the ITTR obviously operate as generally applicable rules, and the Court will treat it as such. *See Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014) ("A rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy.").

United States From Any Foreign Country, 86 Fed. Reg. 69,256 (Dec. 7, 2021).[3] The CDC justified these regulations under Section 361(a) of the Public Health Service Act ("**PHSA**"), which provides:

> The Surgeon General, with the approval of the Secretary [of the HHS],[4] is authorized to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession. For purposes of carrying out and enforcing such regulations, the Surgeon General may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary.

42 U.S.C. § 264(a).

Plaintiff initiated this action on June 7, 2021, challenging the CDC's enactment of the FTMM and the ITTR. (Doc. 1). On December 26, 2021, Plaintiff filed the Amended Complaint, which asserts the following causes of action against the Federal Defendants: the FTMM and the ITTR violate the PHSA (Counts I and IX); the FTMM and the ITTR violate the Administrative Procedure Act ("**APA**")

---

[3]   This is the third version of the ITTR. The CDC originally issued the ITTR on January 28, 2021, and it amended the regulation on November 5, 2021. *See* 86 Fed. Reg. 7,387 (Jan. 28, 2021); 86 Fed. Reg. 61,252 (Nov. 5, 2021).

[4]   Although the statute vests authority in the Surgeon General, Congress abolished the Office of the Surgeon General and transferred its functions to the Secretary of Health, Education, and Welfare in 1966. *See* Reorganization Plan No. 3 of 1966, 31 Fed. Reg. 8,855 (June 25, 1966). Congress redesignated the Department of Health, Education, and Welfare as the HHS in 1979. *See* Department of Education Organization Act, Pub. L. No. 96-88, 93 Stat. 668 (1979) (codified as 20 U.S.C. § 3508). Congress reestablished the Office of the Surgeon General in 1987, but the Secretary of the HHS retained the transferred functions. *See* Statement of Organization, Functions and Delegations of Authority, 52 Fed. Reg. 11,754-03 (Apr. 10, 1987); *see also* 42 U.S.C. § 203. The Secretary of the HHS, in turn, delegated his enforcement and implementation authority to the CDC. *See* 42 C.F.R. §§ 70.2, 71.31(b), 71.32(b).

(Counts II, III, X, and XI); the FTMM and the ITTR violate the nondelegation doctrine, the Tenth Amendment, the Fifth Amendment, and the right to travel (Counts IV, V, VI, VII, XII); and the FTMM violates the Air Carrier Access Act ("**ACAA**") (Count VIII). (Doc. 188, ¶¶ 304–412).[5] Plaintiff and the Federal Defendants have filed competing requests for summary judgment, and the matter is now ripe for review.

## II.    STANDARD OF REVIEW

To prevail on a summary judgment motion, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case. An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find

---

[5] To the extent that Plaintiff's Motion for Summary Judgment raises claims that do not appear in his Amended Complaint, the Court properly disregards them. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314–15 (11th Cir. 2004) (per curiam); *Newman v. Ormond*, 396 F. App'x 636, 639 (11th Cir. 2010) (per curiam). Plaintiff's position—that his contentions regarding the Food, Drug, and Cosmetic Act ("**FDCA**"), the International Covenant on Civil and Political Rights ("**ICCPR**"), and the Convention on International Civil Aviation ("**CICA**") merely "buttress[]" some of the claims raised in his Amended Complaint—is weak; evaluation of those contentions would require the Court to undertake an independent review of the FDCA and the treaties at issue—it is not part and parcel of the arbitrary and capricious analysis. (Doc. 269, pp. 17–19; *see* Doc. 230, pp. 17–21, 34–35). And, to the extent the Amended Complaint refers to the FDCA, the ICCPR, and the CICA, it violates the Court's December 18, 2021, Order, which dismissed the original Complaint without prejudice (as to some claims and parties) and prohibited Plaintiff from adding new claims on repleader. (Doc. 187, pp. 28–29).

Furthermore, to the extent Plaintiff raises any new arguments in his response to the Federal Defendants' Motion for Summary Judgment and his reply in support of his Motion for Summary Judgment, the Court properly disregards these arguments. *Starbuck v. R.J. Reynolds Tobacco Co.*, 349 F. Supp. 3d 1223, 1229 (M.D. Fla. 2018) ("A party cannot raise new arguments in support of summary judgment for the first time in a reply brief.").

for the nonmoving party." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014).

The Court must "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." *Davila v. Gladden*, 777 F.3d 1198, 1203 (11th Cir. 2015) (quoting *Carter v. City of Melbourne*, 731 F.3d 1161, 1166 (11th Cir. 2013) (per curiam)). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1162 (11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)).

## III.   DISCUSSION

The nondelegation doctrine,[6] Tenth Amendment,[7] Fifth Amendment,[8] right to travel,[9] and ACAA[10] claims all clearly lack merit. Accordingly, the Court focuses

---

[6]   Where Congress has statutorily granted power to an agency and has provided the agency with an intelligible principle to guide executive discretion, the nondelegation doctrine is not offended. *See J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 404–05 (1928); *City of Arlington v. FCC*, 569 U.S. 290, 301 (2013); *cf. A.L.A. Schechter Poultry v. United States*, 295 U.S. 495, 541–42 (1935). By providing the goal "to prevent the introduction, transmission, or spread of communicable diseases," Congress properly gave the CDC an intelligible principle to guide its judgments. 42 U.S.C. § 264(a).

[7]   "The anticommandeering doctrine does not apply when" the government "evenhandedly regulates an activity in which both States and private actors engage." *Murphy v. NCAA*, 138 S. Ct. 1461, 1478 (2018). Because the FTMM applies to public and private mass transportation systems, Plaintiff's Tenth Amendment challenge falls flat. 86 Fed. Reg. at 8,026, 8,028. Furthermore, the ITTR only applies to private international air travel—not state actors—and therefore the Tenth Amendment is inapplicable. *Cf. New York v. United States*, 505 U.S. 144, 156–57 (1992) ("[T]he Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States. The Tenth Amendment thus directs us to determine, as in this case, whether an incident of state sovereignty is protected by a limitation on an Article I power.").

[8]   To qualify as a constitutionally protected, due process liberty interest, the interest must be "objectively, deeply rooted in history and tradition of the United States, and must be implicit in concept of ordered liberty, so that neither liberty nor justice would exist if it were sacrificed." *Kerry v. Din*, 576 U.S. 86, 93 (2015) (plurality) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)). Trying to fit the "right to travel free of a mask" into this definition is a useless endeavor.

[9]   The fundamental right to travel primarily protects three things: (1) the "right to enter and leave another state," (2) "the right to be treated fairly when temporarily present in another state," and (3) the right to be treated the same as other state citizens when moving permanently to another state. *Doe v. Moore*, 410 F.3d 1337, 1348 (11th Cir. 2005) (citing *Saenz v. Roe*, 526 U.S. 489, 500 (1999)). Plaintiff is not barred from traveling to another state by virtue of not wearing a mask. A mere inconvenience caused by a reasonable government regulation is not enough to amount to a denial of this fundamental right. *Id.*

[10]   Plaintiff's ACAA claim fails on several grounds. First, the ACAA only applies to "air carriers" and the CDC is not an "air carrier." 49 U.S.C. § 41705(a). Second, Plaintiff alleges that the FTMM discriminates against handicapped individuals; however, the FTMM explicitly exempts any "person with a disability who cannot wear a mask . . . because of a disability." 86 Fed. Reg. at 8,027. Further, the Eleventh Circuit has explained that the ACAA does not provide a private right of action except for a limited review when the Department of Transportation has abdicated its statutory duties, which is not relevant here. *See Love v. Delta Air Lines*, 310 F.3d 1347, 1354, 1360 (11th Cir. 2002).

on the PHSA and APA claims, which present the following questions: (A) whether Section 361(a) of the PHSA permitted the CDC's promulgation of the FTMM and the ITTR; and (B) if so, whether the CDC properly invoked the APA's good cause exception.[11]

### A.    Did the PHSA Permit the CDC's Promulgation of the FTMM and ITTR?

To answer the first question, the Court analyzes the CDC's regulations under the *Chevron* doctrine, which proceeds in three "Steps." The initial inquiry—Step Zero—is whether the application of the doctrine is proper. "*Chevron* deference is appropriate 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Astrue v. Capato ex rel. B.N.C.*, 566 U.S. 541, 558 (2012) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001)). "This approach 'is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the

---

[11]   On April 18, 2022, a court in this district vacated the FTMM. *Health Freedom Def. Fund, Inc. et al. v. Biden*, No. 8:21-cv-1693, 2022 WL 1134138 (M.D. Fla. Apr. 18, 2022). However, a "district court cannot be said to be bound by a decision of one of its brother or sister judges." *Fishman & Tobin, Inc. v. Tropical Shipping & Const. Co., Ltd.*, 240 F.3d 956, 965 (11th Cir. 2001).

Further, "[a] case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (internal quotations omitted). That is, a case does not necessarily become moot simply because intervening events may make it impossible for a federal court to issue the exact form of relief that Plaintiff requests. *Church of Scientology of Cal. v United States*, 506 U.S. 9, 13 (1992) (Stevens, J.). In the Second Amended Complaint, Plaintiff requests that the Court vacate the FTMM and enjoin the CDC from any *further rules* "requiring any person wear a face mask." (Doc. 188, p. 87). Therefore, "[t]he availability of this possible remedy is sufficient to prevent this case from being moot." *Id.*

agency to fill in the statutory gaps.'" *King v. Burwell*, 576 U.S. 473, 485 (2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).

If the doctrine applies, then the Court advances to Step One, the interpretation of the agency's organic statute to determine whether it is ambiguous. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). "If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation." *Id*. "Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute," or Step Two of the doctrine. *Id*.

After examining each Step of the *Chevron* doctrine, the Court concludes that the FTMM and the ITTR are valid exercises of the CDC's authority under Section 361(a) of the PHSA.

       *1.*    Chevron *Step Zero*

Congress clearly intended to delegate authority to the CDC to make rules regarding public health with the force of law. Section 361(a) of the PHSA specifically states that "[t]he Surgeon General, with the approval of the Secretary [of the HHS], is authorized to make and enforce such regulations." 42 U.S.C. §

264(a).[12] The statute also empowers the agency to "make and enforce such regulations as . . . are *necessary* to prevent the introduction, transmission, or spread of communicable diseases," further revealing Congress' intent to give the CDC power to make binding regulations.[13] *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980–81 (2005) (Thomas, J.) ("[T]he authority to execute and enforce, . . . and to prescribe such rules and regulations as may be *necessary* . . . give the [agency] the authority to promulgate binding legal rules." (internal citations and quotations omitted)).

However, even if Congress clearly delegated power to the CDC to create binding rules, the Court must also ensure that such delegation does not run afoul of the major questions doctrine. In essence, the major questions doctrine stands for the proposition that courts "expect Congress to speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (quoting *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

The FTMM and the ITTR are not questions of "deep 'economic and political significance'" that demand explicit congressional delegations of power. *King*, 576

---

[12]   *See supra* note 4.

[13]   While examining the procedure used in the promulgation of the rule is an excellent tool to determine whether it was meant to have the force of law, the procedure is only a proxy for the true question—whether Congress intended the agency to act with the force of law—which may only be ascertained from the language of the statute alone. *Cf. Mead*, 533 U.S. at 231 ("[T]he want of [formal] procedure here does not decide the case, for we have sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded."). The Court reviews the procedure the CDC used for the FTMM and the ITTR in depth later in this Order.

U.S. at 485–86. Unlike the CDC's moratorium on eviction, which obviously placed a large financial burden on landlords, the masking and testing requirements place negligible financial burdens on travelers. *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489. In fact, the CDC correctly pointed out that the FTMM helps *prevent* the imposition of economic burdens by stymying the spread of COVID-19 and, consequently, avoiding future lockdowns and resulting losses. 86 Fed. Reg. at 8,029. Further, the CDC's regulations do not intrude into a particular domain of state law. *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489. Instead, the regulations deal with a matter of public health relating to uniquely federal issues—interstate and foreign commerce. *See, e.g.*, *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 258 (1964); *United States v. Darby*, 312 U.S. 100, 118–19 (1941); *Gibbons v. Ogden*, 22 U.S. 1, 89–91 (1824).

Moreover, the FTMM and the ITTR clearly fall within the CDC's public health domain. *Cf. King*, 576 U.S. at 486 ("It is especially unlikely that Congress would have delegated this decision to the *IRS*, which has no expertise in crafting health insurance policy of this sort."). The CDC targeted the spread of the highly contagious, airborne SARS-CoV-2 virus via air travel by requiring all passengers to wear a mask and by requiring negative COVID-19 pre-departure tests for international fliers seeking entry into the United States. 86 Fed. Reg. at 8,026; 86 Fed. Reg. at 69,256–57. The fact that the CDC operated within its area of expertise bolsters the Court's conclusion here: the CDC's authority does not run afoul of the major questions doctrine.

2.    Chevron *Step One*

Section 361(a) of the PHSA is clearly *un*clear. On the one hand, the statutory text indicates a broad conferral of authority upon the CDC to issue any public health measure effective in "prevent[ing] the introduction, transmission, or spread of communicable diseases." 42 U.S.C. § 264(a). Indeed, the title of Section 361, "Regulations to control communicable diseases," "suggests a broad authority," and the first sentence of Section 361(a) gives the CDC the authority "to make and enforce such regulations as . . . are necessary," without limitation. § 264(a); WEN W. SHEN, CONG. RSCH. SERV., R46758, SCOPE OF CDC AUTHORITY UNDER SECTION 361 OF THE PUBLIC HEALTH SERVICE ACT (PHSA) 27 (2021).

It follows that the second sentence does not *limit* the scope of the first; such a construction would not only conflict with the expansive grant of power in the first sentence, but it would also read restrictive language into the second. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997) (favoring an interpretation that "accords more coherence" to the statutory provisions); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 155–57 (2012) ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory."). Rather, the second sentence *clarifies* the breadth of the first by enumerating various "tools" at the CDC's disposal "[f]or purposes of carrying out and enforcing such regulations" and concluding with the open-ended phrase "and other measures, as in [its] judgment may be necessary." § 264(a). That is, the

second sentence is not an exhaustive list; it is merely a list of examples or suggestions.

On the other hand, the statutory context implies a narrow grant of authority to the CDC to issue public health measures related or incident to quarantine. Section 361 appears under Part G of the PHSA, titled "Quarantine and Inspection," and "several other provisions within this part refer to regulations issued under Section 361 as 'quarantine laws,'" "point[ing] to a narrower interpretation of Section 361 under which quarantine and isolation authority is the principal, if not the maximum, authority granted under the provision." SHEN, *supra*, at 4–6, 27.[14]

Additionally, subsections (b) through (d) of Section 361 "primarily set forth the CDC's foreign and interstate quarantine and isolation authority, including the authority to apprehend, examine, and detain any individual reasonably believed to be infected with certain communicable diseases," subject to "additional safeguards." SHEN, *supra*, at 26 (internal quotations omitted); *see* § 264(b)–(d). It follows that, "insofar as Congress contemplated a use of subsection (a) authority beyond the enumerated measures to permit the quarantine of persons . . . it subjected the exercise of such authority to some limits," and, given that the cornerstone of the subsequent subsections is the CDC's "quarantine authority and

---

[14] The Congressional Research Service Report cites to Sections 311 and 322 of the PHSA, which do not appear in Part G of Title 42. 42 U.S.C. §§ 243(a), 249. The author notes: "The headings and subheadings referenced in this report are as they appear in the PHSA, and may differ slightly from the versions codified in Title 42 of the U.S. Code. Title 42 of the U.S. Code is a non-positive law title that has been editorially arranged by the Code's editors and includes certain changes in the compiled laws' text to facilitate their inclusion in the Code." SHEN, *supra*, at 4 n.43.

its parameters, the enumerated list under subsection (a) could potentially be understood as a list of measures that facilitate or supplement quarantine efforts." SHEN, *supra*, at 26; *see Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 586 (2008) ("Under that rule [of *ejusdem generis*], when a statute sets out a series of specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows.").

Adding even more obscurity to the statutory text, Section 361 does not define those listed terms in subsection (a), including, as is pertinent here, the words "sanitation" and "inspection." Thus, the Court looks to the "ordinary, contemporary, and common meaning[s]" of those words at the time Congress enacted the statute in 1944. *Patel v. United States Att'y Gen.*, 971 F.3d 1258, 1273 (11th Cir. 2020) (quoting *Artis v. Dist. of Columbia*, 138 S. Ct. 594, 603 n.8 (2018)); *see* SCALIA & GARNER, *supra*, at 80–89 ("Words must be given the meaning they had when the text was adopted."). Because both terms have multiple permissible meanings, they are inherently ambiguous.

Dictionaries from 1942 and 1946, respectively, define "sanitation" as: "[a] rendering sanitary; science of sanitary conditions; use of sanitary measures"; and "[t]he devising and applying of measures for preserving and promoting public health; the removal or neutralization of elements injurious to health; the practical application of sanitary science." *Sanitation*, WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (1942); *Sanitation*, FUNK & WAGNALLS NEW

STANDARD DICTIONARY OF THE ENGLISH LANGUAGE (1946).[15] These dictionaries further define "sanitary" as: "[o]f or pert. to health; for or relating to the preservation or restoration of health; occupied with measures or equipment for improving conditions that influence health; free from, or effective in preventing or checking, agencies injurious to health, esp. filth and infection; hygienic," or "[a] water closet, urinal, or the like, fitted with sanitary plumbing"; and "[r]elating to the preservation of health, especially to hygiene and public health; concerned with sanitation," or "[a] public water-closet or urinal, especially one equipped with sanitary fixtures." *Sanitary*, WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (1942); *Sanitary*, FUNK & WAGNALLS NEW STANDARD DICTIONARY OF THE ENGLISH LANGUAGE (1946). Notably, modern dictionary definitions are substantially the same: "sanitation" means "the promotion of hygiene and prevention of disease by maintenance of sanitary conditions (as by removal of sewage or trash)" or "the act or process of making sanitary," and "sanitary" means "of or relating to health," "of, relating to, or used in the disposal especially of domestic waterborne waste," or "characterized by or readily kept in cleanliness." *Sanitation*, *Sanitary*, MERRIAM-WEBSTER (2022), https://www.merriam-webster.com/dictionary/sanitation, https://www.merriam-webster.com/dictionary/sanitary.

A 1942 dictionary definition of "inspection" is: the "[a]ct or process of inspecting; a strict or prying examination"; a legal term for "[t]he critical

---

[15]   (*See* Docs. 263-3, 263-4).

examination of something as a part of a legal proceeding[,] esp. . . . [t]he physical examination of the injured part of a person suing for damages for personal injury [or] [t]he examination of articles of commerce (under laws called inspection laws) to determine their fitness for transportation or sale"; "[i]nsight; perception"; or a military and naval term for an "[o]fficial examination to determine and report on the condition of personnel and material." *Inspection*, WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (1942). The same dictionary defines "inspect" as: "[t]o look upon; to view closely and critically, esp. so as to ascertain quality or state, to detect errors, etc.; to scrutinize"; "[t]o view and examine officially, as troops, arms, etc."; and "[t]o grade, as lumber." *Inspect*, WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (1942). Again, these words' meanings are substantially the same today: "inspection" is "the act of inspecting," the "recognition of a familiar pattern leading to immediate solution of a mathematic problem," or "a checking or testing of an individual against established standards"; and "inspect" is "to view closely in critical appraisal: look over," "to examine officially," or "to make an inspection." *Inspection*, *Inspect*, MERRIAM-WEBSTER (2022), https://www.merriam-webster.com/dictionary/inspection, https://www.merriam-webster.com/dictionary/inspect.

The legislative history is also ambiguous. A drafter of the PHSA "described Section 361[] . . . as concerning 'quarantine and inspection and supersedes several complex, outmoded, and inadequate statutes on the subject.'" SHEN, *supra*, at 9

(quoting Alanson W. Wilcox, *The Public Health Service Act, 1944*, 7 SOC. SEC. BULL. 15, 17 (1944)). At a 1944 congressional hearing, the drafters explained that the first sentence of Section 361(a) "express[es] 'the gist of a long and complex provision of the act of February 14, 1893,'" noted that "the states had already 'wholly withdrawn' from foreign quarantine," and stated that "as to interstate quarantine, the federal law would be 'confined to matters pertaining to the interstate movement of people or things over which the States have both constitutional and practical difficulties in achieving effective control.'" *Id.* at 9–10 (quoting Hearing Before a Subcomm. on Interstate & Foreign Commerce on H.R. 3379: A Bill to Codify the Laws Relating to the Public Health Service, and for Other Purposes, 78th Cong. 138–39 (1944) (statements of Alanson W. Wilcox, Assistant General Counsel, Federal Security Agency, and Thomas Parran Jr., Surgeon General)). Regarding the second sentence, the drafters testified that it "expressly authorize[s] the [agency] to make inspections and take other steps necessary in the enforcement of quarantine." *Id.* at 10. And, as to subsections (b) through (d) of Section 361, the drafters "designed [them] to clarify, perhaps enlarge, the authority with respect to the apprehension and detention of individuals." *Id.*

However, at the same hearing, the drafters "emphasized that 'these provisions are written in broader terms in order to make it possible to cope with emergency situations which we cannot now foresee.'" *Id.* And, "[i]n a separate committee hearing, then-Surgeon General Thomas Parran Jr. similarly echoed the view that the authority under Section 361 'may be very important because of the

possibility that strange diseases may be introduced in the country and become a threat,' and 'flexibility in dealing with such contingencies would be very helpful.'" *Id.* (quoting Hearing before a Subcomm. on Educ. & Labor, 78th Cong. 6 (1944) (statement of Thomas Parran Jr., Surgeon General)).

Furthermore, Congress only "substantively" amended Section 361 once, as part of the Public Health Security and Bioterrorism Preparedness and Response Act of 2002, "to bolster the nation's ability to respond effectively to bioterrorist threats and other public health emergencies following the anthrax attacks in the fall of 2001." *Id.* at 11. The amendments expanded the agency's authority—specifically, the agency's quarantine authority (*i.e.*, they eliminated a provision that predicated the issuance of quarantine rules on recommendations by the National Advisory Health Council, and they permitted the quarantine of individuals "in the precommunicable stage, if the disease would be likely to cause a public health emergency if transmitted to other individuals"). *Id.* Thus, the legislative history supports either the broad reading of the statutory text or the narrow reading, and the Court concludes that Congress has not directly addressed whether Section 361(a) of the PHSA permits the CDC's promulgation of the FTMM and the ITTR.

3.   Chevron *Step Two*

Cognizant that it is not the judiciary's role to impose its own construction on the statute, the Court finds that the CDC's interpretation of the PHSA is permissible and that it did not act arbitrarily and capriciously in issuing the FTMM

and the ITTR. Given the ambiguity of the statutory text, the statutory context, and the legislative history, the CDC's broad reading of Section 361(a) is certainly reasonable.

Moreover, even setting aside Section 361(a)'s wide-ranging catch-all provision for other "necessary" measures, it is reasonable to categorize the FTMM as a "sanitation" measure. As a matter of common sense, masks control the number of particles inhaled from the public airspace by the wearer and the number of particles exhaled by the wearer into the public airspace. In other words, masks have two functions: (1) they protect the wearer from breathing in harmful air particles (*e.g.*, construction workers frequently use masks to protect themselves from inhaling asbestos, sawdust, or other harmful substances); and (2) they prevent the wearer from breathing out harmful air particles (*e.g.*, surgeons, nurses, and other operating room staff use masks for the patient's benefit). In this way, masks (to varying degrees) promote the public health by checking the transmission of airborne viruses, such as SARS-CoV-2, and thus fit within the definitions of "sanitation."

Likewise, it is reasonable to categorize the ITTR as an "inspection" measure. Antigen tests "detect structural features of the outside of the [SARS-CoV-2] virus called antigens—small proteins that make up the virus—that may be present in a patient's sample," often obtained by a nasopharyngeal swab, an anterior nasal swab, or a saliva collection cup. Johns Hopkins Ctr. for Health Sec., *Antigen Tests*, COVID-19 Testing Toolkit (2022), https://www.centerforhealthsecurity.org/

covid-19TestingToolkit/testing-basics/types-of-COVID-19-tests/diagnostic-tests/ antigen-tests.html. Molecular tests, or nucleic acid amplification tests, identify the ribonucleic acids that comprise the genetic material of the SARS-CoV-2 virus from specimens collected from the patient's upper or lower respiratory tract and then amplify, or produce many copies of, the virus' genetic material, if any is present in the patient's specimen. Ctrs. for Disease Control & Prevention, *Nucleic Acid Amplification Tests (NAATs)*, COVID-19 (June 14, 2021), https://www.cdc.gov/ coronavirus/2019-ncov/lab/naats.html. Logically, these tests are critical examinations of patients' samples to uncover the presence of the SARS-CoV-2 virus and therefore qualify as "inspections" of those patients.

The broad reading of Section 361(a) makes sense from a practical, policy perspective, too. The narrow reading of the PHSA constrains the CDC's ability to expediently address health crises, such as the COVID-19 pandemic, to the detriment of the public health. And, most importantly, Congress delegated the administration of the PHSA, "in light of everyday realities," to the CDC, the nation's health protection experts, not to federal judges, who are neither "experts in the field" nor "part of either political branch of the Government":

> When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. In such a case, federal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial

> ones: "Our Constitution vests such responsibilities in the
> political branches."

*Chevron*, 467 U.S. at 865–66 (quoting *TVA v. Hill*, 437 U.S. 153, 195 (1978)).

However, "[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Allentown Mack Sales & Serv., Inc v. NLRB*, 522 U.S. 359, 374 (1998). "It follows that agency action is lawful only if it rests 'on a consideration of the relevant factors.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (Scalia, J.) (quoting *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). Ultimately, a court may not substitute its judgment, but instead "simply ensures that the agency has acted within a zone of reasonableness." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

Relying on several scientific journals, the CDC explained the specific benefits of wearing a mask as (1) reducing the "emission of virus-laden droplets . . . by blocking exhaled virus" and (2) reducing the "inhalation of these droplets . . . through filtration." 86 Fed. Reg. at 8,028. Then, citing to seven different studies that "confirmed the benefit of universal masking in community level analyses," the CDC concluded that masking would be beneficial when people are exposed to others for prolonged periods in places that are not amenable to social distancing.[16] *Id*. The CDC observed that these risk factors are especially prevalent during mass

---

[16]   These studies were conducted on wide range of subjects, from insulated hospital systems and a German city to nationwide studies from Canada and the United States. *Id.*

transportation, as people spend extended periods of time in security lines, crowded terminals, and tight seating arrangements on airplanes, buses, and trains. *Id.* at 8,029. Further, the CDC relied on an economic analysis of American data to support its prediction that the masking requirement could "prevent the need for lockdowns and reduce associated losses of up to $1 trillion or about 5% of the gross domestic product." *Id.* at 8,028.

When giving the CDC the power to create rules under Section 361(a) of the PHSA, Congress stated that the CDC may "make and enforce such regulations in [its] judgment [that] are *necessary*." § 264(a) (emphasis added). The use of the word "necessary" gives the CDC leeway to decide what the relevant factors are in a particular situation, but "an agency may not 'entirely fail to consider an important aspect of the problem' when deciding whether regulation is appropriate." *Michigan*, 576 U.S. at 752 (2015) (quoting *State Farm Mut. Automobile Ins. Co.*, 463 U.S. at 43). Here, as discussed above, the CDC looked at extensive scientific research supporting the use of masks to prevent the spread of COVID-19, especially when other preventative tools were impossible to implement effectively, such as social distancing. 86 Fed. Reg. at 8,028–29. Further, the CDC not only relied on scientific data for the benefits of the mask regulation, but it also relied on the cost to the entire country's economy if the regulation was not implemented. *Cf. Michigan*, 576 U.S. at 752 ("No regulation is 'appropriate' if it does significantly more harm than good."). Therefore, the CDC properly considered the relevant factors and appropriately based the FTMM on the evidence before the agency.

The Court recognizes that the CDC was making a prediction about the effects of the FTMM—but this is exactly when courts should defer to agency expertise. At the time of the FTMM's enactment, the novel SARS-CoV-2 virus continued to mutate into new variants (and, in fact, new variants continue to emerge to this day), some even more lethal than the original strain, and treatment of COVID-19 was at the forefront of scientific discovery.[17] 86 Fed. Reg at 8,028. Thus, the COVID-19 pandemic was exactly the type of situation imagined by Congress where courts should refrain from imposing its own judgment and give appropriate deference to the agency's scientific expertise in determining the best way to stem the spread of the unprecedented disease. *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983) (O'Connor, J.) ("[A] reviewing court must remember that the [agency] is making predictions, within its area of special expertise, at the frontiers of science. When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential.").

Many of the same observations above apply equally to the ITTR, which the CDC supported in three parts. First, the CDC discussed how SARS-CoV-2 is spread among the population. 86 Fed. Reg. at 69,258. The CDC again cited to a variety of scientific articles, including the one titled "Transmission from People Without

---

[17] While the Court notes that there are still new variants emerging today, the Court does not rely on any post-hoc rationalizations in arriving at its decision. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (holding a court reviewing an agency's decision "must judge the propriety of [the agency] action solely by the grounds invoked by the agency").

Covid-19 Symptoms." *Id.* at 69,258 n. 15. Second, the CDC addressed the new concern facing the United States during the pandemic: the emergence of the Omicron variant. *Id.* at 69,259. At the time, it was not clear how the Omicron variant would affect vaccinated or previously infected people because the variant "contains more changes in the spike protein than have been observed in other variants." *Id.* Properly relying on the limited scientific studies available, the CDC predicted that vaccines may give the individual "reduced protection from infection." *Id.* Therefore, due to this "potential danger to public health posed by this newly identified variant," the CDC mandated a pre-departure testing requirement for all international travelers, regardless of vaccination status. *Id.* at 69,259–60.

When promulgating the ITTR, the CDC properly considered the relevant factors, assessed the evidence before it, and relied on its scientific expertise to determine the best way to prevent the Omicron variant from undermining the nation's progress in combating the pandemic. Given that SARS-CoV-2 may be spread by unvaccinated individuals, including those who may be asymptomatic, and the limited scientific evidence on how vaccines may be less effective against the new variant allowing vaccinated individuals to contribute to the spread, the CDC predicted that the new Omicron variant could easily be spread by both the vaccinated and unvaccinated population. *Id.* As stated previously, these predictions were at the "frontiers of science," and, as such, they warrant the "most deferential" judicial review. *Baltimore Gas & Elec. Co.*, 462 U.S. at 103.

In conclusion, when issuing the FTMM and the ITTR, the CDC made permissive policy decisions, provided adequate evidence to support the decisions, and provided sound reasoning to connect the evidence with their policy decisions, and there is no reason to suspect the CDC passed the FTMM or the ITTR for pretextual reasons. *Cf. Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575–76 (2019) ("We are presented, in other words, with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking [sic] process."). Therefore, the CDC did not abuse its discretion in enacting the FTMM and the ITTR.

Accordingly, the Court finds that the CDC properly promulgated the FTMM and the ITTR under Section 361(a) of the PHSA and grants summary judgment in favor of the Federal Defendants on these claims.

### B. Did the CDC Properly Invoke the APA's Good Cause Exception?

The Court now shifts to the second question presented here: whether, in promulgating the FTMM and the ITTR, the CDC appropriately bypassed the standard notice-and-comment rulemaking procedure under the APA's good cause exception.[18] The answer: yes.

Sections 553(b) and (d) of the APA requires an agency to publish a general notice of proposed rulemaking in the Federal Register at least 30 days prior to the proposed rule's effective date, and, after publication, Section 553(c) requires the

---

[18]   *See supra* note 2.

agency to "give interested persons an opportunity to participate in the [rulemaking] through the submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(b)–(d). However, there is an exception to the notice-and-comment rulemaking procedure "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." § 553(b)(B). While "the good cause exception should be read narrowly," "[t]he exception is, however, an important safety valve to be used where delay would do real harm." *U.S. v. Dean*, 604 F.3d 1275, 1279 (11th Cir. 2010) (internal quotations omitted). "Emergencies, though not the only situations constituting good cause, are the most common"; in other words, an emergency is not a prerequisite to the invocation of the good cause exception. *Id.* at 1281.

Here, the FTMM, issued on February 3, 2021, explicitly invokes the good cause exception: "Considering the public health emergency caused by COVID-19, it would be impracticable and contrary to the public's health, and by extension the public's interest, to delay the issuance and effective date of this Order." 86 Fed. Reg. at 8,030. It also describes the nature of the emergency:

> There is currently a pandemic of respiratory disease . . . caused by a novel coronavirus (SARS-CoV-2). As of January 27, 2021, there have been 99,638,507 confirmed cases of COVID-19 globally, resulting in more than 2,141,000 deaths. As of January 27, 2021, there have been over 25,000,000 cases identified in the United States and over 415,000 deaths due to the disease. New SARS-CoV-2 variants have emerged in

> recent weeks, including at least one with evidence of increased
> transmissibility.

*Id.* at 8,028. Similarly, the latest iteration of the ITTR, issued on December 7, 2021,

states:

> To reduce introduction and spread of current and future
> SARS-CoV-2 variants into the United States at a time when
> global air travel is increasing, CDC must take quick and
> targeted action to help curtail the introduction and spread of
> the Omicron variant into the United States. As of December 2,
> 2021, [the World Health Organization] has indicated that 23
> countries have reported cases of the Omicron variant, many
> of which were associated with international travelers. . . . there
> is good cause to dispense with prior public notice and
> comment and a delay in effective date. Considering the rapid
> and unpredictable developments in the public health
> emergency caused by COVID-19, including the recently
> identified emergent Omicron variant, it would be
> impracticable and contrary to the public's health, and by
> extension the public's interest, to delay the issuance and
> effective date of this Amended Order. Further delay could
> increase risk of transmission and importation of additional
> undetected cases of SARS-CoV-2 Omicron variant or other
> emerging variants through passengers.

86 Fed. Reg. at 69,260 (internal citations omitted). The CDC's "brief statement[s]

of reasons" speak for themselves. The highly contagious character and the

devastating effects of the SARS-CoV-2 virus demanded expeditious action by the

CDC. Frankly, if battling this elusive enemy does not rise to the level of urgency

that qualifies for deviation from normal rulemaking procedures under the good

cause exception, the Court is not sure what does. *Cf. Florida v. Dep't of Health &*

*Hum. Servs.*, 19 F.4th 1271, 1290 (11th Cir. 2021) ("But recognizing that good cause

existed in this case does not mean that the COVID-19 pandemic *always* will justify

an agency's bypassing the notice-and-comment process.").

One argument against the application of the good cause exception to the FTMM and the ITTR is that COVID-19 has been plaguing the world since December 2019. In other words, COVID-19 is old news. However, the Court does not see a correlation between the *length* of the pandemic and the *severity* of it. In fact, the justification of the ITTR was the rise of and high risk associated with the Omicron variant, which could infect both the unvaccinated and vaccinated populations. 86 Fed. Reg at 69,259–60. The fact that the world has lived with SARS-CoV-2 for over two years, and perhaps has grown accustomed to the virus's unpredictability, does not necessarily diminish the emergency or the CDC's responsibility to the public health.

Another, related argument against the application of the good cause exception here is that the pandemic was in full force by mid-2020, but the CDC did not issue the FTMM and the ITTR until 2021; that is, the CDC unreasonably delayed in promulgating these orders and thereby contributed to the exigent circumstances. This argument ignores the emergence of SARS-CoV-2 variants with increased transmissibility, referenced in both orders. *See* 86 Fed. Reg. at 8,028; 68 Fed. Reg. at 69,259–60.

In any event, the good cause exception is not limited to emergencies; it applies when "delay would do real harm." *Dean*, 604 F.3d at 1279. All of the CDC's good cause justifications related to the public interest: (1) the SARS-CoV-2 virus was extremely transmissible and has caused millions of deaths worldwide; (2) new variants of the SARS-CoV-2 virus continued to emerge, some of which possessed

increased transmissibility, and the ability of vaccines to protect individuals against these variants was unknown; (3) "masks prevent dispersal of an infected person's respiratory droplets that carry the virus" and "also provide some protection to the wearer by helping reduce inhalation of respiratory droplets," and they "prevent the introduction, transmission, and spread of COVID-19 into the United States and among the states and territories," particularly as "[t]raveling on multi-person conveyances increases a person's risk of getting and spreading COVID-19 by bringing persons in close contact with others, often for prolonged periods, and exposing them to frequently touched surfaces"; and (4) although pre-departure testing for SARS-CoV-2 "does not eliminate all risk," it "monitor[s] risk and control[s] introduction and spread of SARS-CoV-2" and forms part of the United States' "multi-layered proactive approach to combating COVID-19, concurrently preventing and slowing the continued introduction and spread of the virus within U.S. communities." 86 Fed. Reg. at 8,028–30; 86 Fed. Reg. at 69,258–60.

Delay in the issuance of the FTMM or the ITTR would do real harm to the public health—it only takes one traveler to start an outbreak and, because the SARS-CoV-2 virus is so persistent and mutable, the CDC must adopt a consistent, concerted approach. Accordingly, the good cause exception excuses the CDC's failure to adhere to the notice-and-comment rulemaking procedure.

## IV.   CONCLUSION

For the aforementioned reasons, it is **ORDERED** and **ADJUDGED** that Plaintiff's Motion for Summary Judgment is **DENIED** and the Federal

Defendants' Motion for Summary Judgment is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment in favor of the Federal Defendants.

Furthermore, the Amended Complaint only asserts state law claims against Defendants Greater Orlando Aviation Authority ("**GOAA**") and Central Florida Regional Transportation Authority ("**LYNX**"), invoking the Court's supplemental jurisdiction. (Doc. 188, p. 5, ¶¶ 413–22). Because this Order resolves the claims over which the Court has original jurisdiction, the Court declines to exercise its supplemental jurisdiction over these state law claims. 28 U.S.C. § 1367(c)(3). Accordingly, the claims against the GOAA and LYNX are **DISMISSED WITHOUT PREJUDICE**, and the Clerk of Court is **DIRECTED** to close the file.

**DONE AND ORDERED** in Orlando, Florida on April 29, 2022.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties